## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JENNIFER THONG, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 1:06-1807 (RCL) |
| | ) | |
| ANDRE CHREKY, an individual, | ) | |
| ANDRE CHREKY SALON, | ) | |
| and SPAC, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

Pursuant to Fed. R. Civ. P. 37(a), Plaintiff Jennifer Thong ("Plaintiff" or "Ms. Thong") hereby respectfully moves this Court for an order compelling Defendants Andre Chreky ("Mr. Chreky"), Andre Chreky Salon (the "Salon"), and SPAC L.L.C. ("SPAC") (collectively, the "Defendants"), to produce documents they are improperly refusing to provide to Ms. Thong.  Ms. Thong specifically requests that Defendants be ordered to produce the following documents:

1.     All documents evidencing the number of hours worked by employees of the Salon, including, but not limited to, time cards, work schedules, and any reports or notes kept by supervisors or managers regarding the number of hours worked by employees of the Salon.

2.     The verified transcript of the Deposition of Andre Chreky in the matter Commonwealth ex rel. Doudaklian v. Andre Chreky, in the Fairfax County Circuit Court,  State of Virginia.

3.     Any and all credit card statements for the period 1998 to the present for all credit cards identified by Defendants in response to Plaintiff's Second Set of Interrogatories, Interrogatory No. 2.

4.     Any and all documents relating or referring to Defendants' telephone bills and statements for the period 1998 to the present.

Ms. Thong respectfully requests that this Court order Defendants to produce these documents on an expedited basis, given the deadline for the close of fact discovery is January 28, 2008.

## I.     INTRODUCTION

In order to properly support her allegations against Defendants and to prosecute her case, Ms. Thong issued standard document requests to Defendants related to Ms. Thong's allegations of unpaid overtime wages and off-the-clock work.  In addition, Ms. Thong issued document requests to Defendants to obtain information relevant to Mr. Chreky's credibility, and Mr. Chreky's recent attempts to obstruct the prosecution of Ms. Thong's case.  Ms. Thong's document requests are unquestionably relevant to the subject matter of this litigation, and within the broad permissible scope of discovery.   Defendants' vague, conclusory objections are inadequate.  This Court should grant Plaintiff's motion for several reasons.

Defendants' primary objection is that the requests seek information outside the scope of permissible discovery in this action.  Contrary to Defendants' conclusory assertions, the requests seek information directly relevant to Ms. Thong's allegations, and are likely to lead to the discovery of admissible evidence.  Because Ms. Thong contends that she was routinely forced to work more than 40 hours a week without receiving overtime compensation, time records

indicating the actual hours worked by employees of the Salon are relevant.   Mr. Chreky's prior

deposition testimony and credit card statements are relevant because they will provide

information relevant to Mr. Chreky's credibility in this action, which is, of course, very relevant.

Further, Mr. Chreky's telephone statements are relevant to establish Mr. Chreky is obstructing

the prosecution of Ms. Thong's case by trying to intimidate Plaintiff's witnesses.

Defendants' conclusory objection that the requests are "unduly burdensome" lacks merit.

Defendants have not provided any evidence beyond their bare objection to reveal of the nature of

the burden.  Moreover, Defendants' unduly burdensome objection is not well-taken in light of

Defendants' supplemental discovery responses revealing how narrow the scope of the potential

discovery truly is.   Therefore, this Court should grant Plaintiff's motion and order Defendants to

produce relevant, discoverable documents.

## II.     BACKGROUND

### A.  Factual Background

Ms. Thong is a former employee of the Andre Chreky Salon.   Ms. Thong brings this

action for violations of the Fair Labor Standards Act of 1963 ("FLSA"), the D.C. Wage and Hour

Act ("WHA"), the D.C. Wage Payment and Collection Act ("WPCA"), the D.C. Human Rights

Act ("DCHRA"), for unlawful assault, battery and conversion, negligence and intentional

infliction of emotional distress against Defendants Andre Chreky ("Mr .Chreky"), Andre Chreky

Salon (the "Salon"), and SPAC L.L.C. ("SPAC") (collectively, "Defendants").   The Defendants

did not compensate Ms. Thong for all hours worked and did not pay her at one and one-half

times her normal hourly rate of pay for all hours worked in excess of forty hours per week.   As a

result, Mr. Chreky and the Salon knowingly, willfully and intentionally violated and continue to violate the FLSA the WHA and the WPCA. Ms. Thong therefore brings this suit to recover unpaid wages, overtime pay, liquidated damages, attorney's fees and costs.

Further, Mr. Chreky and the Salon subjected Ms. Thong to unwanted sexual comments, touches and physical attacks violating the DCHRA and intentionally committed assault, battery, and intentional infliction of emotional distress against Ms. Thong. The Salon and SPAC were negligent in failing to warn and protect Ms. Thong from this physical and emotional harm. In addition, Mr. Chreky and the Salon confiscated and retained money that Ms. Thong had earned in tips committing conversion and economically harming her. Ms. Thong therefore brings this action for economic, compensatory and punitive damages, as well as attorney's fees and costs of suit.

B.  Procedural Background

This case is nearing conclusion of discovery, as the close of fact discovery is currently set for January 23, 2008. (See Scheduling Order dated December 6, 2007, Docket No. 22.) Ms. Thong served her Second Set of Requests for the Production of Documents and Second Set of Interrogatories on October 26, 2007. (See Exs. A and B, attached hereto.) Defendants responded to Ms. Thong's discovery on November 26, 2007, without producing any actual documents. (See Exs. C and D, attached hereto.)

Defendants objected to a number of Ms. Thong's document requests on the basis that they are "not likely to lead to the discovery of admissible evidence." However, Defendants provided no supporting evidence (i.e., affidavits) beyond that vague objection. In addition, Defendants objected to a number of Ms. Thong's document requests on the basis that they were "unduly

4

burdensome." Again, however, Defendants failed to demonstrate how these requests were overly broad, burdensome, or oppressive by submitting affidavits or offering evidence which revealed the nature of the burden.

Accordingly, pursuant to Local Rule 7(m) of the United States District Court for the District of Columbia, Ms. Thong, by counsel, sent Defendants a detailed letter outlining the deficiencies in Defendants' discovery responses and requesting a conference of counsel. (See Ex. E, attached hereto.)   On December 4, 2007, the parties met and conferred via telephone, in a good faith effort to narrow the areas of disagreement with respect to Defendants' deficient discovery responses.  As a result, Defendants' produced Amended Objections and Responses to Ms. Thong's discovery requests on December 7, 2007, and produced documents therewith. (See Exs. F and G, attached hereto.)   However, Defendants did not amend their responses to Document Request Nos. 19, 20, 22 and 24, which form the basis for this Motion to Compel ("Motion").   This Motion is opposed.

## III.    THIS COURT SHOULD ORDER DEFENDANTS TO PRODUCE DISCOVERABLE DOCUMENTS

"Trial courts have considerable discretion when handling discovery matters." Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd., 242 F.R.D. 1, 6 (D.D.C. 2007) (Lamberth, J.), citing Food Lion Inc. v. United Food and Commercial Workers Intern. Union, 103 F.3d 1007, 1012 (D.C.Cir. 1997).  "The scope of discovery itself is broad, allowing for discovery regarding any matter, not privileged, relevant to a claim or defense." Id.; Fed.R.Civ.P. 26(b)(1).  The term "relevance" at the discovery stage is a broadly construed term and is given very liberal treatment. Id.  The treatment of the term is so liberal that relevant information sought need not even "be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of

admissible evidence." Id.; F.R.C.P. 26(b)(1). For the reasons set forth below, Ms. Thong's document requests are reasonably calculated to lead to the discovery of admissible evidence in this case and well within the permissible scope of discovery, and Defendants' objections are wholly without merit.

C.  This Court Should Order Defendants to Produce Employee Time Records

Ms. Thong requested Defendants produce documents evidencing the number of hours actually worked by employees of the Salon, including but not limited to time cards, work schedules, and notes or reports kept by supervisors or managers at the Salon. (See Ex. A, Doc. Req. No. 19.)[1] Defendants do not object to the relevance of this Request. (See Ex. C, at p. 5.) Rather, Defendants' sole remaining objection to this Request is that it "is duplicative, as Defendants have previously produced all payroll records, which reflect hours worked, for all employees currently maintained by Defendants." (Id.)

Defendants' objection that this request is "duplicative" lacks merit. While Defendants may have previously produced payroll records which purport to reflect the hours worked by Defendants' employees, these documents do not necessarily reflect the actual hours worked by Defendants' employees. Defendants' payroll records reflect only those hours employees were permitted to report on their time cards, or those hours for which they "punched in" on the time clock (i.e., when they are "on-the-clock").

---

[1]    Initially, Defendants objected to this request on the basis that it is "not limited in time." (See Ex. C, at p. 5.) However, during the conference of counsel, Plaintiff limited this request to the period of 1998 to the present, consistent with the relevant time frame of the allegations contained in the complaint, and Ms. Thong's employment with Defendant. (See Ex. E, at p. 3.) Accordingly, this objection is moot.

During the course of Ms. Thong's employment at the Salon, Ms. Thong was required to work in excess of fifty-five hours per week without pay, and in excess of forty hours without being paid overtime in accordance with the FLSA and the DCWHA.  See Amended Complaint, Counts 1-4.  Ms. Thong was routinely required to work overtime hours "off-the-clock", for which she was not compensated.  Id.  Logically, these undocumented, "off-the-clock" overtime hours would not be reflected Defendants' payroll records.  Witness testimony in depositions further confirms that Defendants' employees worked overtime hours for which they were not compensated.  (See, e.g., Ex. H, Deposition of Denia Santos, at p. 20:9 – 25:15.)  Therefore, documents reflecting the actual hours worked by Defendants' employees - such as handwritten time cards, work schedules, calendars and notes – are not duplicative of Defendants' payroll records because such documents will confirm the excessive off-the-clock hours worked by Defendants' employees, including Ms. Thong, for which they have not been not compensated.

Therefore, this Court should order Defendants to produce the requested time cards.

D.  This Court Should Order Defendants to Produce Mr. Chreky's Deposition Transcript

Ms. Thong requested the verified transcript of the deposition of Andre Chreky in the matter Commonwealth ex rel. Doudaklian v. Andre Chreky ("the Doudaklian case"), in the Fairfax County Circuit Court, State of Virginia.  (See Ex. A, Doc. Req. No. 20.)  Defendants object to this request on the sole basis that they believe it is not likely to lead to the discovery of admissible evidence.  (See Ex. C, at p. 6.)  This deposition transcript is likely to lead to the discovery of admissible evidence because this transcript evidencing Mr. Chreky's prior sworn testimony is indisputably relevant to Mr. Chreky's credibility, which is always at issue.

As stated previously, Rule 26(b)(1) is a very broad rule allowing discovery regarding any claim or defense, even allowing discovery of material which would be inadmissible at trial but, at the time of discovery, appears reasonably calculated to lead to admissible evidence. See Fed.R.Civ.P. 26(b)(1). Discoverable information includes evidence relevant to the credibility of a key witness, and, logically relevant to the credibility of a party. See Cobell v. Norton, 13 F.R.D. 16, 25 (D.D.C. 2003)(Lamberth, J.) (noting that discovery that bears on the credibility of a key witness is relevant); Alexander v. FBI, 192 F.R.D. 32, 34 (D.D.C. 2000)(Lamberth, J.) (holding information discoverable because it bears on the weight and credibility of witness' testimony).

In this case, Mr. Chreky has provided Ms. Thong with sworn, verified discovery responses. In addition, Mr. Chreky is currently scheduled to appear for a deposition in January 2008. Consequently, Mr. Chreky' credibility is, and will be, at issue in this case.

On information and belief, Mr. Chreky was engaged in an extramarital sexual relationship with Adele Doudaklian for more than 20 years. (See Ex. I, Decl. of Adele Doudaklian, ¶¶ 1-2.) Ms. Doudaklian became pregnant with Mr. Chreky's child, and a subsequent DNA test established Mr. Chreky was the father of Ms. Doudaklian' child with 100% probability. (Id., at ¶ 10.) In addition, Mr. Chreky admitted to a former Salon manager that he was, in fact, the father of Ms. Doudaklian' child. (See Ex. J, Decl. of Maurice Clarke, ¶ 14; Ex. K, Deposition of Maurice Clarke, at p. 162:2-164:2.) On information and belief, Mr. Chreky appeared for a deposition in the Doudaklian case, and provided sworn testimony that he was not the father of Ms. Doudaklian's child. (See Ex. J, Decl. of Maurice Clarke, ¶ 14.) Given the evidence suggesting Mr. Chreky previously lied under oath to conceal his extra-marital affair and

illegitimate child, Mr. Chreky's verified transcript in the <u>Doudaklian</u> case is relevant here in

order for Ms. Thong to weigh the credibility of Mr. Chreky's testimony in this case.

    E.   <u>This Court Should Order Defendants to Produce Defendants' Credit Card Statements.</u>

Ms. Thong requested Defendants identify all credit cards in their names and produce all

credit card statements related to the identified credit cards.  (<u>See</u> Ex. A, Doc. Request No. 22;

Ex. B, Interrogatory No. 2.)  Defendants did not specifically object to Document Request No. 22,

rather, Defendants simply cited their objections to Interrogatory No. 2.  (<u>See</u> Ex. C, at p. 6.)

Defendants initially objected to Interrogatory No. 2 on the basis that it is was overly burdensome

and not likely to lead to the discovery of admissible evidence. (<u>See</u> Ex. D, at p. 2.)  Defendants

also objected to this interrogatory on the basis that it is duplicative of prior discovery requests

aimed at assessing Defendants' financial status because Defendants already produced documents

evidencing the income and net worth of each defendant. (<u>Id.</u>) All of Defendants' objections lack

merit.

Contrary to Defendants' contention, Defendants' credit card statements are likely to lead

to the discovery of admissible evidence.  As stated previously, Rule 26(b)(1) is a very broad rule

allowing discovery regarding any claim or defense, even allowing discovery of material which

would be inadmissible at trial but, at the time of discovery, appears reasonably calculated to lead

to admissible evidence. <u>See</u> Fed.R.Civ.P. 26(b)(1); <u>Centinela</u>, 242 F.R.D. at 6-7.  Defendants'

American Express credit card statements are relevant and likely to lead to the discovery of

admissible evidence here for two reasons.

First, witness testimony in depositions has confirmed that Mr. Chreky was involved in

personal intimate relationships with a number of his female employees and frequently

entertained them at hotels and restaurants close to the Salon as well as out of town travel. Specifically, a number of witnesses have testified in depositions that Mr. Chreky invited them to hotel rooms to participate in sexual encounters with two specific female employees. (See Ex. L, Deposition of Jeremy Buchanan, at p. 123:7 – 124:12; Ex. M, Deposition of Remy Metsu, at p. 49:1 – 51:14.) Defendants' American Express credit card statements are therefore relevant to validate the frequency of Mr. Chreky's hotel stays, and to validate witness testimony regarding these sexual encounters at hotels.

Second, abundant evidence in this case, including Defendants own discovery responses, suggests that Mr. Chreky, Andre Chreky Salon and SPAC, LLC, are not operating with any level of corporate distinction and formality. Amongst other information provided in Defendants' recent discovery responses: there are no bylaws for the Salon, there is no operating agreement for SPAC, LLC, there is no lease agreement between SPAC and the Salon for the premises on which the Salon operates, and Mr. and Mrs. Chreky do not issue themselves paystubs. (See Ex. F, at pp. 1-2.) Moreover, Mr. Chreky and SPAC, LLC do not have credit cards in their own name; rather, Mr. Chreky simply uses the sole corporate American Express card for all purposes – business and pleasure. (See Ex. G, at p. 2.) Consequently, to the extent Mr. Chreky's sexual liaisons at hotels (and other personal expenses) were paid for using corporate credit cards, such evidence is relevant to Defendants' lack of corporate formality and the credibility of Defendants' financial reporting. The complete lack of respect for corporate formality among Mr. Chreky, the Salon and SPAC is also relevant because Mr. Chreky appears to act as if he is above the law and is not subject to the same legal requirements as other business owners in the District of Columbia. Similarly, Mr. Chreky thinks he can manipulate, threaten and sexually harass his female employees without any regard to their rights.

Defendants' objection to Interrogatory No. 2 (and therefore Document Request No. 22) on the basis that it is "overly burdensome", without more factual support, is not sufficient. "Once relevance has been established, the burden is on the party objecting to the interrogatories to show that the information sought is not readily available to it." Centinela, 242 F.R.D.at 8; Alexander, 192 F.R.D. at 53.  "In order to satisfy its burden, the objecting party must make a specific, detailed showing of how the interrogatory is burdensome." Id.  To disclose the nature of this burden, the objector must do more than just state the objection, the objector must submit affidavits or offer evidence which reveals the nature of the burden.  Id.  Defendants have provided no such evidence beyond their vague objection.  Moreover, in their Supplemental Responses to Ms. Thong's Second Set of Interrogatories, Defendants effectively concede the extremely limited scope of responsive information because Defendants admit that they collectively only have one credit card.  ("ACI maintains a corporate credit card account with American Express.  Mr. Chreky does not maintain a credit card in his name.  SPAC does not maintain a credit card in its name.") (See Ex. G, at p. 2.)  Thus, Defendants "overly burdensome" objection is not well-taken considering there is only one credit card at issue.

Consequently, Defendants should be ordered to produce Defendants' credit card statements.

F.  This Court Should Order Defendants to Produce Defendants' Telephone Statements

Finally, Ms. Thong requested Defendants' telephone bills and statements from 1998 to the present.  Defendants object on the basis that it is unduly burdensome and not likely to lead to the discovery of admissible evidence.

11

Defendants' telephone statements are relevant to confirm Mr. Chreky's inappropriate personal relationships with some of his female employees. Witness testimony in depositions suggests that Mr. Chreky was involved in personal intimate relationships with a number of his female employees and frequently entertained them at hotels and restaurants close to the Salon as well as out of town travel. (See Ex. L, Deposition of Jeremy Buchanan, at p. 123:7 – 124:12; Ex. M, Deposition of Remy Metsu, at p. 49:1 – 51:14.) Defendants' telephone statements will likely confirm witness testimony regarding Mr. Chreky's personal escapades.

In addition, on information and belief, Mr. Chreky has contacted or attempted to contact a number of Ms. Thong's witnesses since she filed her complaint to intimidate, threaten or otherwise persuade these witnesses. (See Ex. N, Decl. of Jonathan Rose.) Among other things, Defendants' recent telephone statements evidencing communications with these witnesses are relevant to establish Mr. Chreky is obstructing the prosecution of Ms. Thong's case by trying to intimidate Ms. Thong's witnesses.

For the same reasons set forth above with respect to Defendants' credit card statements, Defendants' conclusory "unduly burdensome" objection is insufficient. While Defendants are correct in stating that a discovery of a document may be limited if discovery of such document is "unduly burdensome", the Court only entertains an unduly burdensome objection when the responding party demonstrates how the document is "overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden." Centinela, 242 F.R.D., at 10. The responding party cannot just "merely state in a conclusory fashion" that the requests are burdensome. Id. Here, Defendants provided no affidavits or other evidence that shed any light on how Ms. Thong's request is "unduly burdensome." Since the onus is on

12

Defendants to demonstrate how the requests are burdensome, their blanket objection on this ground must be rejected.

## IV.    CONCLUSION

Defendants committed heinous acts of sexual harassment, and major wage violations. Defendants should not be permitted to hide relevant information from Ms. Thong, or block Ms. Thong's efforts to obtain the information she needs to support her allegations, by hiding behind conclusory, unsubstantiated objections. Accordingly, this Court should grant Plaintiff's motion to compel.

Dated: December 21, 2007

Respectfully submitted,

By:_____/s/_____
        Jonathan G. Rose
        Sheppard Mullin Richter & Hampton LLP
        1300 I Street, N.W.
        11th Floor East
        Washington, D.C. 20005
        202-772-5390 (Direct)
        202-312-9410 (Fax)
        jrose@sheppardmullin.com

        Counsel for Plaintiff Jennifer Thong

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of December, 2007, I caused true copies of the foregoing Plaintiff's Motion to Compel the Production of Documents to be served by e-mail and first class mail on:

John Bredehoft, Esq.
David J. Sullivan, Esq.
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100 Norfolk, Virginia 23510

_____/s/_____
Jonathan G. Rose

# **EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JENNIFER THONG | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 1:06-1807 (RCL) |
| | ) | |
| ANDRE CHREKY SALON, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF JENNIFER THONG'S SECOND REQUEST
## FOR THE PRODUCTION OF DOCUMENTS TO DEFENDANTS

Pursuant to Fed. R. Civ. P. 34, Plaintiff Jennifer Thong ("Ms. Thong" or "Plaintiff"), by and through her attorney, hereby requests that Defendants Andre Chreky, Andre Chreky Salon, and SPAC, LLC (collectively "Defendants") produce all documents and things listed herein to undersigned counsel within thirty (30) days of receipt of this request.

These requests are continuing in nature, and require Defendants to promptly serve a supplemental response if additional documents are acquired by Defendants after its initial response.

These requests shall be read and interpreted in accordance with the definitions and instructions set forth below:

### DEFINITIONS AND INSTRUCTIONS

**1.    Definitions**

1.    The word "document" is used in the broadest sense possible and means the original and all drafts of all written or graphic matter, however produced or reproduced, of any kind or description, whether or not sent or received, and all copies thereof which are different in

any way from the original (whether by interlineation, receipt stamp, notation, indication of copies sent or received, or otherwise), including without limitation, any paper, book, account, photograph, blueprint, drawing, sketch, schematic, agreement, contract, collective bargaining agreement, memorandum, press release, circular, advertising material, correspondence, letter, telegram, telex, object, report, opinion, investigation, record, transcript, hearing, meeting, study, note, notation, working paper, summary, intra-office communication, diary, chart, minute, index sheet, computer software, invoice, records or recording, or summary of any telephone or other conversation, or of any interview or of any conference, or any other written, recorded, transcribed, punched, taped, filmed or graphic matter, including any electronically stored information in computerized format, computer files, or e-mail of which you have or have had possession, custody or control.

2.    The term "person or entity" means natural persons, businesses, proprietorships, partnerships, firms, corporations, institutions, employee benefit plans, bodies, joint ventures, other forms of legal entity, municipal corporations, federal, state and local governments, all departments and agencies thereof, and any other governmental agencies, any other group or combination acting as an entity, and any representative or agent of the foregoing.

3.    The word "communication" means any manner or form of information or message transmission, however produced or reproduced, whether by "document" or orally or otherwise, which is made, distributed or circulated between or among persons, or data storage or processing units, and any and all documents containing, consisting of, or relating or referring, in any way, either directly or indirectly, to a communication.

4.    The word "Defendants" means Andre Chreky, Andre Chreky Salon, and SPAC, LLC, and any of these entities' owners, directors, employees, agents, managers, representatives, or attorneys.

5.    The word "Mr. Chreky" means Defendant Andre Chreky.

6.    The word "SPAC" means Defendant SPAC, LLC, its owners, directors, employees, agents, managers, representatives, or attorneys.

7.    The word "Salon" means Defendant Andre Chreky Salon, its owners, directors, employees, agents, managers, representatives, or attorneys.

8.    The words "you" and "your" means Andre Chreky, Andre Chreky Salon, and/or SPAC, LLC, and any of these entities' owners, directors, employees, agents, managers, representatives or attorneys.

9.    The words "Plaintiff" or "Ms. Thong" mean Plaintiff Jennifer Thong.

10.    The word "Answer" means the Answer filed by Defendants Andre Chreky, Andre Chreky Salon, and SPAC, LLC in the United States District Court for the District of Columbia (Civil Action No. 1:06-1807), on April 13, 2007, in response to Plaintiff's Amended Complaint, filed on February 16, 2007.

11.    The word "any" means each and every as well as any one.

12.    The words "and" and "or" shall be construed conjunctively or disjunctively, as necessary to make the request inclusive rather than exclusive.

13.    The word "identify" means:

(a)    with respect to a natural person, to state the full name, present or last known title or position, business affiliation, and business address.

(b)    with respect to a corporation, to state the corporation's full name and address.

(c)    with respect to a person or entity other than a natural person or corporation, to state its proper name or designation and its address.

14.    The words "relating" or "referring" means consisting of, embodying, summarizing, describing, mentioning, evidencing, or in any way pertaining to.

15.    The word "date" means the exact day, month and year, if ascertainable, or if not, the best approximation thereof.

17.    The term "employment agreement" means the document(s) used by the Salon to record or confirm employment by the Salon, define the scope of employment and/or outline compensation arrangements for employees of the Salon.

18.    The term "hotel reward club program" means a guest reward program that awards points, airline miles or other benefits with each reservation or hotel stay, including but not limited to the Hilton HHonors Program and the Starwood Preferred Guest/ StarPoints Program.

## 2.    **Instructions**

1.    If the Defendants assert a claim of attorney-client privilege or attorney work product with respect to any of the requests contained herein:

a.    State the precise nature of the privilege or other protection claimed;

b.    Describe the document with sufficient particularity such that Plaintiff can evaluate the claim of privilege or other protection;

c.    Identify each person or entity who signed the document and the identity of each person who participated in preparing the document;

d.      State the date of the document;

e.      State the title or heading of the document;

f.      State the numbered request(s) to which the document is responsive;

g.      State the present (or if present is not known, the last known) location and custodian of the document; and

h.      Identify any person or entity who reviewed or received copies of the document.

2.      In producing documents pursuant to this request, please indicate to which numbered request(s) each document is responsive.

3.      This document request is continuing in nature, and to the extent that the Defendants, the Defendants' attorneys, agents or representatives become aware of additional documents responsive to this request subsequent to their initial response to this request, the Defendants are requested immediately to provide such documents, or if such documents are not in the Defendants' custody, possession or control, to provide the information requested herein.

## DOCUMENTS REQUESTED

1.      Any and all "minute books" for the Salon for the period 1998 to the present.

2.      Any and all Articles of Incorporation for the Salon.

3.      Any and all Bylaws for the Salon.

4.      Any and all operating agreements for SPAC, LLC.

5.      Any and all rental or lease agreements for the premises located at 1604 K St., NW, Washington, DC, 20006 for the period 1998 to the present.

6.      Any and all documents relating to the assessed tax value by the District of Columbia for the premises located at 1604 K St., NW, Washington, DC, 20006.

7.    Mr. Chreky's W-2 Forms for the years 2002, 2003, 2004, 2005, and 2006.

8.    Mr. Chreky's pay stub(s) for October 2007.

9.    Serena Chreky's W-2 Forms for the years 2002, 2003, 2004, 2005, and 2006.

10.    Serena Chreky's pay stub(s) for October 2007.

11.    Detailed general ledger for the Salon for the year ending April 30, 2007.

12.    Any and all documents or records relating to the April 2007 bank statements for the Salon.

13.    Any and all documents or records relating to the April 2007 bank statements for SPAC, LLC.

14.    Any and all documents relating to life insurance policies for Mr. Chreky.

15.    Any and all documents relating to life insurance policies for Serena Chreky.

16.    The 1099 Form for the Salon for the year 2006.

17.    The W-2 Form for the Salon for the year 2006.

18.    Any and all employment agreements for all employees, officers, managers, and supervisors of the Salon for the period 1998 to the present.

19.    All documents evidencing the number of hours worked by employees of the Salon, including, but not limited to, time cards, work schedules, and any reports or notes kept by supervisors or managers regarding the number of hours worked by employees of the Salon.

20.    The verified transcript of the Deposition of Andre Chreky in the matter <u>Commonwealth ex rel. Doudaklian v. Andre Chreky</u>, in the Fairfax County Circuit Court, State of Virginia.

21.    Any and all bank statements for the period 1998 to the present for all savings accounts, checking accounts and safety deposit boxes identified by Defendants in response to Plaintiff's Second Set of Interrogatories, Interrogatory No. 1.

22.    Any and all credit card statements for the period 1998 to the present for all credit cards identified by Defendants in response to Plaintiff's Second Set of Interrogatories, Interrogatory No. 2.

23.    Any and all hotel reward club program statements for the period 1998 to the present for all reward club programs identified by Defendants in response to Plaintiff's Second Set of Interrogatories, Interrogatory No. 3.

24.     Any and all documents relating or referring to Defendants' telephone bills and statements for the period 1998 to the present.


Dated: October 26, 2007


                                        Respectfully submitted,


                        By:     _____
                                Jonathan Rose, DC Bar No. 446208
                                Emily N. Seymour, DC Bar No. 500201
                                Sheppard Mullin Richter & Hampton, LLP
                                1300 I Street, N.W.
                                11th Floor East
                                Washington, D.C. 20005
                                (202) 218-0000 (phone)
                                (202) 218-0020 (fax)
                                jrose@sheppardmullin.com
                                eseymour@sheppardmulllin.com

                                Counsel for Plaintiff Jennifer Thong

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of October, 2007, I caused true copies of the foregoing Plaintiff Jennifer Thong's Second Request for the Production of Documents to be personally served on:

John Bredehoft, Esq.
David J. Sullivan, Esq.
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510

_____
Jonathan Rose

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JENNIFER THONG ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil No. 1:06-1807 (RCL) |
| ) | |
| ANDRE CHREKY SALON, et al. ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFF JENNIFER THONG'S SECOND SET OF**
**INTERROGATORIES TO DEFENDANTS**

Pursuant to Fed. R. Civ. P. 33, Plaintiff Jennifer Thong ("Ms. Thong" or "Plaintiff"), by and through her attorney, hereby requests that Defendants Andre Chreky, Andre Chreky Salon, and SPAC, LLC (collectively "Defendants") answer under oath the interrogatories set forth below no later than thirty (30) days after the service of these requests upon Plaintiff.

These requests are continuing in nature, and require Defendants to promptly serve a supplemental response if additional documents are acquired by Defendants after its initial response.

These requests shall be read and interpreted in accordance with the definitions and instructions set forth below:

**DEFINITIONS AND INSTRUCTIONS**

**1.    Definitions**

1.    The word "document" is used in the broadest sense possible and means the original and all drafts of all written or graphic matter, however produced or reproduced, of any kind or description, whether or not sent or received, and all copies thereof which are different in

any way from the original (whether by interlineation, receipt stamp, notation, indication of copies sent or received, or otherwise), including without limitation, any paper, book, account, photograph, blueprint, drawing, sketch, schematic, agreement, contract, collective bargaining agreement, memorandum, press release, circular, advertising material, correspondence, letter, telegram, telex, object, report, opinion, investigation, record, transcript, hearing, meeting, study, note, notation, working paper, summary, intra-office communication, diary, chart, minute, index sheet, computer software, invoice, records or recording, or summary of any telephone or other conversation, or of any interview or of any conference, or any other written, recorded, transcribed, punched, taped, filmed or graphic matter, including any electronically stored information in computerized format, computer files, or e-mail of which you have or have had possession, custody or control.

2.      The term "person or entity" means natural persons, businesses, proprietorships, partnerships, firms, corporations, institutions, employee benefit plans, bodies, joint ventures, other forms of legal entity, municipal corporations, federal, state and local governments, all departments and agencies thereof, and any other governmental agencies, any other group or combination acting as an entity, and any representative or agent of the foregoing.

3.      The word "communication" means any manner or form of information or message transmission, however produced or reproduced, whether by "document" or orally or otherwise, which is made, distributed or circulated between or among persons, or data storage or processing units, and any and all documents containing, consisting of, or relating or referring, in any way, either directly or indirectly, to a communication.

4.     The word "Defendants" means Andre Chreky, Andre Chreky Salon, and SPAC, LLC, and any of these entities' owners, directors, employees, agents, managers, representatives, or attorneys.

5.     The word "Mr. Chreky" means Defendant Andre Chreky.

6.     The word "SPAC" means Defendant SPAC, LLC, its owners, directors, employees, agents, managers, representatives, or attorneys.

7.     The word "Salon" means Defendant Andre Chreky Salon, its owners, directors, employees, agents, managers, representatives, or attorneys.

8.     The words "you" and "your" means Andre Chreky, Andre Chreky Salon, and/or SPAC, LLC, and any of these entities' owners, directors employees, agents, managers, representatives, or attorneys.

9.     The words "Plaintiff" or "Ms. Thong" means Plaintiff Jennifer Thong.

10.     The word "Answer" means the Answer filed by Defendants Andre Chreky, Andre Chreky Salon, and SPAC, LLC in the United States District Court for the District of Columbia (Civil Action No. 1:06-1807), on April 13, 2007, in response to Plaintiff's Amended Complaint, filed on February 16, 2007.

11.     The word "any" means each and every as well as any one.

12.     The words "and" and "or" shall be construed conjunctively or disjunctively, as necessary to make the request inclusive rather than exclusive.

13.     The word "identify" means:

(a)     with respect to a natural person, to state the full name, present or last known title or position, business affiliation, and business address.

(b)     with respect to a corporation, to state the corporation's full name and address.

(c)     with respect to a person or entity other than a natural person or corporation, to state its proper name or designation and its address.

14.    The words "relating" or "referring" means consisting of, embodying, summarizing, describing, mentioning, evidencing, or in any way pertaining to.

15.    The word "date" means the exact day, month and year, if ascertainable, or if not, the best approximation thereof.

16.    The term "hotel reward club program" means a guest reward program that awards points, airline miles or other benefits with each reservation or hotel stay, including but not limited to the Hilton HHonors Program and the Starwood Preferred Guest/ Starpoints Program.

## 2.    <u>Instructions</u>

1.    If the Defendant asserts a claim of attorney-client privilege or attorney work product with respect to any of the interrogatories contained herein:

a.    State the precise nature of the privilege, or other protection claimed; and

b.    State the numbered interrogatory to which the privileged information is responsive.

2.    This request for interrogatories is continuing in nature, and to the extent that the Defendants, the Defendants' attorneys, agents or representatives become aware of additional information responsive to this request subsequent to their initial response to this request, Defendants are requested to immediately provide such information requested herein.

## INTERROGATORIES

1.      For the period 1998 to the present, identify all savings accounts, checking accounts and safety deposit boxes held by Defendants by name and address of the financial institution and the account number.

2.      For the period 1998 to the present, identify all credit cards held by Defendants, by name and address of the financial institution and the account number.

3.      For the period 1998 to the present, identify any hotel reward club programs to which Defendants belong, by name of the program and the account number.

Dated: October 26, 2007

Respectfully submitted,

By:    _____

Jonathan Rose, DC Bar No. 446208
Emily N. Seymour, DC Bar No. 500201
Sheppard Mullin Richter & Hampton, LLP
1300 I Street, N.W.
11th Floor East
Washington, D.C. 20005
(202) 218-0000 (phone)
(202) 218-0020 (fax)
jrose@sheppardmullin.com
eseymour@sheppardmullin.com

Counsel for Plaintiff Jennifer Thong

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of October, 2007, I caused true copies of the

foregoing Plaintiff Jennifer Thong's Second Set of Interrogatories to Defendants to be personally

served on:

> John Bredehoft, Esq.
> David J. Sullivan, Esq.
> Kaufman & Canoles, P.C.
> 150 West Main Street, Suite 2100
> Norfolk, Virginia 23510

_____
Jonathan Rose

# **<u>EXHIBIT C</u>**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JENNIFER THONG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 1:06-01807 (RCL) |
| ) | |
| ANDRE CHREKY SALON, ET AL. ) | |
| ) | |
| Defendants. ) | |
| ) | |

### DEFENDANTS' OBJECTIONS AND RESPONSES TO
### PLAINTIFF JENNIFER THONG'S SECOND SET OF REQUEST
### FOR THE PRODUCTION OF DOCUMENTS TO DEFENDANTS

Defendants Andre Chreky, Andre Chreky Salon, and SPAC, LLC (the "Defendants"), by counsel, respond to Plaintiff Jennifer Thong's Second Set of Request for the Production of Documents to Defendants as follows:

1.      Any and all "minute books" for the Salon for the period 1998 to the present.

Objection:      Defendants object to this Request for Production on the grounds that it is vague, unduly burdensome, and not likely to lead to the discovery of admissible evidence, as it seeks "[a]ny and all 'minute books'" without regard to the subject matter of the issues addressed therein.

2.      Any and all Articles of Incorporation for the Salon.

Response:      Defendants are in the process of locating such documents and will provide them as soon as they are available.

3.      Any and all Bylaws for the Salon.

<u>Response</u>:    Defendants are in the process of locating such documents and will provide them as soon as they are available.

4.    Any and all operating agreements for SPAC, LLC.

<u>Response</u>:    Defendants are in the process of locating such documents and will provide them as soon as they are available.

5.    Any and all rental or lease agreements for the premises located at 1604 K St., NW, Washington, DC, 20006 for the period 1998 to the present.

<u>Response</u>:    Defendants are in the process of locating such documents and will provide them as soon as they are available.

6.    Any and all documents relating to the assessed tax value by the District of Columbia for the premises located at 1604 K St., NW, Washington, DC, 20006.

<u>Response</u>:    Defendants are in the process of locating such documents and will provide them as soon as they are available.

7.    Mr. Chreky's W-2 Forms for the years 2002, 2003, 2004, 2005, and 2006.

<u>Objection</u>:    Defendants object to this request on the grounds that it is unduly burdensome, not likely to lead to the discovery of admissible evidence, and duplicative, as five years of tax records are not necessary to determine Defendants' financial status, Defendants assert that they have previously produced documents evidencing the income and net worth of each defendant, including two years of tax returns, and Plaintiff has issued subpoenas for tax records directly from Defendants' tax preparer, Goodman & Company; Andre and Serena Chreky have executed releases authorizing Goodman & Company to produce responsive tax records.

8.    Mr. Chreky's pay stub(s) for October 2007.

2

Objection:    Defendants object to this Request for Production on the grounds that it is not likely to lead to the discovery of admissible evidence, as none of plaintiff's claims are based on acts alleged to have occurred in October 2007. To the extent this Request for Production purports to be based on assessing Defendants' financial status, Defendants assert that they have previously produced documents evidencing the income and net worth of each defendant.

9.    Serena Chreky's W-2 Forms for the years 2002, 2003, 2004, 2005, and 2006.

Objection:    Defendants object to this request on the grounds that it is unduly burdensome, not likely to lead to the discovery of admissible evidence, and duplicative, as five years of tax records are not necessary to determine Defendants' financial status, Defendants assert that they have previously produced documents evidencing the income and net worth of each defendant, including two years of tax returns, and Plaintiff has issued subpoenas for tax records directly from Defendants' tax preparer, Goodman & Company; Andre and Serena Chreky have executed releases authorizing Goodman & Company to produce responsive tax records.

10.    Serena Chreky's pay stub(s) for October 2007.

Objection:    Defendants object to this Request for Production on the grounds that it is not likely to lead to the discovery of admissible evidence, as none of plaintiff's claims are based on acts alleged to have occurred in October 2007. To the extent this Request for Production purports to be based on assessing Defendants' financial status, Defendants assert that they have previously produced documents evidencing the income and net worth of each defendant.

11.    Detailed general ledger for the Salon for the year ending April 30, 2007.

Objection:    Defendants object to this Request for Production on the grounds that it is not likely to lead to the discovery of admissible evidence, as none of plaintiff's claims are based

on acts alleged to have occurred in 2007.  To the extent this Request for Production purports to be based on assessing Defendants' financial status, Defendants assert that they have previously produced documents evidencing the income and net worth of each defendant.

12.     Any and all documents or records relating to the April 2007 bank statements for the Salon.

Objection:     Defendants object to this Request for Production on the grounds that it is not likely to lead to the discovery of admissible evidence, as none of plaintiff's claims are based on acts alleged to have occurred in April 2007.  To the extent this Request for Production purports to be based on assessing Defendants' financial status, Defendants assert that they have previously produced documents evidencing the income and net worth of each defendant.

13.     Any and all documents or records relating to the April 2007 bank statements for SPAC, LLC.

Objection:     Defendants object to this Request for Production on the grounds that it is not likely to lead to the discovery of admissible evidence, as none of plaintiffs claims are based on acts alleged to have occurred in April 2007.  To the extent this Request for Production purports to be based on assessing Defendants' financial status, Defendants assert that they have previously produced documents evidencing the income and net worth of each defendant.

14.     Any and all documents relating to life insurance policies for Mr. Chreky.

Objection:     Defendants object to this Request for Production on the grounds that it is not likely to lead to the discovery of admissible evidence.  To the extent this Request for Production purports to be based on assessing Defendants' financial status, Defendants assert that they have previously produced documents evidencing the income and net worth of each defendant.

15.     Any and all documents relating to life insurance policies for Serena Chreky.

Objection:     Defendants object to this Request for Production on the grounds that it is not likely to lead to the discovery of admissible evidence.  To the extent this Request for Production purports to be based on assessing Defendants' financial status, Defendants assert that they have previously produced documents evidencing the income and net worth of each defendant.

16.     The 1099 Form for the Salon for the year 2006.

Response:     Defendants are in the process of locating any such document in Defendants' possession and will produce responsive documents when available.

17.     The W-2 Form for the Salon for the year 2006.

Response:     Defendants are in the process of locating any such document in Defendants' possession and will produce responsive documents when available.

18.     Any and all employment agreements for all employees, officers, managers, and supervisors of the Salon for the period 1998 to the present.

Objection:     Defendants object to this Request for Production on the grounds that it is overly burdensome and not likely to lead to the discovery of admissible evidence.

19.     All documents evidencing the number of hours worked by employees of the Salon, including, but not limited to, time cards, work schedules, and any reports or notes kept by supervisors or managers regarding the number of hours worked by employees of the Salon.

Objection:     Defendants object to this Request for Production on the grounds that it is not limited whatsoever in time.  Defendants further object that this Request for Production is duplicative, as Defendants have previously produced all payroll records, which reflect hours worked, for all employees currently maintained by Defendants.

20.     The verified transcript of the Deposition of Andre Chreky in the matter *Commonwealth ex rel. Doudaklian v. Andre Chreky*, in the Fairfax County Circuit Court, State of Virginia.

Objection:     Defendants object to this request on the ground that it is not likely to lead to the discovery of admissible evidence.

21.     Any and all bank statements for the period 1998 to the present for all savings accounts, checking accounts and safety deposit boxes identified by Defendants in response to Plaintiff's Second Set of Interrogatories, Interrogatory No. 1.

Objection:     *See* Objection to Interrogatory No. 1.

22.     Any and all credit card statements for the period 1998 to the present for all credit cards identified by Defendants in response to Plaintiff's Second Set of Interrogatories, Interrogatory No. 2.

Objection:     *See* Objection to Interrogatory No. 2.

23.     Any and all hotel reward club program statements for the period 1998 to the present for all reward club programs identified by Defendants in response to Plaintiff's Second Set of Interrogatories, Interrogatory No. 3.

Objection:     *See* Objection to Interrogatory No. 3.

24.     Any and all documents relating or referring to Defendants' telephone bills and statements for the period 1998 to the present.

Objection:     Defendants object to this Request for Production on the grounds that it is unduly burdensome and not likely to lead to the discovery of admissible evidence.

6

November 26, 2007                          Respectfully submitted,

                                           _____
                                           John M. Bredehoft
                                           D.C. Bar No. 375606
                                           KAUFMAN & CANOLES, P.C.
                                           150 West Main Street, Suite 2100
                                           Norfolk, Virginia 23510
                                           757-624-3225 (direct voice line)
                                           757-624-3169 (facsimile)
                                           jmbredehoft@kaufcan.com


## CERTIFICATE OF SERVICE

This will certify that a true copy of the foregoing Objections and Responses to Plaintiff

Jennifer Thong's Second Set of Request for the Production of Documents to Defendants was sent

via first class mail, this 26th day of November, 2007, to:

> Jonathan G. Rose, Esq.
> Sheppard Mullin Richter and Hampton, LLP
> 1300 I Street, N.W.
> 11th Floor East
> Washington, DC  20005

_____
John M. Bredehoft


1292226\1

# **<u>EXHIBIT D</u>**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JENNIFER THONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:06-01807 (RCL) |
| | ) | |
| ANDRE CHREKY SALON, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF
### JENNIFER THONG'S SECOND SET OF INTERROGATORIES TO DEFENDANTS

Defendants Andre Chreky, Andre Chreky Salon, and SPAC, LLC (the "Defendants"), by counsel, respond to Plaintiff Jennifer Thong's Second Set of Interrogatories to Defendants as follows:

1.     For the period 1998 to the present, identify all savings accounts, checking accounts and safety deposit boxes held by Defendants by name and address of the financial institution and the account number.

Objection:     Defendants object to this Interrogatory on the grounds that it is overly burdensome and not likely to lead to the discovery of admissible evidence.  To the extent this Interrogatory purports to be based on assessing Defendants' financial status, Defendants assert that they have previously produced documents evidencing the income and net worth of each defendant.

2.     For the period 1998 to the present, identify all credit cards held by Defendants, by name and address of the financial institution and the account number.

Objection:    Defendants object to this Interrogatory on the grounds that it is overly burdensome and not likely to lead to the discovery of admissible evidence.  To the extent this Interrogatory purports to be based on assessing Defendants' financial status, Defendants assert that they have previously produced documents evidencing the income and net worth of each defendant.

3.    For the period 1998 to the present, identify any hotel reward club programs to which Defendants belong, by name of the program and the account number.

Objection:    Defendants object to this Interrogatory on the grounds that it is not likely to lead to the discovery of admissible evidence.

November 26, 2007

Respectfully submitted,

John M. Bredehoft
D.C. Bar No. 375606
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
757-624-3225 (direct voice line)
757-624-3169 (facsimile)
jmbredehoft@kaufcan.com

## <u>CERTIFICATE OF SERVICE</u>

This will certify that a true copy of the foregoing Objections and Responses to Plaintiff

Jennifer Thong's Second Set of Interrogatories to Defendants was sent via first class mail, this

26th day of November, 2007, to:

      Jonathan G. Rose, Esq.
      Sheppard Mullin Richter and Hampton, LLP
      1300 I Street, N.W.
      11th Floor East
      Washington, DC  20005

                        John M. Bredehoft

1292170\1

# EXHIBIT E



1300 I Street, NW | 11th Floor East | Washington, D.C. 20005-3314
202-218-0000 *office* | 202-218-0020 *fax* | *www.sheppardmullin.com*

Writer's Direct Line:
jrose@sheppardmullin.com

November 30, 2007

Our File Number: 0100-092359

*VIA E-MAIL AND U.S. MAIL*

David Sullivan, Esq.
Kaufman & Canoles, PC
150 West Main Street, Suite 2100
Norfolk, VA 23510
E-Mail: djsullivan@kaufcan.com

      Re:    <u>Thong v. Chreky, et al.</u>

Dear David:

      This is to follow-up with you regarding Defendants' responses to Plaintiff Jennifer Thong's Second Request for the Production of Documents and Second Set of Interrogatories in the above-referenced matter. As I explained to you yesterday in our telephone call, we believe Defendants' responses are unacceptable and fail to comply with their duty to produce all documents responsive to these requests.

I.    <u>Plaintiff's Second Request for the Production of Documents</u>

      As you are well aware, the scope of discovery is "broad", allowing for discovery regarding any matter, not privileged, relevant to a claim or defense. <u>Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.</u>, 242 F.R.D. 1, 6-7 (D.D.C. 2007) (Lamberth, J.). The term "relevance" at the discovery stage is a broadly construed term and is given very liberal treatment. <u>Id.</u> The treatment of the term is so liberal that relevant information sought need not even "be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." <u>Id.</u>; F.R.C.P. 26(b)(1).

      Once relevance has been established, the burden is on the party objecting to the discovery to show that the information sought is not readily available to it. <u>Id.</u>, at 8. In order to satisfy its burden, the objecting party must make a specific, detailed showing. <u>Id.</u> The objector must do more than just state the objection, the objector must submit affidavits or offer evidence which reveals the nature of the objection. <u>Id.</u>

      Defendants object to a number of Plaintiff's document requests on the basis that they are "not likely to lead to the discovery of admissible evidence." Defendants have provided no supporting evidence beyond that vague objection. It is improper for Defendants to summarily

SHEPPARD MULLIN RICHTER & HAMPTON LLP

David Sullivan, Esq.
November 30, 2007
Page 2

determine what discovery is or is not "likely" to lead to admissible evidence at this stage. Defendants are not privy to Plaintiff's theories of the case and legal strategy. For the reasons set forth below, Plaintiff's document requests are well within the permissible scope of discovery and reasonably calculated to lead to the discovery of admissible evidence in this case.

In addition, Defendants object to a number of Plaintiff's document requests on the basis that they are "unduly burdensome." The court only entertains an unduly burdensome objection when the responding party demonstrates how the document is "overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden." Bacardi, 242 F.R.D. at 10. The responding party cannot just "merely state in a conclusory fashion" that the requests are burdensome. Id. Since the onus is on Defendants to demonstrate how the requests are unduly burdensome, Defendants' objections on this ground are insufficient and improper, and we do not believe they will be upheld by this Court.

Document Request Nos. 1 and 18

Document Request No. 1 seeks all minute books for the Salon, and Document Request No. 18 seeks employment agreements for all employees, officers, directors and managers of the Salon. Defendants object to both of these requests on the basis that they are not likely to lead to the discovery of admissible evidence. On the contrary, the requested documents are relevant to understanding the interrelationship between the corporate and individual Defendants, and whether proper corporate formalities were/are maintained between and among the Defendants. Employment agreements for the officers, directors and managers of the Salon are relevant to determining who the officers are, what their duties are, and how their compensation is determined. Likewise, any minute books memorializing decisions of the Salon are relevant to determining whether proper corporate procedures are followed in setting the "reasonable" compensation of the Salon's corporate officers, including but not limited to, Mr. and Mrs. Chreky. Not only are these documents relevant to whether or not financial improprieties may have occurred at the Salon, but they are relevant to Mr. Chreky's credibility, which, as you know, is always at issue.

To the extent Defendants object to these requests on the basis that they are overly burdensome, Defendants' conclusory objections lack merit. Defendants have failed to provide any evidence (i.e., affidavits, etc.) demonstrating how these requests are overly burdensome. Indeed, these documents should be readily available for production because correct and complete books and records and minutes of the proceedings of shareholders and board of directors must be maintained by Defendants at all times. See D.C. Code § 29-101.45.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

David Sullivan, Esq.
November 30, 2007
Page 3

### Document Request Nos. 7, 8, 9 and 10

Document Request Nos. 7, 8, 9 and 10 seek W-2 and current payroll information regarding Mr. Chreky, and his wife, Mrs. Chreky, an officer of the corporate Defendants. Such documents are necessary to confirm whether Mr. and Mrs. Chreky possess any other non-taxable assets that are not included on the face of their tax returns, and/or not included on their personal financial statements. While Defendants have already produced some documents evidencing the income and net worth of Mr. Chreky, the documents requested herein are relevant because they relate, among other things, to Mr. Chreky's credibility and the accuracy of Defendants' financial statements.

### Document Request Nos. 11, 12 and 13

Document Requests Nos. 11, 12 and 13 seek information related to the financial transactions conducted among and between the Defendants at the conclusion of the Salon's most recent fiscal year, in April 2007. Such documents are relevant to determining, among other things, whether payments made to Mr. and Mrs. Chreky at the end of the financial year are treated as shareholder dividends, or as cash distributions, and whether proper corporate formalities were/are respected and upheld when conducting financial transactions. As with Document Request Nos. 1 and 18, these documents are relevant to understanding the interrelationship between the corporate and individual Defendants, and whether proper corporate formalities were/are maintained between and among the Defendants.

### Document Request Nos. 14 and 15

Document Request Nos. 14 and 15 seek copies of life insurance polices for Mr. and Ms. Chreky. Defendants' objection to this request is completely meritless. Such life insurance policies are certainly relevant if they either have a cash value, or if they are subject to a buy-sell agreement with one of the corporate Defendants. If so, then such life insurance policies may be used to satisfy part or all of a potential judgment against the Defendants and are, therefore, discoverable. F.R.C.P. 26(a)(1)(D).

### Document Request No. 19

Document Request No. 19 requests documents evidencing the number of hours actually worked by employees of the Salon, including but not limited to time cards, work schedules, and notes or reports kept by supervisors or managers at the Salon. Defendants object to this request on the basis that it is not limited in time. To the extent that Defendants are withholding documents responsive to this request on that basis, Plaintiff is willing to limit this request to the period of 1998 to the present, consistent with the relevant time frame of the allegations contained in the complaint.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

David Sullivan, Esq.
November 30, 2007
Page 4

Defendants' objection that this request is "duplicative" is without any merit. While Defendants have previously produced payroll records which purport to reflect "hours worked" by Defendants' employees, these documents are insufficient. Defendants' payroll records reflect only those hours employees were permitted to report on their time cards. Plaintiff alleges she was routinely required to work overtime hours "off-the-clock", for which she was not compensated and, therefore, would not be reflected in payroll records. See Amended Complaint, Counts 1-4. Witness testimony in depositions further confirms that Defendants' employees worked overtime hours for which they are not compensated. Therefore, documents reflecting the actual hours worked by Defendants' employees - such as handwritten time cards, work schedules, calendars and notes - are indisputably relevant to Plaintiffs' off-the-clock overtime claim, and must be produced.

Document Request No. 20

Document Request No. 20 requests the verified transcript of the deposition of Andre Chreky in the matter Commonwealth ex rel. Doudaklian v. Andre Chreky ("the Doudaklian case"), in the Fairfax County Circuit Court, State of Virginia. On information and belief, Mr. Chreky testified in a deposition in the Doudaklian case, that he was not the father of Ms. Doudaklian's child. Contrary evidence has been presented in this case, including a declaration from Ms. Doudaklian stating that Mr. Chreky is, in fact, the father of her child. Mr. Chreky's verified transcript in Doudaklian is relevant to establish that Mr. Chreky has a practice of lying to conceal his indiscretions, including committing perjury to conceal such indiscretions. This transcript is therefore relevant to Mr. Chreky's credibility, which is always at issue.

Document Request No. 24

Document Request No. 24 seeks Defendants' telephone bills and statements from 1998 to the present. Defendants' telephone statements are relevant to confirming witness testimony that Mr. Chreky was engaged in personal, intimate relationships with a number of his female employees. In addition, on information and belief, Mr. Chreky has contacted or attempted to contact a number of Plaintiffs' witnesses since she filed her complaint to intimidate, threaten or otherwise persuade these witnesses. Among other things, Defendants' telephone statements evidencing communications with these witnesses are relevant to establish Defendant is obstructing the prosecution of Plaintiff's case by trying to intimidate Plaintiff's witnesses.

Document Request Nos. 2-6 and 16-17

Finally, in response to Doc. Request Nos. 2-6 and 16-17 Defendants stated that they are "in the process of locating responsive documents and will produce responsive documents when available." These document requests seek the basic corporate documents of the corporate Defendants (Articles of Incorporation, Bylaws, Operating Agreements, Lease Agreements, Tax Assessments) and basic tax forms (1099 and W-2) for the Salon for 2006.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

David Sullivan, Esq.
November 30, 2007
Page 5

These documents should be readily available at Defendants' principal place of business as a matter of prudent business practice.

Furthermore, Plaintiff served her Second Request for the Production of Documents to Defendants on October 26, 2007. Defendants had ample time to collect and produce documents responsive to these basic requests within the standard 30-day deadline allotted by Federal Rule of Civil Procedure 34. As such, Plaintiff requests that Defendants produce these documents immediately, and no later than Wednesday, December 5, 2007.

II.    Plaintiff's Second Set of Interrogatories 1-3 and Plaintiff's Second Request for the Production of Documents 21-23

Plaintiff's Second Set of Interrogatories 1-3 and Document Requests 21-23 seek copies of Defendants' bank statements, credit card statements and hotel reward club programs. Contrary to Defendants' erroneous assertion, these interrogatories and document requests are not aimed at assessing Defendants' financial status. Witness testimony in depositions has confirmed that Mr. Chreky was involved in personal intimate relationships with a number of his female employees and frequently entertained them at hotels and restaurants close to the Salon as well as out of town travel. In addition, a number of witnesses have testified in depositions that Mr. Chreky invited them to hotel rooms to participate in sexual encounters and "threesomes." Defendants' bank statements, credit card statements and hotel reward club statements are relevant to confirming the frequency of Mr. Chreky's hotel stays, and to validate witness testimony regarding these encounters. Moreover, to the extent Mr. Chreky's sexual liaisons at hotels were paid for using corporate credit cards, such evidence is relevant to Defendants' lack of corporate formality and the credibility of Defendants' financial reporting.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

David Sullivan, Esq.
November 30, 2007
Page 6


        Plaintiff expected that Defendants would provide substantive responses in good
faith, and we do not believe the Court will uphold Defendants' hollow objections. Pursuant to
Local Rule 7(m) of the U.S. District Court for the District of Columbia, we would like to
schedule a teleconference to discuss Defendants' inadequate discovery responses so that we can
hopefully avoid filing a motion to compel with the Court, or at least narrow the areas of
disagreement.  We are available for a teleconference on Monday, December 3rd, anytime after
4:00 p.m.  Please let me know if this time is convenient for you, and if not, please provide me
with an alternate time on Monday, December 3rd or early morning on Tuesday, December 4th.

                                    Sincerely,

                                    Jonathan G. Rose



c:      John M. Bredehoft, Esq.
        Debra Katz, Esq.
        Ari Wilkenfeld, Esq.

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JENNIFER THONG,             ) | |
|        ) | |
|       Plaintiff,        ) | |
|        ) | |
| v.                         ) | C.A. No. 1:06-01807 (RCL) |
|        ) | |
| ANDRE CHREKY SALON, ET AL.        ) | |
|        ) | |
|       Defendants.        ) | |

DEFENDANTS' SUPPLEMENTAL RESPONSES TO
PLAINTIFF JENNIFER THONG'S SECOND SET OF REQUEST
FOR THE PRODUCTION OF DOCUMENTS TO DEFENDANTS

Defendants Andre Chreky ("Mr. Chreky"), Andre Chreky, Inc. ("ACI"), and SPAC, LLC

("SPAC") (collectively the "Defendants"), by counsel, respond to Plaintiff Jennifer Thong's

Second Set of Request for the Production of Documents to Defendants as follows:

1.    Any and all "minute books" for the Salon for the period 1998 to the present.

Response:    Notwithstanding and without waiving its prior objection, ACI states that it

does not have minute books in its possession, custody or control.

2.    Any and all Articles of Incorporation for the Salon.

Response:    See documents bates labeled Chreky 003961-003966.

3.    Any and all Bylaws for the Salon.

Response:    ACI states that it does not have bylaws in its possession, custody or

control.

4.    Any and all operating agreements for SPAC, LLC.

<u>Response</u>:       SPAC states that it does not have an operating agreement in its possession, custody or control.

5.       Any and all rental or lease agreements for the premises located at 1604 K St., NW, Washington, DC, 20006 for the period 1998 to the present.

<u>Response</u>:       Defendants state that they do not have such an agreement in their possession, custody or control.

6.       Any and all documents relating to the assessed tax value by the District of Columbia for the premises located at 1604 K St., NW, Washington, DC, 20006.

<u>Response</u>:       <u>See</u> document bates labeled Chreky 003967.

7.       Mr. Chreky's W-2 Forms for the years 2002, 2003, 2004, 2005, and 2006.

<u>Response</u>:       Notwithstanding and without waiving defendants' prior objection, <u>see</u> documents bates labeled Chreky 003968-003972.

8.       Mr. Chreky's pay stub(s) for October 2007.

<u>Response</u>:       Notwithstanding and without waiving defendants' prior objections, Mr. Chreky and ACI state that they do not maintain pay stubs.  However, <u>see</u> documents bates labeled Chreky 003973-003974 for payroll register reports reflecting paychecks issued to Mr. Chreky in October, 2007.

9.       Serena Chreky's W-2 Forms for the years 2002, 2003, 2004, 2005, and 2006.

<u>Response</u>:       Notwithstanding and without waiving defendants' prior objection, <u>see</u> documents bates labeled Chreky 003968-003972.

10.       Serena Chreky's pay stub(s) for October 2007.

<u>Response</u>:       Notwithstanding and without waiving defendants' prior objections, ACI states that it does not maintain pay stubs.  However, <u>see</u> documents bates labeled Chreky

003973-003974 for payroll register reports reflecting paychecks issued to Serena Chreky in October, 2007.

11.    Detailed general ledger for the Salon for the year ending April 30, 2007.

<u>Response</u>:    Notwithstanding and without waiving its prior objection, <u>see</u> ACI's general ledger bates labeled Chreky 003977-004094.

12.    Any and all documents or records relating to the April 2007 bank statements for the Salon.

<u>Response</u>:    Notwithstanding and without waiving its prior objection, <u>see</u> documents bates labeled Chreky 0004099-0004141.

13.    Any and all documents or records relating to the April 2007 bank statements for SPAC, LLC.

<u>Response</u>:    Notwithstanding and without waiving its prior objection, <u>see</u> documents bates labeled Chreky 0004095-0004098.

14.    Any and all documents relating to life insurance policies for Mr. Chreky.

<u>Response</u>:    Notwithstanding and without waiving his prior objection, Mr. Chreky does not have any such documents in his possession, custody or control.  Mr. Chreky does not maintain documents related to his life insurance policy, which is a term life insurance policy.

15.    Any and all documents relating to life insurance policies for Serena Chreky.

<u>Response</u>:    Notwithstanding and without waiving defendants' prior objection, defendants do not have any such documents in their possession, custody or control.  Defendants do not maintain documents related to Ms. Chreky's life insurance policy, which is a term life insurance policy.

16.    The 1099 Form for the Salon for the year 2006.

Response:     See documents bates labeled Chreky 003975-003976.

17.     The W-2 Form for the Salon for the year 2006.

Response:     Defendants previously produced all W-2 forms issued by ACI for several years, including 2006 (see documents bates labeled Chreky 000588-000637).

18.     Any and all employment agreements for all employees, officers, managers, and supervisors of the Salon for the period 1998 to the present.

Response:     Notwithstanding and without waiving their prior objection, other than signature pages associated with the Andre Chreky Salon Staff Manual, no such agreements exist. To the extent plaintiff wishes to review personnel files to review and copy such signature pages, ACI agrees to make such documents available for inspection and copying at a mutually convenient time and place.

21.     Any and all bank statements for the period 1998 to the present for all savings accounts, checking accounts and safety deposit boxes identified by Defendants in response to Plaintiff's Second Set of Interrogatories, Interrogatory No. 1.

Response:     Notwithstanding and without waiving defendants' objection, in the action filed against Defendants by Ronnie Barrett, the Court Granted Defendants' Motion to Quash a subpoena on Adams National Bank seeking only a subset of the documents requested in this Request for Production.

23.     Any and all hotel reward club program statements for the period 1998 to the present for all reward club programs identified by Defendants in response to Plaintiff's Second Set of Interrogatories, Interrogatory No. 3.

Objection:     Notwithstanding and without waiving defendants' prior objection, no such documents exist.

4

December 7, 2007

                                                    Respectfully submitted,

                                                    _____
                                                    John M. Bredehoft
                                                    D.C. Bar No. 375606
                                                    KAUFMAN & CANOLES, P.C.
                                                    150 West Main Street, Suite 2100
                                                    Norfolk, Virginia 23510
                                                    757-624-3225 (direct voice line)
                                                    757-624-3169 (facsimile)
                                                    jmbredehoft@kaufcan.com


## CERTIFICATE OF SERVICE

This will certify that a true copy of the foregoing Supplemental Responses to Plaintiff Jennifer Thong's Second Set of Request for the Production of Documents to Defendants was sent via first class mail and electronic mail, this 7th day of December, 2007, to:

Jonathan G. Rose, Esq.
Sheppard Mullin Richter and Hampton, LLP
1300 I Street, N.W.
11th Floor East
Washington, DC  20005

                                    _____
                                    John M. Bredehoft

::ODMA\PCDOCS\DOCSNFK\1304932\1

# **<u>EXHIBIT G</u>**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JENNIFER THONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:06-01807 (RCL) |
| | ) | |
| ANDRE CHREKY SALON, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANTS' SUPPLEMENTAL RESPONSES TO PLAINTIFF
### JENNIFER THONG'S SECOND SET OF INTERROGATORIES TO DEFENDANTS

Defendants Andre Chreky ("Mr. Chreky"), Andre Chreky, Inc. ("ACI"), and SPAC, LLC ("SPAC") (collectively the "Defendants"), by counsel, respond to Plaintiff Jennifer Thong's Second Set of Interrogatories to Defendants as follows:

1.    For the period 1998 to the present, identify all savings accounts, checking accounts and safety deposit boxes held by Defendants by name and address of the financial institution and the account number.

<u>Response</u>:    Notwithstanding and without waiving their objection, Defendants state that Mr. Chreky maintains a personal checking account (joint account with his wife, Serena Chreky) at Adams National Bank and Sun Trust Bank.  ACI and SPAC maintain checking accounts at Adams National Bank.

2.    For the period 1998 to the present, identify all credit cards held by Defendants, by name and address of the financial institution and the account number.

<u>Response</u>:     Notwithstanding and without waiving their objection, Defendants state that ACI maintains a corporate credit card account with American Express.  Mr. Chreky does not maintain a credit card in his name.  SPAC does not maintain a credit card in its name.

3.     For the period 1998 to the present, identify any hotel reward club programs to which Defendants belong, by name of the program and the account number.

<u>Response</u>:     Notwithstanding and without waiving their objection, Defendants state that no defendants belongs to any hotel reward club program.

December 7, 2007

Respectfully submitted,

John M. Bredehoft
D.C. Bar No. 375606
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
757-624-3225 (direct voice line)
757-624-3169 (facsimile)
jmbredehoft@kaufcan.com

## <u>CERTIFICATE OF SERVICE</u>

This will certify that a true copy of the foregoing Supplemental Responses to Plaintiff Jennifer Thong's Second Set of Interrogatories to Defendants was sent via first class mail and electronic mail, this 7th day of December, 2007, to:

> Jonathan G. Rose, Esq.
> Sheppard Mullin Richter and Hampton, LLP
> 1300 I Street, N.W.
> 11th Floor East
> Washington, DC  20005

_____
John M. Bredehoft

::ODMA\PCDOCS\DOCSNFK\1305097\1

# EXHIBIT H

1

08:46:10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x

RONNIE BARRETT,                     :

       Plaintiff,               :

    vs.                             :  C.A. No.
                       :  07-CV-0250(RCL)
ANDRE CHREKY,                       :
ANDRE CHREKY SALON/ANDRE
CHREKY INC., SPAC, LLC.,            :

       Defendants.              :

- - - - - - - - - - - - - - x

JENNIFER THONG,                     :

       Plaintiff,               :

    vs.                             :  Civil No.
                       :  1:06-1807(RCL)
ANDRE CHREKY SALON, et al.,         :

       Defendants.              :

- - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, October 31, 2007

    The deposition of DENIA SANTOS, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Sheppard, Mullin, Richter & Hampton, LLP,

1300 I Street, N.W., 11th Floor East, Washington,

JARDIM REPORTING ASSOCIATES
(703) 867-0396

---

2

D.C., convened at 9:00 a.m., before PAULA J. EASTES,
a notary public in and for the District of Columbia,
when were present on behalf of the parties:

APPEARANCES:

On behalf of the Plaintiff Ronnie Barrett:

    ARI M. WILKENFELD, ESQUIRE
    Katz, Marshall & Banks, LLP
    1718 Connecticut Avenue, N.W.
    Sixth Floor
    Washington, D.C. 20009
    (202) 299-1140

On behalf of the Plaintiff Jennifer Thong:

    JONATHAN G. ROSE, ESQUIRE
    EMILY SEYMOUR, ESQUIRE
    Sheppard, Mullin, Richter & Hampton LLP
    1300 I Street, N.W.
    11th Floor East
    Washington, D.C. 20005
    (202) 218-0000

---

3

APPEARANCES (Continued):

On behalf of the Defendants:

    DAVID SULLIVAN, ESQUIRE
    Kaufman & Canoles
    150 West Main Street
    Suite 2100
    Norfolk, Virginia 23510
    (757) 624-3225

Also Present:  ANDRE CHREKY

---

4

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR | |
| --- | --- | --- |
| | PLAINTIFFS | DEFENDANTS |
| DENIA SANTOS | | |
| By Mr. Rose | 5 | -- |
| By Mr. Sullivan | -- | 47 |
| By Mr. Wilkenfeld | 49 | -- |
| By Mr. Rose | 52 | -- |

E X H I B I T S

| SANTOS EXHIBITS | MARKED |
| --- | --- |
| Exhibit No. 1 | 45 |

17

09:17:59 1    Q.    It was in process.  Okay.

09:17:51 2    A.    Because I have to take the test at a

09:17:12 3  different time because of the language.  But still it

4  was kind of like I was in the system.

09:18:01 5    Q.    I understand.

09:18:03 6          But just so that I am clear, you currently

09:18:06 7  have a D.C. license?

09:18:09 8    A.    No.

09:18:10 9    Q.    It is still in process?

09:18:12 10   A.    Yes.

09:18:22 11   Q.    So, you were hired in May 1999.

09:18:25 12         Who did you interview with when you applied

09:18:28 13 to the salon?

09:18:30 14   A.    With Andre.

09:18:31 15   Q.    Directly with Andre?  You met with him?

16   A.    Yes.

09:18:33 17   Q.    How long did you meet with Andre at that

09:18:36 18 time?

09:18:37 19   A.    How long did I meet him?

09:18:36 20   Q.    Was it five minutes, one minute?

09:18:41 21   A.    No.  It was more like 20 minutes probably,

09:18:45 22 half an hour.  I don't remember.

18

09:18:48 1    Q.    Did he speak with you?  Did he talk with you

09:18:51 2  the entire time?

09:18:51 3    A.    Yes.

09:18:52 4    Q.    Did he ask you to show your skills on a

09:18:58 5  person or on a manikin?

09:18:58 6    A.    No.  But he was teaching me, giving me some

09:19:04 7  of his knowledge.  He was training me as an

09:19:10 8  assistant.  I was working as an assistant.

09:19:12 9    Q.    But that was in your first interview?

09:19:15 10   A.    Not the first day.

09:19:16 11   Q.    Well, my question is who did you meet with

09:19:19 12 when you interviewed?

09:19:20 13   A.    With him.

09:19:20 14   Q.    Just with him?  You didn't talk with anyone

09:19:23 15 else?

09:18:24 16   A.    I don't remember.  That is a long time ago.

09:19:26 17   Q.    I know it was a long time ago.

09:19 18   A.    Probably a manager.

09:19 19   Q.    Okay.  That is fine.

09:19:35 20         So, you were hired there on the spot when

09:19:35 21 you met with him?

09:19:38 22   A.    Yes.

19

09:19:36 1    Q.    And you started work shortly thereafter?

09:19:41 2    A.    Later.  Yes.

09:19:43 3    Q.    What were you hired to do?

09:19:45 4    A.    Excuse me?

09:19:47 5    Q.    What were you doing when you were hired at

09:19:49 6  the salon?  Were you coloring hair?  Were you doing

09:19:52 7  facials?

09:19:52 8    A.    No.  I was an assistant for three months.

09:19:55 9    Q.    You were his assistant for three months,

09:19:57 10 which meant that you did blow-drys on his clients?

09:20:00 11   A.    Yes.

09:20:02 12   Q.    And you said just for three months you were

09:20:04 13 in that capacity?

09:20:05 14   A.    Yes.

09:20:07 15   Q.    What did you do after three months?  Did you

09:20:12 16 start cutting hair of people yourself or did you work

09:20:13 17 with someone else?

09:20:14 18   A.    Cutting.

09:20:15 19   Q.    You started cutting hair?

09:20:17 20   A.    Styling.

09:20:21 21   Q.    And so you were a stylist?

09:20:26 22         How long were you a stylist?  The entire

20

09:20:37 1  time that you worked at the salon?

09:20:29 2    A.    Yes.

09:20:30 3    Q.    When did you leave the salon?  When did your

09:20:35 4  employment end?

09:20:36 5    A.    Around two years ago.

09:20:37 6    Q.    About two years ago.

09:20:39 7          So, the fall of 2005?

09:20:43 8    A.    Yes.

09:20:56 9    Q.    What were your hours when you worked at the

09:21:04 10 Andre Chreky Salon?

09:21:04 11   A.    At first three months it was 60.

09:21:08 12   Q.    60 hours a week?

09:21:10 13   A.    Yes.

09:21:11 14   Q.    How many hours were you getting paid for?

09:21:15 15   A.    I don't remember.

09:21:17 16   Q.    Did you get paid overtime?

09:21:20 17   A.    I don't know.  I had a salary of $500.

09:21:24 18   Q.    Your salary was what?

09:21:25 19   A.    $500.

09:21:26 20   Q.    $500 a week?

09:21:28 21   A.    Yes.

09:21:29 22   Q.    And that is what you would be paid for the

21

09:21:32  1    60 hours? That didn't change if you worked 55 hours

09:21:39  2    or 65 hours?

09:21:39  3        A.    No. It didn't go up to 65. It went just to

09:21:41  4    60.

09:21:43  5        Q.    It was just 60 hours.

09:21:45  6        So, what were your shifts? When did you

09:21:49  7    arrive and when did you leave?

09:21:51  8        A.    When did I leave the salon?

09:21:53  9        Q.    No. I'm sorry.

09:21:54  10       During the day you arrived at the salon in

09:21:57  11   the morning at what time?

09:21:59  12       A.    It was different times. It was 10:00 to

09:22:06  13   8:00.

          14       Q.    10:00 to 8:00.

09:22:06  15       Did you work weekends as well?

09:22:07  16       I mean, how many days a week did you work?

09:22:11  17       A.    I think it was six.

09:22:14  18       Q.    Six days a week, 10:00 to 8:00?

09:22:17  19       A.    Yes.

09:22:21  20       Q.    How long did you have these hours, roughly

09:22:27  21   60 hours?

09:—?—  22        A.    Three months.

22

09:22:27  1        Q.    For three months. Okay.

09:22:29  2        That was when you were Andre's assistant?

09:22:32  3        A.    Yes.

09:22:32  4        Q.    He is very hardworking, isn't he?

09:22:35  5        A.    Yes.

09:22:35  6        Q.    He works very long hours?

09:22:38  7        A.    Yes.

09:22:39  8        Q.    So, after three months your hours changed?

09:22:45  9        A.    Yes.

09:22:45  10       Q.    To what? How many hours a week were you

09:22:48  11   working?

09:22:49  12       A.    Five days.

09:22:49  13       Q.    Five days. Still ten-hour days?

09:22:52  14       A.    Yes.

09:22:52  15       Q.    So, you were working 50 hours a week?

09:22:54  16       A.    But that was commission.

09:22:57  17       Q.    You were on a commission at that point.

          18       So, you were no longer making $500 a week,

09:—?—  19    you were on commission?

09:23:08  20       A.    Yes. It still was like $600 or $700.

09:23:10  21       Q.    It was $600 or $700. So, it was a slight

09:23:14  22   rise?

23

09:23:14  1        A.    Yes.

09:23:15  2        Q.    But you were working ten hours less?

09:23:18  3        A.    Yes.

09:23:37  4        Q.    Did all of the stylists work long hours like

09:23:41  5    you?

09:23:42  6        A.    Yes.

09:23:42  7        Q.    50 or more hours?

09:23:44  8        A.    Yes.

09:23:44  9        Q.    Was that true of other employees of the

09:23:48  10   salon as well, people that did color?

09:23:49  11       A.    Yes.

09:23:50  12       Q.    People who did nails, they all worked long

09:23:53  13   hours?

09:23:53  14       A.    Yes.

09:23:53  15       Q.    50, 60 hours a week?

09:23:56  16       A.    Yes.

09:23:56  17       Q.    Do you know whether or not any of them got

09:23:58  18   paid overtime?

09:23:59  19       MR. SULLIVAN:  Foundation.

09:24:00  20       THE WITNESS:  I don't know.

          21   BY MR. ROSE:

09:24:05  22       Q.    Do you know what overtime pay is?

24

09:24:08  1        A.    Yes.

09:24:09  2        Q.    And you don't recall ever being paid

09:24:12  3    overtime; is that correct?

09:24:14  4        A.    Yes.

09:24:34  5        Q.    Were you employed at the salon when a

09:24:40  6    governmental agency came in and investigated the pay

09:24:44  7    practices of the salon?

09:24:44  8        A.    Yes.

09:24:45  9        Q.    You were there.

09:24:47  10       What is it that you remember about the

09:24:51  11   governmental investigation of Mr. Chreky's pay policy

09:24:55  12   or failure to comply with the legal requirements for

09:24:58  13   overtime pay?

09:24:59  14       A.    I don't know. I just remember that I just

09:25:02  15   get a check for $100.

09:25:04  16       Q.    You got an extra check?

09:25:05  17       A.    Yes.

09:25:06  18       Q.    Was there any explanation as to what that

09:25:09  19   check was for?

09:25:09  20       A.    It was for overtime work.

09:25:11  21       Q.    Did Mr. Chreky hand the check to you

09:25:13  22   personally?

25

```
09:25:13  1    A.    No.  It was sent by mail.
09:25:15  2    Q.    It was sent by mail.  Okay.
          3          Was it ever communicated to you that
          4    Mr. Chreky was encouraging employees not to cash
09:25:31  5    those checks?
09:25:33  6    A.    No.  I don't know.
          7    Q.    So, you were never threatened to not cash
09:25:41  8    that check?
          9    A.    No.
09:25:42 10    Q.    So, you got an extra check in the mail as a
09:25:45 11    result of the government's investigation finding that
09:25:47 12    Mr. Chreky had failed to comply with this wage
09:25:51 13    payment with the wage payment laws.
09:25:53 14          That is correct?
09:25:54 15    A.    Yes.
09:25:55 16    Q.    Was there any letter explaining what that
09:25:57 17    check was for?
09:25:59 18    A.    Yes.  But I don't remember what exactly it
09:26:01 19    said.
09:26:01 20    Q.    That is fine.  I wasn't going to ask you
09:26:03 21    that.  I know a lot of these events we are talking
09:26:    22    about are in the past.
```

26

```
09:26:07  1          So, after three months you were no longer
09:26:10  2    Mr. Chreky's assistant.
09:26:18  3          Where in the salon did you work?
09:26:21  4    A.    Downstairs.
09:26:21  5    Q.    You worked downstairs?
09:26:23  6    A.    Yes.
09:26:25  7    Q.    Is that where you worked the entire time
09:26:28  8    after your three-months working as Mr. Chreky's
09:26:33  9    assistant?
09:26:33 10    A.    Yes.
09:26:34 11    Q.    When you were Mr. Chreky's assistant did you
09:26:38 12    receive tips?
09:26:39 13    A.    Yes.
09:26:39 14    Q.    You did?
09:26:40 15    A.    Yes.
09:26:40 16    Q.    How is it that you received tips?  Would
09:26:43 17    people give them to you directly?
          18    A.    Sometimes.
09:26:45 19    Q.    Would Mr. Chreky give you a portion of his
09:26:48 20    tips?
09:26:49 21    A.    No.  Clients would give a tip to me
09:26:52 22    sometimes.
```

27

```
09:26:52  1    Q.    So, he never shared his tips, it would be
09:26:55  2    clients that would leave tips for you?
          3    A.    A client would give a tip to him and a tip
09:27:02  4    to the assistant, to me.
09:27:02  5    Q.    So, would they leave you an envelope at the
09:27:05  6    front desk with your name on it?
          7    A.    Sometimes.
09:27:08  8    Q.    And sometimes they would give it to you
09:27:09  9    directly?
09:27:10 10    A.    Yes.
09:27:11 11    Q.    So, that was a common practice that the
09:27:14 12    clients would give two tips, one for Mr. Chreky for
09:27:16 13    cutting the hair and one to you for blow-drying?
09:27:21 14    A.    Yes.
09:27:27 15    Q.    How were the tips handled?
09:27:26 16          I am talking about beyond the three-month
09:27:31 17    period.  During the time that you worked there, how
09:27:35 18    were tips handled?  How did you receive your tips?
09:27:41 19    A.    A client sometimes give it to you.
09:27:45 20    Sometimes they leave it at the front desk.
09:27:49 21    Q.    And how often would you get your tips from
09:27:52 22    the front desk?  Would that be on a daily basis?
```

28

```
09:27:54  1    A.    Every week.
09:27:55  2    Q.    Just on a weekly basis?
09:27:57  3    A.    A weekly basis.
09:27:59  4    Q.    When during the week would you receive your
09:28:02  5    tips?
09:28:02  6    A.    Saturday night.
09:28:03  7    Q.    Saturday night.
09:28:04  8          After the salon had closed?
09:28:05  9    A.    It still was open.
09:28:10 10    Q.    But towards the end of the day?
09:28:12 11    A.    Yes.
09:28:13 12    Q.    Were you working Saturdays?
09:28:15 13    A.    Yes.
09:28:20 14    Q.    Did you ever hear any other stylist, any
09:28:24 15    other hair care professionals, complain that they
09:28:26 16    thought that tips of their's had been stolen?
09:28:29 17    A.    Yes.
09:28:30 18    Q.    That wasn't uncommon, people regularly
09:28:34 19    complained that they felt their tips had been stolen;
09:28:36 20    is that correct?
09:28:36 21    A.    Yes.
09:28:37 22    Q.    Did you ever feel that you had tips that
```

# EXHIBIT I

## DECLARATION OF ADELE DOUDAKLIAN

I, Adele Doudaklian, hereby state that I am over eighteen (18) years of age, am competent to testify and have personal knowledge of the facts stated herein:

1.      I met Andre Chreky when I was approximately 17 years old, working as a receptionist at Piaf's, a Salon owned by Mr. Chreky and his sister. Prior to my marriage Mr. Chreky pursued a sexual relationship with me. After my marriage to Edwin Dean Lucas, he continued to pursue a sexual relationship with me. My husband and I began having marital problems, and Mr. Chreky, who is ten years older than me, began making sexual overtures toward me almost immediately. I recall that Mr. Chreky was very flirtatious with me and other women in the Salon. He constantly made sexual remarks about the women in the Salon, both employees and clients. He would comment on their breasts or buttocks. I believe that Mr. Chreky targeted me for his attentions because I was young and vulnerable. Throughout my relationship, Mr. Chreky often coerced me into sex, forcing himself upon me even when I did not want to have sex. I recall that he consistently got very close to me physically, often coming up behind me and pressing himself against me, and following me to isolated parts of the Salon.

2.      After Mr. Chreky subjected me to these attentions for some time, I began a sexual relationship with him that lasted more than 20 years. In 1986 I became pregnant with our son Andrew. At that time, I was still married. Although I was confident that the child was mine and Mr. Chreky's, at Mr. Chreky's insistence, I told my husband that he was the father of the child. However, as the child got older it became apparent this was not the case. Mr. Lucas is half Japanese, and my son has no Japanese physical characteristics. I continued to work with Mr. Chreky at the Piaf's Salon in Georgetown after the birth of my son, and often brought the child to the Salon. I told both my mother and my sister that the child was Mr. Chreky's. I continued a sexual relationship with Mr. Chreky after Andrew was born, and he continued to pay me child support, although he often objected to the use of that term. He paid me approximately $1,000 in cash on a monthly basis.

3.      I knew of and saw Ronnie Barrett during the first period that Ms. Barrett worked for Mr. Chreky, at Piaf's. At that time, I heard rumors in the Salon as well as from members of the Chreky family that the two were having a sexual relationship. I do not know whether Ms. Barrett consented to a relationship with Mr. Chreky, but would not be surprised if Mr. Chreky coerced her, as I suspected he did with many women over the years.

4.      Over the years, I had sex with Mr. Chreky regularly, meeting him in the Salon, in my car, his car and in hotels, sometimes several times a week. I specifically recalled having sex with Mr. Chreky on the 5th floor of the Andre Chreky Salon, in the bathroom and in the reception area.

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER

5.     When Andrew was approximately 11 or 12 years old, I approached Mr. Chreky about telling Andrew that Mr. Chreky was his father. Mr. Chreky told me that he needed time to prepare Serena Chreky for this news. After several months, Mr. Chreky still had not told Serena, and I told Andrew that Mr. Chreky was his father. Mr. Chreky became upset, and although the boy wanted to meet his father, Mr. Chreky refused.

6.     I continued the sexual relationship with Mr. Chreky until approximately 2000, when as a result of an interaction we had in a hotel room, I began to feel that he was treating me like a prostitute. He came to the hotel room, had sex with me, handed me an envelope with money for child support, and left, stating that he had to go because he "had someone waiting." From the way he said this, I did not believe he meant his wife. Over the years I was aware that Mr. Chreky pursued many of his female employees sexually.

7.     Shortly thereafter, I ceased my sexual relationship with Mr. Chreky, although he made repeated efforts to get me to see him again. Eventually, I filed for child support against Mr. Chreky because he ceased paying me any money for the support of our child. He had stopped regular payment and in 1989 and continuously promised to pay, stringing me along for several years with excuses why he could not pay. However, Mr. Chreky never denied to me that the child was his.

8.     Mr. Lucas and I divorced in 1994 after years of living apart. Shortly thereafter, Mr. Lucas asked for a paternity test to confirm that he was not Andrew's father, a fact that I had already acknowledged to Mr. Lucas. The test came back and showed that Mr. Lucas was not the boy's father.

9.     In approximately, 2002 after Mr. Chreky ceased paying child support for Andrew and did not comply with an oral contract regarding payment. I filed an enforcement action with the Division of Child Support Enforcement. It took the Division over a year to find Mr. Chreky. At the initial hearing, the Judge ordered a DNA test. When Mr. Chreky appeared for the test, he listed his ethnicity as Moroccan. The test came back with a 99.9% probability that he was the father. At the follow up hearing, Mr. Chreky's attorney asked that Mr. Chreky be permitted to take another test (Mr. Chreky was not present). The Judge denied the request stating that another test was unnecessary because the test conclusively proved that Mr. Chreky was the father.

10.     In a later proceeding, the Attorney General attempted to introduce Andrew's DNA test from the time Mr. Lucas was tested for paternity, which, when compared to Mr. Chreky's DNA test, established paternity at 100% probability. The judge refused to permit this second DNA sample to be admitted, and also refused to hear the testimony of the Attorney General's expert in the case who was prepared to testify that the comparison between the two samples conclusively established paternity. It was my understanding that the Attorney General's office never asked for another test because they did not feel one was necessary. In court, there was testimony that Mr. Chreky's ancestry is not in fact Moroccan; his grandparents were from Spain and Yugoslavia.

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER

11.    Despite their early statements to me to the contrary, the Attorney General's office decided not to pursue the case on appeal. They told me that this was because Andrew was over eighteen by the time the trial was over, and because they were concerned that if they lost the case, it would open them up to significant liability from others who would claim they were falsely adjudicated to be fathers of children in Virginia.

12.    I sought an attorney for a contract claim against Mr. Chreky on the grounds that he made an oral promise of support to me which he breached, but I was advised that without an appeal in the Child Support case, such a claim would likely be unsuccessful.

13.    Based on my knowledge of Mr. Chreky over the years, and the way that he treated me, I believe that Mr. Chreky thinks he is above the law and that he preys on vulnerable women.

14.    Mr. Chreky has a violent temper. When I worked with him at the Piaf's Salon I saw him get angry and throw things. I also know that the reason he moved from Piaf's to his brother's Salon, Daniel's, was that while he worked at Piaf's, he had an altercation with his sister, while Mr. Chreky denied these allegations, witnesses told me that that he attacked her with a knife at the Salon.

I SOLEMNLY SWEAR OR AFFIRM under the penalties of perjury that the

matters set forth in this Declaration are true and correct to best of my personal

knowledge, information and belief. Executed on this 31st day of January 2007.


_____
Adele Doudaklian

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER

THONG00008

# EXHIBIT J

## DECLARATION OF MAURICE CLARKE

I, MAURICE CLARKE, hereby state that I am over eighteen (18) years of age, am competent to testify and have personal knowledge of the facts stated herein:

1.     I joined the staff at the Andre Chreky Salon ("the Salon") in the Fall of 1994 as a Stylist, and by the time I left the Salon in April 2005, I had served as the Salon's Senior Manager for approximately six years.

2.     Andre Chreky, the owner of the Salon, routinely made comments to female employees about their bodies and appearance.  He would surround himself in the upstairs of the Salon with women that he was interested in sleeping with, or, was believed to be sleeping with – it was like his own harem.  He often sent women employees whom he was interested in, including Jennifer Thong and Ronnie Barrett, to isolated areas of the Salon and then followed them.  Andre on, at least, one occasion told me that he thought "women were second tier" and should be "subservient" to men.  He seemed to target vulnerable immigrant women who were less assertive and less aware of their rights.

3.     It was well known that Andre was sleeping with at least two of his female managers, Mindy Roberts and Amelle Darri.  In particular, they acted in a manner other than professional – being extremely familiar and informal in a frequently uncomfortable way -- frequently seen late at night in Andre's office upstairs, or together out drinking late at night at bars near the Salon.  It was rumored that Andre had a regular room at the St. Regis where he would go to have sex with female employees, and occasionally customers.

4.     On one occasion I walked into Andre's office and he was wrestling with a female employee on his couch, and it appeared that she clearly was not interested in being touched, or in that position.  Andre was startled, and the women left the office flustered and upset as quickly as possible.  On another occasion, in a back room in the kitchen area, I walked in on Andre with a female manager, and they were partially clothed and clearly were engaged in sexual activity.

5.     While I worked at the Salon, I had the opportunity to work with both Jennifer Thong and Ronnie Barrett.  Similar to his treatment of other female employees, Andre would regularly make comments about how "sexy" Jennifer and Ronnie looked, and would make other inappropriate comments about their appearance.  Both Jennifer and Ronnie came to me on numerous occasions, complaining to me about Andre's inappropriate sexual advances and sexual comments to them, seeking my assistance to intervene.  On those occasions, it was clear how upset and traumatized Jennifer and Ronnie were from Andre's unwanted sexual advances.

6.     While I worked at the Salon, approximately twenty different female employees on, at least, sixty different occasions came to me to complain about Andre's inappropriate sexual advances and sexual comments to them, and requested my assistance to intervene in some way. In response to these complaints, I spoke with Andre on numerous occasions telling him how inappropriate it was for him to pursue these employees, and suggested that he was opening

himself up to unnecessary liability. On at least one occasion, Andre simply responded "I have an attorney." On another, I recall him telling me after I reported a complaint to him, "This is my business and I will run it the way I want." In all of my discussions with Andre about the complaints from female employees, I don't recall his ever taking issue with the truthfulness of the complaints.

7.      Based on over ten years of employment at the Salon, I believe that Andre is a sexual predator with his female employees, particularly those who are originally from third world countries, because of the power he can exert over them based on their immigration status and lack of knowledge of their rights.

8.      It was well known that the Salon had on its staff a number of undocumented workers who were also unlicensed hair professionals. In fact, Andre would have his unlicensed employees perform expensive services for clients who clearly believed they were getting experienced, licensed professional hair care. In fact, Andre would send some of these undocumented and unlicensed employees to the White House to provide services for the First Lady and her daughters Barbara and Jenna.

9.      Andre expected employees of the Salon to work at least fifty hours a week, but most worked closer to sixty or more hours a week. Most employees did not get to take a break for lunch, and if they got a break it was usually only enough to quickly eat something on the run. The Salon's practice was not to pay overtime. This practice continued even after the Salon was investigated by the Department of Labor and fined for non-compliance with overtime pay requirements. He continued to state "nobody gets overtime." He often had people come to work and instructed them not to punch in, and also altered employees time cards to make it appear they worked forty hours when in fact they had worked more than forty hours. Also, Andre would put most stylists on commission until they built up a clientele, at which time he would shift their compensation to a salaried position to minimize their pay. Andre manipulated the Salon's numbers out of greed to minimize the amounts he had to pay employees who were on commission.

10.      The tips for the Salon's employees were kept in a lock box at the desk on a daily basis, and then moved to a locked closet upstairs, with only Andre the Receptionist Manager and myself had the combination. The tips would be divided up on a weekly basis, and were distributed on Saturday nights. There were always people complaining that their tips were missing or had been stolen. On a number of occasions, Andre told me, and employees would also tell me that Andre told them, he withheld their tips for various punitive reasons. Along the same lines, on a number of occasions, I saw Andre take money out of the cash register for his own use. He exercised control over everything in the Salon, and treated the money in the cash register and his employees tips as if they were his to use as he pleased.

11.      Andre's wife Serena worked for the Salon, but when she came into the Salon, she would be there for the morning and leave by early afternoon because of childcare/transportation issues. Although Serena was a part-owner and Manager, she did not even have a key to the Salon until I gave her one – a sign of how little Andre wanted her a part of the Salon's management.

12.     When Andre got angry, which was not uncommon, he had a violent temper. In particular, he was very scary and intimidating – getting red-faced and his veins popped out of his neck and face. He would get very close to the person and/or grab their arm if they were trying to get away or did not pay attention in the manner he wanted. I heard Andre say on a number of occasions to employees he was yelling at that "you're never going to work in this town again" to intimidate them from leaving, or to make them feel worse as they left.

13.     When Andre would get angry with a stylist for resisting or rejecting his advances he often punished them. He would punish them financially and professionally by sending them home, or instructing me or other employees to change their schedules or take their appointments and assign them to another stylist. He routinely did this when he became angry with Ms. Barrett or Ms. Thong. When he became angry with the female employees who resisted him, he also made their day to day work more difficult by assigning them additional tasks or over emphasizing their mistakes.

14.     Andre had a paternity suit filed against him by women who claimed Andre was the father of her baby. For purposes of his defense in the litigation, Andre vehemently denied that he was the father of her baby. Significantly, despite the fact that he provided sworn testimony to the contrary, Andre admitted to me before the case was even filed that he was, in fact, the baby's father.


        I SOLEMNLY SWEAR OR AFFIRM under the penalties of perjury that the matters set

forth in this Declaration are true and correct to best of my personal knowledge, information and

belief. Executed on this **26** th day of January 2007.


                _____
                MAURICE CLARKE

3

# **<u>EXHIBIT K</u>**

1

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
RONNIE BARRETT,                :
            Plaintiff,         :
    vs.                        :    C.A. No.
                               :    07-CV-0250(RCL)
ANDRE CHREKY,                  :
ANDRE CHREKY SALON/ANDRE       :
CHREKY INC., SPAC, LLC.,       :
            Defendants.        :
- - - - - - - - - - - - - - x
JENNIFER THONG,                :
            Plaintiff,         :
                               :    Civil No.
    vs.                        :    1:06-1807(RCL)
                               :
ANDRE CHREKY SALON, et al.,    :
            Defendants.        :
- - - - - - - - - - - - - - x

Washington, D.C.
Tuesday, October 16, 2007

The deposition of MAURICE CLARKE, called for

examination by counsel for Defendants in the

above-entitled matter, pursuant to Notice, in the

offices of Sheppard, Mullin, Richter & Hampton, LLP,

1300 I Street, N.W., 11th Floor East, Washington,

JARDIM REPORTING ASSOCIATES
(703) 867-0396

---

2

D.C., convened at 9:03 a.m., before PAULA J. EASTES,
a notary public in and for the District of Columbia,
when were present on behalf of the parties:

APPEARANCES:

On behalf of the Plaintiff Ronnie Barrett:

    ARI M. WILKENFELD, ESQUIRE
    Katz, Marshall & Banks, LLP
    1718 Connecticut Avenue, N.W.
    Sixth Floor
    Washington, D.C. 20009
    (202) 299-1140

On behalf of the Plaintiff Jennifer Thong:

    JONATHAN G. ROSE, ESQUIRE
    EMILY SEYMOUR, ESQUIRE
    Sheppard, Mullin, Richter & Hampton
    1300 I Street, N.W.
    11th Floor East
    Washington, D.C. 20005
    (202) 772-5390

---

3

APPEARANCES (Continued):

On behalf of the Defendants:

    JOHN M. BREDEHOFT, ESQUIRE
    DAVID SULLIVAN, ESQUIRE
    Kaufman & Canoles
    150 West Main Street
    Suite 2100
    Norfolk, Virginia 23510
    (757) 624-3225

Videographer:  RON MEEK

Also Present:  ANDRE CHREKY

---

4

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR | |
| | PLAINTIFFS | DEFENDANTS |
| MAURICE CLARKE | | |
| By Mr. Bredehoft | -- | 6 |
| By Mr. Rose | 54 | -- |
| By Mr. Wilkenfeld | 166 | -- |
| By Mr. Bredehoft | -- | 197 |

E X H I B I T S

| Clarke Deposition Exhibits | MARKED |
| --- | --- |
| No. 1 | 54 |
| No. 2 | 166 |

161

1    what I said.

2        Q.   What did you say to him?

3        A.   My concern was having the best quality

4    people doing the service more so than whether or not

5    a new person can handle a regular client or what they

6    may want as far as service.  And subsequently after

7    that I was relieved of that responsibility.

8        Q.   Directing your attention to paragraph 14 of

9    your declaration, it states:  Andre had a paternity

10   suit filed against him by a woman who claimed Andre

11   was the father of her baby.  For purposes of his

12   defense in the litigation, Andre vehemently denied

13   that he was the father of her baby.

14           Do you see that?

15       A.   Yes.

16       Q.   And those are true statements, correct?

17       A.   It is a true statement because -- well, what

18   I will say is this.  That at the time of this coming

19   to the surface I no longer worked there, I was

20   employed somewhere else.

21       Q.   But you were aware that these allegations

22   and this litigation was going on, correct?

162

1        A.   Yes.

2        Q.   It goes on to say, the last sentence of

3    paragraph 14 says:  Significantly, despite the fact

4    that he provided sworn testimony to the contrary,

5    Andre admitted to me before the case was even filed

6    that he was in fact the baby's father.

7            Do you see that?

8        A.   Yes.

9        Q.   That is a true statement?

10       A.   Yes.

11       Q.   What were the circumstances of your

12   discussion with Mr. Chreky with respect to his

13   admission that the child involved in the paternity

14   suit against him where he admitted it was his child?

15       A.   This was a conversation long before the suit

16   actually ever came up.  It was a problem.  It was an

17   issue that he was dealing with.  But through that

18   give-and-take communication, that is when he made

19   that statement to me.

20       Q.   I am going to try to understand.  The

21   circumstances were such that you were having a

22   discussion with Mr. Chreky where he was sharing some

163

1    information regarding his life that was giving him

2    stress.

3        A.   Yes.

4        Q.   Would that be a fair statement?

5        A.   Yes.

6        Q.   And in that discussion, before the suit was

7    filed --

8        A.   Yes.

9        Q.   -- he admitted that he had fathered a child

10   out of wedlock?

11       A.   Yes.

12       Q.   By this woman who eventually sued him,

13   correct?

14       A.   I can't say it was by that woman.  He said

15   that he had a child.

16       Q.   Not with Serena his wife?

17       A.   Right.

18       Q.   Did he say whether or not he had provided

19   any child support for the child?

20       A.   No.

21       Q.   But you subsequently learned that Mr. Chreky

22   had denied in the context of that litigation that

164

1    that child was his?

2        A.   Yes.

3            MR. ROSE:  Let's take a break.

4            THE VIDEOGRAPHER:  We are now going off the

5    video record at 12:55 p.m.

6            (Recess.)

7            THE VIDEOGRAPHER:  We are now back on the

8    video record.  The time is 1:18 p.m.

9    BY MR. ROSE:

10       Q.   Mr. Clarke, I am kind of nearing the end of

11   my questions.  I believe Mr. Wilkenfeld has some

12   questions for you as well.

13           I wanted to circle back to Mr. Chreky's

14   control and dominance over the salon and every aspect

15   of it that we discussed very briefly.

16           Could you tell us how he exercised his

17   dominion and control over or total control over the

18   salon, some of the ways that that would manifest

19   itself on a daily basis?

20           What aspects of the operations, what things

21   did he do, that made it clear that he was in control

22   at all times?

# EXHIBIT L

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x

RONNIE BARRETT,

      Plaintiff,

    vs.        :  C.A. No.
                :  07-CV-0250(RCL)
ANDRE CHREKY,
ANDRE CHREKY SALON/ANDRE
CHREKY INC., SPAC, LLC,

      Defendants.

- - - - - - - - - - - - - - - x

JENNIFER THONG,

      Plaintiff,

    vs.        :  Civil No.
                :  1:06-1807(RCL)
ANDRE CHREKY SALON, et al.,

      Defendants.

- - - - - - - - - - - - - - - x

Washington, D.C.
Monday, October 15, 2007

The deposition of JEREMY BUCHANAN, called

for examination by counsel for Defendants in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396

---

2

at 9:11 a.m., before PAULA J. EASTES, a notary public
in and for the District of Columbia, when were
present on behalf of the parties:

APPEARANCES:

On behalf of the Plaintiff Ronnie Barrett:

    DEBRA S. KATZ, ESQUIRE
    ARI M. WILKENFELD, ESQUIRE
    Katz, Marshall & Banks, LLP
    1718 Connecticut Avenue, N.W.
    Sixth Floor
    Washington, D.C. 20009
    (202) 299-1140

On behalf of the Plaintiff Jennifer Thong:

    JONATHAN G. ROSE, ESQUIRE
    EMILY SEYMOUR, ESQUIRE
    Sheppard, Mullin, Richter & Hampton
    1300 I Street, N.W.
    11th Floor East
    Washington, D.C. 20005
    (202) 772-5390

---

3

APPEARANCES (Continued):

On behalf of the Defendants:

    JOHN M. BREDEHOFT, ESQUIRE
    DAVID SULLIVAN, ESQUIRE
    Kaufman & Canoles
    150 West Main Street
    Suite 2100
    Norfolk, Virginia 23510
    (757) 624-3225

Videographer:  RON MEEK

Also Present:  ANDRE CHREKY

---

4

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR | |
| | PLAINTIFFS | DEFENDANTS |
| JEREMY BUCHANAN | | |
| By Mr. Bredehoft | -- | 6 |
| By Mr. Rose | 107 | -- |
| By Ms. Katz | 137 | -- |
| By Mr. Bredehoft | -- | 147 |

E X H I B I T S

| Buchanan Deposition Exhibits | MARKED |
| --- | --- |
| No. 1 | 49 |
| No. 2 | 62 |

31

---

**121**

11:49:00 1   to take as much time as you need to read line by line

11:48:15 2   every word in this declaration and to tell me whether

11:48:19 3   or not this declaration is accurate.

11:48:?? 4     A.  Okay.

11:48:25 5     (Witness complies.)

11:48:30 6     Well, the first line it appears as if I was

11:48:33 7   there until 2002. I was there until 2001.

11:48:36 8     But the way I recounted this over the phone

11:48:40 9   was just to, you know, I didn't think about it in

11:48:42 10  terms of like a resume. All I could do was kind of

11:48:45 11  count back from where I am now to then and it was

11:48:48 12  really an estimation. I didn't have, you know, those

11:48:52 13  things in front of me.

11:48:54 14    Q.  Okay.

11:48:55 15     Why don't you read through the whole thing

11:48:57 16  and tell me whether or not there is anything?

11:48:59 17    A.  In particular?

11:49:00 18    Q.  Anything in particular that you believe is

11:49:03 19  inaccurate.

11:49:04 20    A.  (Witness complies.)

11:49:52 21     In number five, just to be absolutely

11:49:54 22  accurate, I don't think that, I wasn't sure that I

---

**122**

11:49:57 1   recounted those last names to the woman on the phone.

11:50:02 2     I mean, I described the name Linda who was a

11:50:08 3   colorist who worked with me and Amal who became the

11:50:10 4   manager. But I can't say for 100 percent that I knew

11:50:12 5   both of those last names.

11:50:14 6    Q.  But when reminded in the process of

11:50:17 7   preparing your declaration these are in fact the

11:50:19 8   women who came and sat at the table at McCormick and

11:50:22 9   Schmidt, correct?

11:50:27 10    A.  Yes.

11:50:28 11     And I am not sure that, you know -- I may

11:50:30 12  have used the word foursome, but what I said was it

11:50:33 13  was obvious that I was being -- what I felt was that

11:50:41 14  they were being offered to me.

11:50:48 15     So, certainly, you know, I may have said the

11:50:52 16  word, you know, foursome, but what I remember

11:50:55 17  specifically is that the feeling that they were

18  being, you know, kind of offered.

11:?? 19    Q.  Well, let me ask you a few questions about

11:51:05 20  that.

11:51:06 21     You are sitting at a bar right virtually

11:51:09 22  next to the door a couple of doors down from your

---

**123**

11:51:11 1   workplace. You have been asked there to have a drink

11:51:14 2   by your boss, correct?

3    A.  Uh-huh.

11:51:15 4    Q.  And you were just settling in to have a

11:51:17 5   drink, correct?

6    A.  Yes.

11:51:18 7    Q.  And shortly after getting there and starting

11:51:21 8   to have a drink your boss asks you whether or not you

11:51:23 9   would like to go have a drink at a nearby hotel a

11:51:26 10  half a block away, correct?

11:51:27 11    A.  Yes. Once the women sat down.

11:51:29 12    Q.  Did that make any sense to you why you would

11:51:31 13  go to a hotel room at the St. Regis and have a drink

11:51:35 14  when you are sitting there in one of the hottest

11:51:38 15  Happy Hours in Washington, D.C.?

11:51:41 16    A.  No.

11:51:44 17    Q.  And you naturally concluded that the reason

11:51:47 18  was that he wanted --

11:51:48 19    A.  Well, he said that he kept a room there. I

11:51:51 20  remember that as well.

11:51:53 21    Q.  Did that sound strange to you?

11:51:55 22    A.  Yes.

---

**124**

11:51:58 1    Q.  Could you imagine why Mr. Chreky would keep

11:52:00 2  a room at a hotel a half a block or less from his

11:52:04 3  workplace?

11:52:05 4    A.  No.

11:52:06 5    Q.  Except for what?

11:52:08 6     I mean, did you have any understanding as to

11:52:14 7  why he might have a hotel room, a regular hotel room,

11:52:16 8  half a block from his workplace?

11:52:17 9    MR. BREDEHOFT:  Foundation.

11:52:17 10    THE WITNESS:  Well, that is why I, you

11:52:22 11  know -- it was clear to me what was being offered. I

11:52:28 12  will leave it at that.

13  BY MR. ROSE:

11:52:36 14    Q.  Okay.

11:52:33 15     Please take a look at paragraph six.

11:52:37 16    A.  (Witness complies.)

11:52:57 17    Q.  Anything you would like to add to paragraph

11:52:59 18  six or is that an accurate statement?

11:53:02 19    A.  I have to say the only times I ever remember

11:53:05 20  people or someone being kind of like, you know, stop

11:53:08 21  it, Andre, no, or, you know, not no, but like quit

11:53:13 22  it, Andre, I mean it might have been in a playful

---

# <u>EXHIBIT M</u>

1

UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
RONNIE BARRETT,                :

            Plaintiff,         :

      vs.                      :    C.A. No.
                               :    07-CV-0250(RCL)
ANDRE CHREKY,                  :
ANDRE CHREKY SALON/ANDRE       :
CHREKY INC., SPAC, LLC,        :

            Defendants.        :

- - - - - - - - - - - - - - - x
JENNIFER THONG,                :

            Plaintiff,         :

      vs.                      :    Civil No.
                               :    1:06-1807(RCL)
ANDRE CHREKY SALON, et al.,    :

            Defendants.        :

- - - - - - - - - - - - - - - x

                  Washington, D.C.
                  Monday, October 15, 2007

      The deposition of REMI METSU, called for

examination by counsel for Defendants in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened


              JARDIM REPORTING ASSOCIATES
                   (703) 867-0396

---

2

at 12:26 p.m., before PAULA J. EASTES, a notary
public in and for the District of Columbia, when were
present on behalf of the parties:


APPEARANCES:


On behalf of the Plaintiff Ronnie Barrett:

      DEBRA S. KATZ, ESQUIRE
      ARI M. WILKENFELD, ESQUIRE
      Katz, Marshall & Banks, LLP
      1718 Connecticut Avenue, N.W.
      Sixth Floor
      Washington, D.C. 20009
      (202) 299-1140


On behalf of the Plaintiff Jennifer Thong:

      JONATHAN G. ROSE, ESQUIRE
      EMILY SEYMOUR, ESQUIRE
      Sheppard, Mullin, Richter & Hampton
      1300 I Street, N.W.
      11th Floor East
      Washington, D.C. 20005
      (202) 772-5390

---

3

APPEARANCES (Continued):


On behalf of the Defendants:

      JOHN M. BREDEHOFT, ESQUIRE
      DAVID SULLIVAN, ESQUIRE
      Kaufman & Canoles
      150 West Main Street
      Suite 2100
      Norfolk, Virginia 23510
      (757) 624-3225



Videographer:  RON MEEK



Also Present:  ANDRE CHREKY

---

4

                C O N T E N T S



                     EXAMINATION BY COUNSEL FOR
WITNESS              PLAINTIFFS      DEFENDANTS
REMI METSU

By Mr. Bredehoft         --              6

By Mr. Rose              78             --

By Ms. Katz              83             --

By Mr. Bredehoft         --             104




              E X H I B I T S

Metsu Deposition Exhibits            MARKED

Exhibit No. 1                          22

13

49

13:06:50 1    Q.   Tell me everything you remember about that.

13:06:54 2    A.   There was a Christmas party in Old Town,

3    Alexandria.  I believe the party took place in a

.2  4    place called Casablanca, which is a Moroccan place

13:07:09 5    with a restaurant.

13:07:09 6         And after the party was over Mr. Chreky

13:07:13 7    asked me if I wanted to get a drink somewhere else

13:07:18 8    and I said yes.  And we went to a place, a hotel bar,

13:07:22 9    I don't recall the name of the hotel, on one of the

13:07:28 10   main streets in Alexandria.  We went to have a drink

13:07:26 11   and with us was Linda and Amal.

13:07:34 12   Q.   Do you remember Linda's last name?

13:07:34 13   A.   No.

13:07:36 14   Q.   Do you remember Amal's last name?

13:07:41 15   A.   No.

13:07:41 16   Q.   Did the four of you go over to the bar at

13:07:43 17   the same time?

13:07:43 18   A.   Yes.

13:07:44 19   Q.   You walked from the restaurant to the hotel

13:07:46 20   bar?

13:07:47 21   A.   Yes.

13:07:47 22   Q.   You say it is on the main street?

50

13:07:49 1    A.   I don't remember if we drove or if we

13:07:51 2    walked.  I don't recall.

13:07:53 3    Q.   Okay.  Not important.  I didn't mean to

13:07:56 4    insinuate.

13:07:56 5         You say though it is on the main street in

13:07:59 6    Old Town.

13:07:59 7         Is that King Street, the one that runs down

13:08:01 8    to the river?

13:08:01 9    A.   The hotel faces a small plaza.

13:08:05 10   Q.   And do you remember if it was modern brick?

13:08:08 11   A.   Yes.

13:08:08 12        It has a little patio for outdoor sitting.

13:08:16 13   Q.   Okay.

13:08:18 14        I interrupted you.  Please continue telling

13:08:21 15   me everything you know about this incident.

13:08:21 16   A.   We went to have a drink there and Mr. Chreky

13:08:27 17   left us and went to the hotel at that point, came

18   back and told us that he had a room and asked me if I

19   wanted to join them for a last drink, which we went

13:08:40 20   upstairs to the room.

13:08:44 21        Linda and Amal disappeared.  They went to

13:08:46 22   the bathroom and came back outside with a bathrobe.

51

13:08:51 1    And Mr. Chreky asked me to stay and I told him that I

13:08:54 2    was uncomfortable and I had to go home to my wife.

13:08:58 3    Q.   And you did in fact leave?

13:09:00 4    A.   Yes.  Absolutely.

13:09:06 5    Q.   It is important that I understand exactly

13:09:09 6    what was said.

13:09:11 7         Did Mr. Chreky -- you said he asked you to

13:09:15 8    stay.

13:09:15 9    A.   Yes.

13:09:15 10   Q.   Did he say anything else?

13:09:20 11   A.   Not that I recall.  No.

13:09:21 12   Q.   Did he say come have sex with us?

13:09:25 13   A.   Well, I think it was pretty obvious.  It

14   didn't have to be said.

13:09:28 15   Q.   I understand.

13:09:29 16        But he didn't say that?

13:09:30 17   A.   He didn't say that.

13:09:32 18   Q.   Were Amal and Linda wearing anything under

13:09:37 19   their robes?

13:09:37 20   A.   I don't know.  They were wearing robes.  It

13:09:41 21   was hard to see.

13:09:42 22   Q.   What kind of room was it?  Was it a big

52

13:09:45 1    suite?

13:09:45 2    A.   No.  It was fairly small actually.

13:09:47 3    Q.   One bed?  Two beds?

13:09:50 4    A.   I believe it was just one bed.

13:09:53 5    Q.   Were you sitting on the bed when the women

13:09:55 6    came out of the bathroom?

13:09:56 7    A.   No.  I was having a drink and I was standing

13:10:00 8    up.

13:10:01 9    Q.   Did you bring your drinks up from the bar --

10   A.   I believe we did.  Yes.

11   Q.   -- or did you order them?

13:10:05 12        Was there alcohol in the room?

13:10:08 13   A.   I don't think so.

13:10:14 14   Q.   What year was this?

13:10:18 15   A.   That is hard to remember.

13:10:18 16        I would say maybe two years after, two or

13:10:20 17   three years after.  I don't recall exactly the year.

13:10:28 18   Q.   Let's see if we can figure out a way to jog

13:10:32 19   your memory.

13:10:32 20        You weren't there for Christmas in 2001.

13:10:35 21   You had already left, right?

13:10:37 22        You left in May 2001?

# **EXHIBIT N**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JENNIFER THONG | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )    Civil No. 1:06-1807 (RCL) |
| | ) |
| ANDRE CHREKY SALON, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>DECLARATION OF JONATHAN G. ROSE</u>

I, Jonathan Rose, declare as follows:

      1.     I am a partner at Sheppard Mullin Richter and Hampton, counsel for

Plaintiff Jennifer Thong.   I submit this declaration in support of Plaintiff Jennifer Thong's

Motion to Compel the Production of Documents.  I have personal knowledge of the facts set

forth below, and if called to testify regarding them, I could and would do so competently.

      2.     On November 14, 2007, I received a telephone call from Ms. Thong.  Ms.

Thong informed me that she had just received a phone call from a current employee of the Andre

Chreky Salon.  The current employee overheard Mr. Chreky tell another current employee to lie

if subpoenaed in this case.

      3.     On or about October 7, 2007, I received a telephone call from a former

employee of the Salon, who has previously provided a declaration in support of Ms. Thong's

case.  She informed me Mr. Chreky called her ex-boyfriend and spoke to him in a threatening

manner about her testimony in this case.

4.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 21st day of December, 2007 at Washington, D.C.

_____
JONATHAN G. ROSE