UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

JENNIFER THONG,                                )
                                               )
                    Plaintiff,                 )
                                               )
         v.                                    )    C.A. No. 1:06-1807 (RCL)
                                               )
ANDRE CHREKY,                                  )
ANDRE CHREKY SALON/ANDRE CHREKY INC.,          )
SPAC, LLC                                      )
                                               )
                    Defendants.                )
                                               )
_____)

**PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT FOR DECLARATORY AND MONETARY RELIEF AND JURY DEMAND AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Plaintiff Jennifer Thong ("Plaintiff" or "Ms. Thong"), through undersigned counsel and pursuant to Rule 15 of the Federal Rules of Civil Procedure, respectfully submits this Motion for Leave to File a Second Amended Complaint for Declaratory and Monetary Relief and Jury Demand ("the Motion").

Plaintiff seeks to file a Second Amended Complaint ("Second Amended Complaint") to further explain, amplify and provide additional specificity and support for critical allegations in her operative Complaint ("Complaint"). Defendants' unlawful actions against her took place within an environment where laws, ordinances, and individual rights were routinely ignored. The Second Amended Complaint, attached hereto as Exhibit 1,[1] includes specific factual allegations pertaining to Defendants' habitual and reckless disregard of laws, statutes, regulations and ordinances such as I.R.S. regulations, D.C. cosmetology licensing ordinances,

_____

[1] New text in the proposed Second Amended Complaint is underlined.

and Defendants' efforts to obstruct justice.   In the same way that Defendants violated Ms. Thong's civil rights, assaulted and threatened her, stole tips from her, and willfully denied her compensation that she was lawfully entitled to under the federal and DC wage and hour laws, so too have the Defendants disregarded a myriad of laws, statutes, regulations and ordinances governing the operation of their business.

Pursuant to Local Rule 7(m) of the United States District Court for the District of Columbia, Ms. Thong, by undersigned counsel, sent Defendants a copy of her proposed Second Amended Complaint on January 30, 2008 and requested that Defendants consent to filing the proposed amendment.  Counsel for the parties conferred on February 4, February 5, and February 6 in a good faith effort to narrow the areas of disagreement.  The parties were not able to reach an agreement.  Therefore, this Motion is opposed.

## I.    NATURE OF NEW ALLEGATIONS

The gravaman of Plaintiffs' Complaint is that Mr. Chreky and the Salon persistently subjected Plaintiff to unwanted sexual comments, touches and physical attacks violating the DCHRA and intentionally committed assault, battery and intentional infliction of emotional distress against Plaintiff.  With her Second Amended Complaint, Plaintiff provides additional information about how Mr. Chreky and his agents have engaged in obstruction of justice by threatening and intimidating third-party witnesses in this lawsuit.  Mr. Chreky's threatening and intimidating behavior since the commencement of this lawsuit is akin to the same types of threats and attacks he launched upon Ms. Thong throughout the duration of her employment when she failed to comply with his sexual advances.

Furthermore, Plaintiff alleges Defendants did not compensate her for all hours worked and did not pay her at least one and one half times her normal hourly rate for all hours worked in excess of forty hours per week.  Plaintiff alleges Defendants knowingly, willfully and intentionally violated and continue to violate the Fair Labor Standards Act ("FLSA"), the DC Wage and Hour Act ("WHA") and the DC Wage Payment and Collection Act ("WPCA"). Plaintiff alleges Defendants either knew or showed reckless disregard as to whether its conduct was prohibited by the FLSA because the DOL investigated and cited the Defendants in 2003 for failing to follow the FLSA.

In her Second Amended Complaint, Plaintiff provides information about Defendants' additional willful violation of I.R.S. regulations regarding the reporting of tips.  Mr. Chreky and ACI officers instructed Salon employees to underreport the tips they received from clients in an effort to lower the amount of FICA/Social Security taxes the Salon would be required to pay to the I.R.S. and to maximize profits.  In addition, Plaintiff provides information about Mr. Chreky's employment of unlicensed salon professionals whom he unlawfully authorized to render services at the Andre Chreky Salon and Spa or on behalf of Salon customers, including First Lady Laura Bush and the President's daughters Barbara and Jenna Bush.  Defendants knowingly employed unlicensed employees in the Salon, and allowed these employees to charge clients top dollar for their services, even though they did not have the requisite training to perform such services in the District of Columbia.

These additional allegations provide important factual support to Plaintiff's allegations that Defendants willfully violated the FLSA.  In the same way Defendants flagrantly disregard I.R.S. regulations and D.C. licensing requirements, Defendants recklessly disregard both federal

and DC wage and hour laws, all in an effort to minimize their payroll tax obligations and increase their profits.

Collectively, these additional factual allegations support a central theme of Plaintiff's Complaint, that Defendants' unlawful activity as to her was simply part of a much larger corporate culture in which the owners and operators of the Salon believe that the law does not apply to them.

A.    Obstruction of Justice

Ms. Thong filed her original Complaint in this action on or about September 22, 2006. Since that time, Defendants and their agents have engaged in a series of prolonged and persistent efforts to obtain favorable testimony from third-party witnesses, and to prevent third-party witnesses from testifying in a manner unfavorable to Defendants, through the use of threat, intimidation, and misrepresentation. By and through their actions, Defendants and their agents have suborned perjury and otherwise obstructed justice violating Ms. Thong's rights and the rights of countless other persons who are not parties to this lawsuit. Second Amended Complaint ¶ 56.

At the beginning of discovery in this action, Counsel for Ms. Thong provided counsel for Defendants copies of several declarations from third-party witnesses all of whom had witnessed and confirmed some or all of the allegations in Ms. Thong's Complaint. Counsel for Ms. Thong also provided the names of additional persons whom they had interviewed and who they anticipated would also provide declarations in the near future. One such individual, Damon Taylor, was in the midst of reviewing and editing a declaration that he would eventually execute on February 2, 2007. Counsel for Ms. Thong explained to counsel for Defendants that Mr.

Taylor had witnessed and had confirmed many of the allegations of sexual harassment, retaliation, and FLSA violations that Ms. Thong had alleged. Id. at ¶ 57. Approximately four hours after counsel for Defendants had been apprised of Mr. Taylor's cooperation with counsel for Ms. Thong, Mr. Taylor received a threatening phone call from Sami Tellawi, a then current Salon employee. Mr. Tellawi told Mr. Taylor that Mr. Chreky demanded that he report to the Salon, where he was no longer an employee, so that he could be interviewed. When Mr. Taylor responded that he was under no obligation to report to the Salon or to cooperate with either party, Mr. Tellawi, at Mr. Chreky's direction, threatened that Mr. Chreky would have Mr. Taylor arrested if he did not cooperate. Id. at ¶ 58.

Mr. Taylor immediately reported this incident to counsel for Ms. Thong and explained that he was concerned that he had placed himself in legal peril by cooperating with Ms. Thong's counsel, by refusing to report to the Salon as Mr. Chreky had demanded, and by agreeing to be interviewed by Ms. Thong's counsel. Id. at ¶ 59. Counsel for Ms. Thong immediately contacted counsel for Defendants to advise them of Mr. Chreky's threatening conduct and to demand that Defendants cease all efforts to intimidate potential material witnesses. Nevertheless, Mr. Chreky, and those acting on his behalf, have continued to threaten, intimidate, and manipulate third party witnesses in this case. Id. at ¶ 60.

In February of 2007, Mr. Chreky and/or his agents ordered all current Salon employees to meet with David Sullivan, one of the attorneys for Defendants. All employees were scheduled for time slots, lasting ten to fifteen minutes each, in which they were required to meet with Mr. Sullivan at a Starbucks situated next door to the Salon where they worked. Upon information and belief, most, if not all such employees felt pressured and compelled to meet with Mr. Sullivan. Upon information and belief, most, if not all such employees believed that meeting

with Mr. Sullivan was a job requirement and that they could be terminated for failing to comply. Id. at ¶ 61.

On or about February 16, 2007, several employees were required to meet with Mr. Sullivan again, this time in the Salon. These employees were presented with declarations drafted by Mr. Sullivan and were instructed to execute them. Upon information and belief, most if not all of the employees felt pressured and compelled to sign the declarations. Upon information and belief, most, if not all of the employees believed that signing the declarations presented to them was a job requirement and that they could be terminated for failing to comply. Id. at ¶ 62.

Mr. Chreky, his agents, and his attorneys knew that in executing these declarations, the declarants provided unreliable, deceptive, and perjurous testimony under oath. The declarations, most of which are carbon copies of each other, all provided that the declarant was aware of and did not believe the "allegations" contained in Ms. Thong's Complaint. However, as Mr. Chreky and Mr. Sullivan knew, none of the declarants had seen, read, or had otherwise been informed of most of allegations contained in Ms. Thong's Complaint and could not competently provide any testimony on the allegations at the time they were required to sign the declarations under pain and penalty of perjury. In addition, most of the declarants are immigrants for whom English is a second language. Mr. Chreky and Mr. Sullivan knew that the declarants did not possess sufficient language skills to understand many of the words contained in the declarations they were required to sign. Mr. Chreky and Mr. Sullivan were aware that due to their lack of sophistication with regard to legal matters, most, if not all of the declarants did not understand or appreciate the legal consequences of executing a sworn declaration that was less than fully accurate or truthful. Id. at ¶ 63.

On October 1, 2 and 3, 2007, counsel for Ms. Thong and Ms. Barrett deposed nine of the individuals who provided virtually identical declarations in support of Mr. Chreky. In the days leading up to their depositions, Mr. Chreky and/or his agents contacted each of the deponents and ordered them to meet with counsel for Defendants at a hotel. Mr. Chreky and/or his agents told the deponents that counsel for Ms. Thong and Ms. Barrett would attempt to "trick" or "confuse" them during their depositions and that they needed to meet with counsel for Defendants so that they would know how to answer properly. All nine deponents met with counsel for Defendants in advance of their depositions. All nine deponents believed that attending said meetings was a job requirement. Most of the deponents believed that they could be terminated if they failed to report for their assigned meetings with counsel for Defendants in advance of their depositions. Id. at ¶ 64.

Upon information and belief, Mr. Chreky and/or his agents promised the deponents that they would receive financial rewards if they provided favorable testimony during their depositions. Upon information and belief, at least one deponent, Khadija Darif, received a phone call from Mr. Chreky immediately following her deposition. Mr. Chreky had attended her deposition just as he had for all of the other current employees deposed that week. Mr. Chreky admonished Ms. Darif for providing testimony that was favorable to Ms. Thong and Ms. Barrett. Mr. Chreky later called the Ms. Darif's residence again, this time asking to speak to her husband, Tony Khateeb. Mr. Chreky told Mr. Khateeb that it was unfortunate that his wife had provided testimony that was favorable to Ms. Thong and Ms. Barrett, but that she could expect to receive a bonus and/or a raise if she would provide testimony favorable to him in the future. Id. at ¶ 65.

With respect to witnesses who were no longer employed by the Salon, counsel for Defendants hired two separate investigation firms, Fortress Global Investigations and Security,

and Vital Investigations, to investigate several individuals including but not limited to those individuals who provided declarations for Ms. Thong and Ms. Barrett. The investigators approached most of the witnesses at work posing as customers. The investigators did not identify themselves as agents for Mr. Chreky. In fact, the investigators attempted to appear to be unassociated parties who were simply interested in hearing more about the lawsuit. In many cases, where witnesses declined to comment on the lawsuit, the investigators would identify themselves and explain that the lawsuit was likely to settle. The investigators knew that there was no possibility that the lawsuit would settle when speaking with the witnesses but rather were attempting to extract information from reluctant witnesses by lying about the posture of the lawsuit. Id. at ¶ 66.

Several individuals who are potential witnesses for Ms. Thong and Ms. Barrett at trial have advised counsel for Ms. Thong that they found the tactics employed by the private investigators to be threatening, that they were second guessing their decision to cooperate with counsel for Ms. Thong, and that they were worried about their continued involvement in this lawsuit. Id. at ¶ 67.

B.    Violations of I.R.S. Regulations Regarding the Reporting of Tips

Mr. Chreky and other ACI officers specifically instructed Salon employees to under-report the tips they received from clients in an effort to lower the amount of FICA/Social Security taxes the Salon would be required to pay to the Internal Revenue Service. Mr. and Mrs. Chreky directed Salon employees to come up with a tip figure that was large enough not to raise suspicion by the IRS. Second Amended Complaint ¶ 17. Mr. Chreky's purpose in encouraging his employees to under-report their tips was to minimize the employer's share of federal income

taxes withheld and paid out on all such tips. Id. at ¶ 19. Mr. Chreky specifically advised

Plaintiff that she should not report all of the tips she received, including cash tips provided to her

directly from a client. With regard to the tips that clients left for her in envelopes at the front

desk, Mr. and Mrs. Chreky told Ms. Thong and other Salon employees to simply report a

nominal amount. Id. at ¶ 18.

Under 26 U.S.C. §§ 3121(a)(12)(B), 3401(a)(16)(B), cash tips of twenty dollars or more

that are received in any calendar month while working for any one employer are subject to Social

Security and income tax withholding and are considered employer-provided remuneration for

FICA purposes. Under 26 U.S.C. § 3121(q), employers are required to apply and collect both

the employer's and the employee's portion of FICA taxes on an employee's reported tip income.

However, an employer is only responsible for the payment of FICA taxes for those tips which

are actually reported by the employee. If an employer is able to convince its employees to

under-report their tips, the employer's obligations to pay FICA taxes are reduced to whatever

extent the employee under-reports which is precisely what Defendants have done with regard to

their employees. Second Amended Complaint ¶ 25.

> Any person who willfully delivers or discloses to the Secretary any list, return,
> account, statement, or other document, known by him to be fraudulent or to be
> false as to any material matter, shall be fined not more than $10,000 ($50,000 in
> the case of a corporation), or imprisoned not more than 1 year, or both. Any
> person required pursuant to section 6047(b), section 6104(d), or subsection (i) or
> (j) of section 527 to furnish any information to the Secretary or any other person
> who willfully furnishes to the Secretary or such other person any information
> known by him to be fraudulent or to be false as to any material matter shall be
> fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned
> not more than 1 year, or both.

26 U.S.C. § 7207.

Defendants were aware that the tips reported by its employees were false because Mr.

and Mrs. Chreky specifically instructed their employees to under-report the tips they had

received.  In addition, Defendants received the monthly tip reports from the employees which

alerted them to the fact that, given the number of services provided by each employee and the

tips generally provided for clients for such services (e.g., typically 15%), the amounts reported

were a small fraction of the amounts actually received.  Most salon employees reported the exact

same amount of tips month after month (e.g., $300 to $400 per month) despite the fact that there

were obvious variations in the tips actually received by virtue of customer flow and number of

hours worked by employees during differing time periods, and despite the fact that given the

number of services provided each week, the actual tip amount would likely be in the range of

$4,000 to $6,000 per month.  Second Amended Complaint ¶ 27.

Defendants knew or reasonably should have known that the tip reports were false and

fraudulent but nevertheless submitted them to the IRS in violation of Section 7207.  Id. at ¶ 28.

On information and belief, Mr. Chreky instructed his employees to report only a minimal

percentage of their tip income in the same way in which he knowingly and willfully failed to

comply with the overtime requirements of the FLSA, the WHA and the WPCA – all in an effort

to maximize the Salon's profits and minimize the Salon's payroll taxes.

C.    Violations of D.C. Licensing Ordinances

Chapter 37 D.C. Reg. § 3702 requires individuals employed in the District of Columbia

in the barber and cosmetology industry to maintain current licenses with the District of Columbia

before performing services on customers.  The regulations specifically list barbers,

cosmetologists, estheticians, manicurists, shampoo assistants, salon managers, salon owners, and

individuals who provide facials, massages, and scalp treatments as individuals who can not

operate without first obtaining a D.C. license and apply to all Salon employees who perform such services for Salon customers. Second Amended Complaint ¶ 29.

A sizable number of salon employees did not have valid District of Columbia licenses at the time they rendered services at the Andre Chreky Salon and Spa or on behalf of Salon customers, including First Lady Laura Bush, and the President's daughters Barbara and Jenna Bush. Such individuals include but are not limited to Elena Vantovskaya, Linda Mahboub, Edil Karkas, Xiomara Maradiaga, Maria Guzman and Sami Tellawi. Id. at ¶ 30. Defendants were aware that all of their salon professionals were required to have valid D.C. licenses in order to perform services at the salon. Id. at ¶ 31.

Section 3727 provides that the City's Director of Consumer and Regulatory Affairs may conduct inspections to determine if a salon or spa maintains appropriate licenses for its professionals. Section 3727.2 specifically requires that salon owners take "appropriate action to ensure access to all parts of the premises for the purpose of facilitating inspection." Id. at ¶ 32.

Instead of complying with these requirements, Mr. Chreky developed an emergency drill whereby all unlicensed workers would flee out the back door of the Salon whenever District of Columbia licensing officials appeared to conduct inspections. Id. at ¶ 33. On such occasions, the front desk staff was trained to stall the inspectors at the front desk to provide the unlicensed staff, which was often as much as one third of the total staff, sufficient time to sneak out the back door where they would wait in the alley until the inspection had been completed. Id. at ¶ 34.

Section 3727.3 provides that the failure to facilitate inspections constitutes cause for withholding the issuance of a new license or revoking or suspending an existing license. Section 3727.5 further provides that any person who fails to comply with any provision of Chapter 37,

shall, upon conviction, be punished by a fine not to exceed $5,000 or by imprisonment not to exceed 90 days for each failure to comply. Id. at ¶ 36.

This set of factual allegations provides an important backdrop for the allegations contained in Plaintiff's Complaint.  If Defendants are so cavalier about violating rules and ordinances that could subject them to fine, imprisonment, and the possible loss of their license to operate a business, they certainly would have had a similar lack of regard for Plaintiff's civil rights.

## II.    LEAVE TO FILE AN AMENDED COMPLAINT SHOULD BE GRANTED HERE BECAUSE THE NEW ALLEGATIONS RELATE BACK TO ALLEGATIONS CONTAINED IN THE ORIGINAL COMPLAINT

Federal Rule of Civil Procedure 15(c) establishes the standard that an amendment to a pleading "relates back" to the date of the original pleading.  Fed. R. Civ. P. 15(c) ("Rule 15"). Where no new cause action is alleged but new relevant facts are provided, as here, the courts liberally grant motions to amend where the new allegations relate back to allegations contained in the original complaint.  See Stevelman v. Alias Research, Inc., 174 F.3d 79, 87 (2nd Cir. 1999).  If the amendment merely "explains, expands or amplifies what was alleged in support of the cause of action already asserted," it relates back under Rule 15.  Wiren v. Paramount Pictures, Inc., 206 F.2d 465, 467-68 (D.C. Cir. 1953); see also  F.D.I.C. v. Conner, 20 F.3d 1376, 1386 (5th Cir. 1994) (asserting that if plaintiff seeks to amplify the facts alleged in the prior complaint, then relation back is allowed); Gray v. Upchurch, 2006 WL 3694604, at *4 (S.D. Miss. Dec. 13, 2006) (granting motion for amended complaint and maintaining that when party further expounds upon facts previously alleged, the proffered amended complaint relates back); Oliner v. McBride's Industries, Inc., 106 F.R.D. 9, 12 (S.D.N.Y. 1985) (maintaining new

allegations contained in an amended pleading will relate back if allegations amplify the facts alleged in original pleading or set forth those facts with greater specificity).

While the new allegations contained in Plaintiffs' Second Amended Complaint are not asserted to add a new cause of action, they are presented in order to illustrate and explain the Defendants' consistently flagrant disregard for the law on all fronts.  Upon information and belief, and Mr. Chreky and ACI officers instructed Salon employees to underreport the tips they received from clients in an effort to lower the amount of FICA/Social Security taxes the Salon would be required to pay to the I.R.S.  Defendant's purpose in encouraging his employees to under-report their tips was to minimize the employer's share of federal income taxes withheld and paid out on all such tips.  Defendants knew or reasonably should have known that the tip reports were false and fraudulent but nevertheless submitted them to the IRS in violation of Section 7207.   They did so in an effort to minimize the amount the Salon paid in taxes and in order to maximize the Salon's profits.  Likewise, Defendants knowingly employed unlicensed employees in the Salon, and allowed these employees to charge clients top dollar for their services, even though they did not have the requisite training to perform such services in the District of Columbia.

These new facts illustrate that Defendants will go to great lengths, including disregard for basic federal and D.C. rules and ordinances, in order to maximize revenue.  Similarly, despite a DOL investigation and citation for failure to comply with the FLSA, Defendants knowingly, willfully and intentionally engaged in a practice of failing to pay overtime compensation for work in excess of forty hours a week, in an effort to reduce wages paid to their employees, minimize payroll taxes and maximize their own profit margin.

Moreover, the new facts contained in the Second Amended Complaint also provide useful explanation of the context in which Mr. Chreky incessantly subjected Plaintiff and other female employees to unwelcome touching, sexual demands, vulgar and sexually explicit remarks, threats, ridicule, intimidation and abuse. These new allegations explain the lawless and unregulated working environment that Plaintiff endured and demonstrate how Defendants believed that the law did not apply to them. Like the laws prohibiting discrimination, sexual harassment, retaliation, misappropriation of tips, and overtime compensation, federal laws regarding the reporting of tips to the IRS, and local laws pertaining to the licensing of barber and cosmetology professionals are clear constraints on the manner in which an employer may treat his employees and conduct business in general. Defendants' actions demonstrate a reckless disregard for these laws and a proclivity to treat their employees in any manner that best suits the Andre Chreky Salon and its principals, including Defendant Mr. Andre Chreky. As such, Plaintiff's Motion for Leave should be granted.


**III.     LEAVE TO FILE AN AMENDED COMPLAINT SHOULD BE "FREELY GIVEN"**

Rule 15(a) of the Federal Rules of Civil Procedure, provides that leave to file an amended pleading should be "freely given when justice so requires." See Foman v. Davis, 371 U.S. 178, 182 (1962); Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C.Cir. 1996). The rule evinces a preference for granting such leave so that cases can be considered on their merits. See e.g., Elmore v. Corcoran, 913 F.2d 170, 172 (4th Cir. 1990) ("It is axiomatic that the Federal Rules of Civil Procedure allow liberal amendment of pleadings throughout the progress of a case."). In fact, courts routinely permit parties to amend pleadings well after suit has been filed. See e.g., Material Supply Int'l, Inc. v. Sunmatch Industrial Co., 146 F.3d 983 (D.C. Cir. 1998) (upholding

trial court's decision to allow defendant to amend answer to include statute of limitations defense seventeen days before the start of trial). A court should also consider the hardship to the moving party if the leave to amend were denied. See 6 Wright, Miller & Kane, Federal Practice & Procedure: Civil 2d, § 1487 at 621-23 (2d ed. 1990).

The purpose of the liberal rule in favor of amendment is to provide the maximum opportunity for each claim to be decided on the merits rather than on procedural technicalities. "[I]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." Foman, 371 U.S. at 182. Thus, unless the district court has a substantial reason to deny leave, its discretion is not broad enough to permit denial.

Applying this liberal standard, courts should only deny a motion for leave to amend when there is evidence of: 1) undue prejudice to the opposing party; 2) repeated failure to cure deficiencies by amendments previously allowed; 3) bad faith on the part of the moving party; 4) futility; or 5) undue delay. Foman, 371 U.S. at 182; See also Firestone, 76 F.3d at 1208; Howard v. Gutierrez, 237 F.R.D. 310, 312 (D.D.C. 2006). None of these issues are present here.[2]

A.    Plaintiffs' Amendments Will Not Prejudice Defendants

In a court's consideration of a motion for leave to amend a pleading, the crucial consideration is prejudice to the opposing party. Stevens v. Stover, 702 F. Supp. 302, 305 (D.D.C. 1988). To show prejudice sufficient to justify a denial of leave to amend, the opposing party must show that it was unfairly disadvantaged or deprived of the opportunity to present facts

---

[2] Ms. Thong's Second Amended Complaint is not proposed with undue delay, nor has she repeatedly failed to cure deficiencies by amendments previously allowed because all of the new allegations were recently revealed during the course of discovery and depositions this past fall, and Ms. Thong has promptly sought leave to amend.

or evidence which it would have offered had the amendments been asserted earlier.  In re Vitamins Antitrust Litigation, 217 F.R.D. 30, 32 (D.D.C. 2003) (granting motion for leave to amend where defendants failed to establish prejudice despite plaintiffs' delay in amending complaint).   The opposing party must show unfairness in procedure or timing preventing them from properly responding.  Id.  See also Djourabchi v. Self, 240 F.R.D. 5, 13 (D.D.C. 2006) (granting motion for leave to add new claim and finding that opposing party failed to show that amendment was prejudicial because it substantially changed the theory of case or imposed added expense and burden).

Here, Defendants will suffer no prejudice because Plaintiff is simply amending the complaint to provide additional relevant facts, not to assert a new claim.  Therefore, Defendants will not suffer the burden of having to defend against a new cause of action.  Not only does the amendment not restrain or hamper Defendants' ability to defend against Plaintiff's claims, it provides Defendants with more supporting facts that better explain and clarify the assertions in the Complaint.

Moreover, Defendants will not be prejudiced by the amendment of the Complaint because discovery is still open.  Plaintiff seeks to amend her Complaint well in advance of the closing date for discovery in this lawsuit, which is currently set for April 4, 2008.  Defendants have ample opportunity to investigate these new factual allegations as they see fit and take whatever discovery, related to these new allegations, that they wish.

Finally, the Court should weigh the fact that the Defendants would not be prejudiced by amending the Complaint against the prejudice that the Plaintiff will suffer should she not be allowed to amend her Complaint.  The factual allegations at issue all support and enhance Ms. Thong's allegations that she worked in an environment in which disregard of the law was the

norm. Such facts are essential to Ms. Thong's claims as they speak to the atmosphere of flagrant disregard for the law which pervaded the Andre Chreky Salon and allowed for the substantial injuries that Ms. Thong has suffered.

### B.    Plaintiff's Amendments Are Not Made In Bad Faith

Plaintiff's proposed amendments are not made in bad faith because they are supported by ample evidence in this case. Counsel for Defendants' has suggested that Plaintiff's amendment is in bad faith because it simply seeks to "add facts to the record that would be embarrassing to the defendants." Exhibit 20, Correspondence from David Sullivan, dated February 5, 2008. This is certainly not the case. The factual allegations Plaintiff seeks to add in her Second Amended Complaint further explain, expand and amplify the allegations currently contained in her Complaint, and as demonstrated below, are supported by ample, and in many cases overwhelming evidence obtained in the course of discovery thusfar.

### 1.    Obstruction of Justice

Plaintiff's allegations that Defendants and their counsel have attempted to obstruct justice are well supported by credible evidence, including the deposition testimony of Defendants' current and former employees.

Paragraphs 58 and 59 of the Second Amended Complaint detail Mr. Chreky's efforts to intimidate Damon Taylor, a witness for Plaintiff, who provided a sworn declaration attesting to the fact that Mr. Chreky subjected female employees, including Ms. Barrett and Ms. Thong, to unwelcome touching and inappropriate sexual comments. The Second Amended Complaint alleges that early on in this case, counsel for Ms. Thong provided counsel for Defendants with the names of persons whom they had interviewed and who they anticipated would provide

declarations in the near future in support of Ms. Thong's case.  Second Amended Complaint at ¶

57.   One such individual, Damon Taylor, was in the midst of reviewing and editing a declaration

that he would eventually execute on February 2, 2007.  Id.  Approximately four hours later, Mr.

Taylor received a threatening phone call from Sami Tellawi, then a current Salon employee who

served as Mr. Chreky's assistant.   Id. at ¶ 58.  As Mr. Taylor confirmed in his signed

declaration, and later at his deposition, the purpose and effect of this telephone call was to

intimidate him:

> In December, 2006, I was contacted by phone by Sammy [sic] a former colleague from
> the Salon, who was working for Mr. Chreky.  Sammy [sic] told me "Damon, you need to
> go over to Andre's office and meet with him immediately.  Andre is a very powerful man
> he can have you thrown in jail if you don't."  It is my belief that Mr. Chreky instructed
> Sammy [sic] to call and make that threat.  I was particularly scared from the threatening
> phone call, because I had seen that Mr. Chreky had a propensity for physical violence,
> having heard that Mr. Chreky had attacked a homeless man outside the Salon.  I have
> been genuinely scared for my safety since this call.

Declaration of Damon Taylor, February 2, 2007, attached and incorporated herein as Exhibit 2,

at ¶ 15.  See also Deposition of Damon Taylor, October 30, 2007, attached and incorporated

herein as Exhibit 3, at p. 94-95 ("Q: Date you have a reason to fear that threat that Sami was

delivering to you from Mr. Chreky?  A:  I was afraid.  Yes.").[3]

The  Second Amended Complaint also details the intimidating effect Defendants' private

investigators have had on potential witnesses for Plaintiff.  Second Amended Complaint at ¶¶ 66-

67.[4]  These allegations are well supported by deposition testimony.  Nora Critzos, a former Salon

employee and potential witness for Plaintiff, testified that a private investigator working for Mr.

Chreky showed up at her place of business posing as a potential customer and tried to question

---

[3]    On December 12, 2006, after repeated attempts to reach counsel for Defendants by telephone, counsel for
Plaintiff Barrett notified counsel for Defendants of this clear effort to intimidate a material witness.  See
Letter from D. Katz to J. Bredehoft (December 12, 2006), attached and incorporated herein as Exhibit 18.

[4]    Counsel for Ms. Barrett notified counsel for Defendant of this further effort to intimidate material witnesses
by letter dated September 18, 2007, attached and incorporated herein as Exhibit 19.

her.  See Deposition of Nora Dunleavy Critzos, November 14, 2007 (hereafter "Critzos Deposition"), attached and incorporated herein as Exhibit 4, at pp. 84-85.  When Ms. Critzos demanded that the private investigator identify herself, she responded that she was an investigator and "sub-lawyer" for David Sullivan, counsel for Defendants.  Id. at 86.  Ms. Critzos testified that she was intimidated by the private investigator's insistence on continuing to ask her questions after she refused to speak with her.  Id. at pp. 86-88.  At one point, the private investigator went so far as to suggest that Ms. Critzos was being paid for her willingness to testify in a manner favorable to Plaintiff.  Id. at p. 87.  Ms. Critzos testified that she found the private investigator's actions intimidating, explaining: "She was really up there in my face.  I mean just right there in my face.  And I was, you know, I don't know who you are.  But it was accusatory questions."  Id. at pp. 87-88.  "I felt nervous because I didn't know who this lady was and she was extremely confrontational.  As I said, this is my personal space.  She was well within that.  And she was a very large woman."  Id. at p. 92.  Ms. Critzos further testified that she became nervous about the fact that she had provided a statement in this case favorable to Plaintiff after her experience with this private investigator.  Id. at p. 88.

Cynthia Torrico, another former Salon employee who had provided a declaration supporting Plaintiff's case, had a similar experience with a private investigator hired by Defendants.  She testified that the private investigator was "pushy," she felt intimidated, and that her encounter with the private investigator made her nervous about her continued involvement in the case.  See Deposition of Cynthia Torrico, November 14, 2007 (hereafter "Torrico Deposition"), attached and incorporated herein as Exhibit 5, at pp. 44, 62 and 64.

The Second Amended Complaint also details Defendants' heavy-handed tactics in attempting to secure favorable testimony from current Salon employees, despite the fact that they

lacked the requisite language skills or legal sophistication to appreciate the legal peril in which they were being placed in executing declarations for their employer.   Second Amended Complaint at ¶¶ 61-65.

Specifically, the Second Amended Complaint alleges that Defendants exerted pressure as employers to compel the "witnesses" to meet with Mr. Sullivan at a Starbucks situated next door to the Salon where they worked.  Id. at ¶ 61.  Several of these witnesses, who ultimately went on to sign declaration for Defendants, confirmed during their depositions that they believed it was part of their job, as employees of the Salon, to meet with Mr. Sullivan, that they felt pressured to meet with Mr. Sullivan, and that they believed they were required to attend the meeting and sign the declarations provided to them by Defendants' counsel.  See Deposition of Mila Petrosyan, October 1, 2007 (hereafter "Petrosyan Deposition"), attached and incorporated herein as Exhibit 6, at p. 32; Deposition of Xiomara Maradiaga, October 2, 2007 (hereafter "Maradiaga Deposition"), attached and incorporated herein as Exhibit 7, at p. 37; Deposition of Anisa Ghafoorzai, October 2, 2007 (hereafter "Ghafoorzai Deposition"), attached and incorporated herein as Exhibit 8, at p. 44.

Aquatif Mahboub testified that Mrs. Chreky specifically directed her to meet with Mr. Sullivan, and that "everybody" knew that they were required to meet with Mr. Sullivan and to provide a declaration on behalf of Mr. Chreky.  Deposition of Aquatif Mahboub, October 1, 2007 (hereafter "Mahboub Deposition"), attached and incorporated herein as Exhibit 9, at pp. 23, 39-40 ("Q: Okay.  But is it fair to say that everyone knew that giving a declaration was a job requirement, right?  A: Right.").  Faviola Veizaga testified that she believed meeting with Mr. Sullivan at Starbucks was part of her job, Deposition of Faviola Veizaga, October 2, 2007 (hereafter "Veizaga Deposition"), attached and incorporated herein as Exhibit 10, at pp. 40-41,

and that it was every employee's job to do so. ("Q: Every single employee in the salon met with Mr. Sullivan?  A: That is what I understood.  Yes.  Q: And that makes sense because it was their job to meet with Mr. Sullivan, correct?  A: I guess.  Yes.")  Id. at p. 72.

Despite the fact that Mr. Chreky was sitting in the room when all of these witness testified, some of them confirmed that they felt pressured to execute the declarations.  For example, Khadija Darif testified:

> QUESTION: When you were being asked to sign a declaration did you fear in any way that if you didn't sign it that your employment at the salon might be in jeopardy?
> THE WITNESS: What does in jeopardy mean?
> Q:  I'm sorry.  That you might be terminated.
> A:  Yes.
> Q:  You did understand that?
> A:  Yes.
> Q:  If you didn't sign it that, you might be terminated?
> A:  Yes.

Deposition of Khadija Darif, October 1, 2007 (hereafter "Darif Deposition"), attached and incorporated herein as Exhibit 11, at p. 96.  See also Deposition of Elena Vantovskaya, October 1, 2007 (hereafter "Vantovskaya Deposition"), attached and incorporated herein as Exhibit 12, at p. 48 (witness felt obligated to provide a declaration).

Defendants extracted these declarations from current Salon employees even though it was plainly obvious to Defendants and/or their counsel that many of these witnesses did not have sufficient language skills to comprehend what they were actually declaring under oath.  Second Amended Complaint ¶ 63.  During the depositions on October 1-3, 2007, counsel for Plaintiff tried to question many of these witnesses about the contents of their declarations which they had signed under the pain and penalty of perjury, only to find out that the witnesses literally did not understand what they had signed.  Counsel for Plaintiff was shocked to learn that Defendants and

their counsel placed these witnesses in legal jeopardy by pressuring them to sign declarations under oath when it was clear they did not understand the words contained in the declarations.

When counsel began to question Xiomara Maradiaga about the contents of the declaration Defendants and their counsel caused her to sign under oath, Ms. Maradiaga was initially unable to provide a meaningful answer because she did not know what the word "declaration" meant. Exhibit 7, Maradiaga Deposition at p. 33.[5] Despite the fact that her declaration contained a firm denial that she had witnessed "sexual harassment" at the Salon, Ms. Maradiaga did not actually know what the term "sexual harassment" meant and tried to look it up the night before her deposition. Id. at p. 79. During her deposition, when questioned about her critical denial of the existence of sexual harassment in the Salon, she demanded that an interpreter explain what "sexually harassed" meant before proceeding. Id. at p. 100. Ms. Maradiaga's declaration also stated that Mr. Chreky had not behaved in a sexually inappropriate manner. When questioned about this, Ms. Maradiaga testified that she did not know what the term "sexually inappropriate" meant. Id. at p. 81.

Anisa Ghafoorzai's declaration stated that she was aware of Plaintiff's "allegations" and knew the "allegations" to be false. When questioned on this point, she asked counsel for Plaintiff to define the word "allegation" before answering questions about her sworn statement that the "allegations" were false. Exhibit 8, Ghafoorzai Deposition at p. 52. In an effort to add credibility to the declarations, counsel for Defendants included a clause whereby the witnesses swore that they did not fear any "reprisal" if they chose not to sign the declaration. When questioned about this statement, and what she understood she was declaring by stating that she feared no "reprisal," Ms. Ghafoorzai testified that "reprisal" meant that no one had offered her a "prize" in exchange for her willingness to sign a declaration. Id. at pp. 55-56, 104.

---

[5] She similarly did not know what the words "loyal" and "hurt" meant. Id. at pp. 66, 70.

Edil Karkas' declaration, like everyone else's, contained a sentence in which he declared that he never heard Mr. Chreky "make comments of a sexual nature." This is obviously an important statement in this case where Plaintiff alleges that she was subjected to a sexually hostile work environment that included constant unwelcome comments of a sexual nature. When questioned about what he meant when he declared that Mr. Chreky did not make "comments of a sexual nature," Mr. Karkas testified: "I mean by like never grabbed in front. I didn't see it. Grab a butt or grab her boobs or force her or force somebody to do stuff." Deposition of Edil Karkas, October 1, 2007 (hereafter "Karkas Deposition"), attached and incorporated herein as Exhibit 13, at p. 75.

All of the declarations in question contained a statement in which the declarant denied having witnessed "sexual harassment" in the Salon. Again, these statements take on enormous importance in a case where Plaintiff claims that she was subjected to severe and pervasive acts of sexual harassment throughout her employment. On October 1, 2007, counsel for Plaintiff deposed several of Defendants' declarants and asked them what they understood the term "sexual harassment" to mean when they signed their respective declarations. Ms. Petrosyan testified that sexual harassment is "when men are not nice to women." Exhibit 6, Petrosyan Deposition at p. 39. Ms. Maradiaga did not know what the term "sexual harassment" meant and asked to be provided with a translation of that term before she would explain what she meant in her declaration where she stated, under oath, that she had not observed "sexual harassment" at the Salon. Exhibit 7, Maradiaga Deposition at p. 100. Ms. Mahboub initially testified that "sexual harassment" is when someone forces you to do something you don't want to do. Exhibit 9, Mahboub Deposition at pp. 27-28. She later clarified that sexual comments, and hugging and kissing in the workplace are, by definition, not sexual harassment because that term is reserved

for forced acts of sexual intercourse.  Id. at pp. 28.  Mr. Karkas defined "sexual harassment" as

instances where a man beats a woman or forces her to have sex with him.  Exhibit 13, Karkas

Deposition at pp. 71.

Having secured the highly suspect declarations discussed above, Mr. Chreky tried to lock

in the declarants' testimony by ordering them to meet with his attorneys before their depositions.

Plaintiffs' Second Amended Complaint Paragraph 64 alleges:

> Mr. Chreky and/or his agents contacted each of the deponents and ordered them to
> meet with counsel for defendants at a hotel.  Mr. Chreky or his agents told the
> deponents that counsel for Ms. Barrett and Ms. Thong would attempt to "trick" or
> "confuse" them during their depositions and that they needed to meet with
> counsel for defendants so that they would know how to answer properly.  All nine
> deponents met with counsel for defendants in advance of their depositions.  All
> nine deponents believed that attending said meetings was a job requirement.
> Most of the deponents believed that they could be terminated if they failed to
> report for their assigned meetings with counsel for defendants in advance of their
> depositions.

These allegations were confirmed during the depositions in question during which most

of the witnesses testified that they met with counsel for Defendants the day before their

depositions, and that they believed they were required to meet with Defendants' attorneys.

Ms. Mahboub testified that Mr. Chreky called her at home (which was unusual) and told

her to meet with his attorneys.  Exhibit 9, Mahboub Deposition at pp. 35-36.  Mr. Chreky told

her that she needed the assistance of his attorneys so that counsel for Plaintiff would not be able

to "trip" or "trick" her.  Id. at pp. 16-17.  Mr. Karkas testified that Mr. Chreky asked him to meet

with his attorneys before his deposition and that he did not feel he could say no.  Exhibit 13,

Karkas Deposition at pp. 37-38.  Ms. Vantovskaya testified that Mr. Chreky asked her to meet

with his attorneys and advised her that Plaintiffs' attorneys would deliberately try to confuse her.

Exhibit 12, Vantovskaya Deposition at pp. 15, 18.  Ms. Veizaga testified that Mr. Chreky told

her to meet with his attorneys and that she understood that doing so was part of her job.  Exhibit

10, Veizaga Deposition at pp. 22-23. Ms. Petrosyan testified that she believed that it was part of her job to meet with Mr. Chreky's attorneys before her deposition. Exhibit 6, Petrosyan Deposition at pp. 14.

On October 1, 2007, counsel for Plaintiff deposed 5 of the individuals who signed declarations for Defendants. As discussed above, these witnesses were unable to define, much less understand, critical terms contained in their declarations such as "sexual harassment." Defendants' counsel immediately met with the declarants who were slated to testify the next day. During this meeting the witnesses were coached to look up or study the meaning of critical terms like "sexual harassment" so that they would be able to explain the declarations that they had signed under oath several months prior. Ms. Maradiaga met with Mr. Sullivan after the first round of depositions during which the witnesses' testimony evidenced that they did not understand the term "sexual harassment." She testified that after her meeting with Mr. Sullivan to prepare her for her deposition the following day, she went home and tried to look up the definition of the term "sexual harassment." Exhibit 7, Maradiaga Deposition at pp. 28-29.[6] Ms. Ghafoorzai testified that Mr. Sullivan told her to think about what "sexual harassment" means before her deposition the next day. Exhibit 8, Ghafoorzai Deposition at pp. 19-20. See also Exhibit 10, Veizaga Deposition at pp. 18-19 (witness was told to think about what sexual harassment means).

Second Amended Complaint paragraph 63 alleges that "Mr. Chreky, his agents, and his attorneys knew that in executing the declarations, the declarants provided unreliable, deceptive, and perjurous testimony under oath." As discussed in detail above, Defendants and their counsel

---

[6] As discussed earlier, it was clear to Defendants and their counsel that many of these witnesses did not possess sufficient English language skills to competently execute the declarations in question. This point is driven home by the fact that even after being instructed to go home and look up the term "sexual harassment," Ms. Maradiaga was still unable to define it the next day at her deposition, and asked that the term be translated before she responded to questions about it. Exhibit 7, Maradiaga Deposition at p. 100.

were clearly on notice that the declarants did not possess sufficient language skills to understand the statements they were affirming under oath. It is notable that Defendants and their counsel largely sought (or perhaps only obtained) declarations from employees for whom English was not their native tongue. All of the witnesses testified that they met with Mr. Sullivan for a maximum of 10 to 15 minutes before they were presented with their declarations as drafted by counsel for Defendants. The declarants did not revise the declarations before executing them. Defendants' counsel, who drafted these declarations, knew that the declarations were almost uniformly identical carbon copies of each other.[7] In addition, as Defendants well knew, many of the declarants did not possess valid D.C. cosmetology licenses and would not be able to secure employment at another salon if they were terminated.[8] Under these circumstances - where the declarants clearly did not understand the statements they were signing under oath, felt pressured to provide their employer with the declarations he sought, and where the declarants made no effort to alter the identical declarations counsel had drafted for them - Defendants and their counsel were certainly aware that the entire exercise of obtaining the executed declarations rendered sworn statements that were unreliable, deceptive, and perjurous.

As demonstrated above, Plaintiff's supplemental allegations concerning Defendants' obstruction of justice are supported by ample evidence obtained during the course of discovery, and therefore are not made in bad faith, but simply to amplify, support and clarify Plaintiffs' current allegations.

---

[7]     These "cookie cutter" declarations are attached and incorporated herein as Exhibit 14. See Declaration of Linda Mahboub, February 16, 2007; Declaration of Edil Karkas, March 9, 2007; Declaration of Khadija Darif, February 16, 2007; Declaration of Mila Petrosyan, February 16, 2007; Declaration of Anisa Ghafoorzai, February 16, 2007; Declaration of Rodney Pinion, February 16, 2007; Declaration of Xiomara Maradiaga, February 16, 2007; Declaration of Elena Vantsovskaya, March 8, 2007; and Declaration of Faviola Veizaga, February 16, 2007.

[8]     In fact, as discussed below, 2 of the declarants were unlicensed workers who had worked at the Salon for years. Mr. Chreky permitted them to work without the appropriate licenses. It was only after they provided the declarations he sought, and approximately 1 month after they were deposed, that Mr. Chreky summarily terminated their employment.

2.     Violations of I.R.S. Regulations Regarding the Reporting of Tips

Second Amended Complaint paragraphs 17-28 contains allegations that Mr. Chreky

instructed his employees to violate IRS regulations and under-report their tips.  As with all of the

other supplemental allegations contained in the Second Amended Complaint already discussed,

discovery has produced ample evidence substantiating these allegations.

For example, Ms. Critzos testified on this point:

Q: You would agree with me that most of the salon employees would average
their tips on the tip reports, correct?
THE WITNESS: Yes
Q: And this was a common practice, correct?
A: Yes
Q: And in all likelihood when employees reported their tips they were probably
under-reporting, correct?
THE WITNESS: Yes
Q: And this is something that was well-known to Mr. Chreky?
THE WITNESS: Yes
Q: In fact, this was something that Mr. Chreky encouraged his professionals to do,
correct?
THE WITNESS: Yes
Q:  Well, you heard him –
A: I have heard him discuss things with us.
Q: And you heard him tell employees, different employees, you should report this
amount you should report that amount, correct?
A: Yes.  Not exactly in those words though.
Q: Well, I am going to let your recollection rule today.  What do you remember
him saying?
A: I just remember him telling how to spend the cash.
Q: How to spend the cash?
A: Yes.  To pay cash for everything so there is no record.
Q: So, he was advising employees on how to dispose of tips which they had not
reported?
A: Correct
Q: You overheard him doing this?
A: Yes.

Exhibit 4, Critzos Deposition at pp. 80-82 (foundation objections omitted).  Ms. Critzos further

testified that Mr. Chreky retaliated against a former employee by reporting her to the IRS for

under-reporting her tips.  Id. at pp. 72, 78-79.

Ms. Guzman testified that the numbers she reported on her tip reports were incorrect and that she was not the only employee who under-reported her tips.  Deposition of Maria Guzman, December 18, 2007 (hereafter "Guzman Deposition"), attached and incorporated herein as Exhibit 15, at p. 303.  She further testified that Mr. and Mrs. Chreky advised her and other employees to under-report their tips so as to minimize the taxes they would have to pay on such earnings.  Id. at pp. 304-308.


3.     D.C. Licensing Violations

Plaintiffs' Second Amended Complaint contains allegations regarding Defendants' practice of hiring and retaining professionals who did not have valid District of Columbia cosmetology licenses.  Second Amended Complaint ¶¶ 29-36.  These allegations are not made in bad faith because, as demonstrated below, discovery has generated substantial credible evidence, both from Plaintiff's and Defendants' witnesses, that this practice was well-known and long standing.

Maria Guzman worked for the Salon from 1997 to 2007 as a shampoo assistant and a colorist.  She testified that after working for Mr. Chreky for almost 8 years without a license he terminated her employment in November of 2007 because she did not have a D.C. license.  Exhibit 15, Guzman Deposition at p. 71.  Even though Mr. Chreky was aware that Ms. Guzman did not have a license at any time during her employment, he only saw fit to terminate her for this reason once Plaintiff began seeking discovery on the issue of his employees' licenses.  Ms. Guzman testified that two other employees, Aquatif Mahboub and Edil Karkas, were similarly terminated on the same day as her after working for years without licenses.  Id. at p. 81.  Ms. Guzman also confirmed Plaintiff's allegation that unlicensed workers were sent to perform

services at the White House for the First Family, testifying that she went to the White House on 2 to 3 occasions, that she did not have a cosmetology license at the time, and that Mr. Chreky knew it.  Id. at p. 74.

Ms. Mahboub, one of the other unlicensed employees fired in November of 2007, testified in October that she had never had a license in D.C., and that as of the date of her deposition she continued to work at the Salon.  Exhibit 9, Mahboub Deposition at p. 9.  She also performed services at the White House, as often as once every 3 weeks, despite the fact that Mr. Chreky knew that she did not have a cosmetology license.  Id. at p. 85.

Mr. Karkas testified in October of 2007 that he had worked at the Salon for over a year without a D.C. license and that Mr. Chreky was aware of the fact that he was unlicensed.  Exhibit 13, Karkas Deposition at pp. 16-17.  Like Ms. Guzman and Ms. Mahboub, Mr. Chreky terminated Mr. Karkas a month after his deposition, apparently for not having a valid license. See also Exhibit 10, Veizaga Deposition at pp. 13-14 (admitted that she had been working as a colorist at the Salon without a license and that Mr. Chreky was aware of this).

Maurice Clarke, a long time supervisor and manager at the Salon testified that during his 7-year tenure at the Salon, there were several employees who did not have the necessary licenses.  Deposition of Maurice Clarke, October 16, 2007 (hereafter "Clarke Deposition"), attached and incorporated herein as Exhibit 16, at pp. 138-141.  See also Exhibit 4, Critzos Deposition at p. 46 (it was well known that Mr. Chreky employed several people without licenses).  Mr. Clarke described a practice employed by the Salon to ensure that the D.C. licensing authorities did not discover that Mr. Chreky had unlicensed professionals working for him.  He testified that on at least one occasion, inspectors from the District of Columbia arrived at the Salon to conduct an unannounced inspection.  The receptionist held up the inspector at the

front door while all of the unlicensed workers snuck out the back door and waited in the alley until the inspection was completed.  Exhibit 16, Clarke Deposition at pp. 141-42, 186-190.  Ms. Critzos testified that this practice was carried out on 2 or 3 occasions.  Exhibit 4, Critzos Deposition at p. 49.  Ms. Guzman was aware of the practice but testified that she was not one of the employees who had to hide in the alley.  Exhibit 15, Guzman Deposition at p. 80.

Plaintiff's supplemental allegations regarding D.C. licensing ordinances are therefore well supported by the evidence in the case and are not proposed in bad faith.


C.  <u>Plaintiff's Amendments Are Not Futile</u>

The standard to determine futility is if the amendment "merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss."  <u>Simpson v. Socialist People's Libyan Arab Jamahiriya</u>, 2008 WL 90238, at *3 (D.D.C. 2008) (citing <u>Robinson v. Detroit News, Inc.</u>, 211 F. Supp. 2d 101, 114 (D.D.C. 2002).  The court may deny a motion to amend a complaint as futile "when the proposed complaint would not survive a motion to dismiss."  <u>Dehaemers v. Wynne</u>, 2007 WL 4208780, at *2 (D.D.C. 2007) (citing <u>James Madison Ltd. v. Ludwig</u>, 82 F.3d 1085, 1099 (D.C.Cir.1996)); <u>see also</u> <u>Monroe v. Williams</u>, 705 F. Supp. 621, 623 (D.D.C. 1988) ("It has been repeatedly held that an amended complaint is 'futile' if the complaint as amended would not survive a motion to dismiss."); <u>Yankelevitz v. Cornell University</u>, 1996 WL 447749, at*4 (S.D.N.Y. 1996) (holding that since "plaintiff only seeks to add to his complaint factual allegations which support his existing claims against defendants, absent an attack by defendants on the validity of these claims, by a motion to dismiss for failure

to state a claim or otherwise, plaintiff's motion to amend cannot be denied on the basis of futility.").

Ms. Thong's Second Amended Complaint states valid claims and requests for relief, supported by sufficient factual allegations that would be supplemented by the proposed amendments. The amendments supplement the facts that were available to Ms. Thong at the time of the filing of her Complaint. Ms. Thong does not seek to make any amendments that would render the complaint unlikely to survive a motion to dismiss. Thus, the proposed amendments are not futile.

* * *

With regard to all the allegations Plaintiff seeks leave to add with her Second Amended Complaint, these allegations support Plaintiff's larger claim that Defendants so commonly and so willfully violated federal law, local ordinances, and the rules of this Court, that her rights as an employee and a citizen were of no importance to Defendants. All of the allegations are supported by evidence obtained during the course of discovery. As inconvenient as the facts pled in the Second Amended Complaint may be for Defendants, Plaintiff's efforts to include them in her Amended Complaint are not made in bad faith.

## IV.    <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiff's Motion for Leave to File an Amended Complaint

for Declaratory and Monetary Relief and Jury Demand should be granted and the Clerk directed

to file the Second Amended Complaint.

Respectfully submitted,


_____/s/_____
Jonathan G. Rose (DC Bar No. 446208)
Sheppard Mullin Richter & Hampton, LLP
1300 I Street, NW, Ste. 1100 East
Washington, D.C. 20005
Telephone: (202) 218-0000
Facsimile: (202) 218-0020
jrose@sheppardmullin.com

*Attorney for Plaintiff Jennifer Thong*

Dated:  February 11, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of February, 2008, I caused true copies of the

foregoing Plaintiff's Motion for Leave to File an Amended Complaint to be served via ECF and

U.S. Mail on:

        John Bredehoft, Esq.
        David J. Sullivan, Esq.
        Kaufman & Canoles, P.C.
        150 West Main Street, Suite 2100
        Norfolk, Virginia 23510

_____/s/_____
Jonathan Rose

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JENNIFER THONG
13869 Rembrandt Way
Chantilly, VA  20151,

        Plaintiff,

    v.

ANDRE CHREKY SALON,
1604 K Street, N.W.
Washington, D.C.  20006

ANDRE CHREKY,
1604 K Street, N.W.
Washington, D.C.  20006

and

SPAC, LLC
1604 K Street, N.W.
Washington, D.C.  20006,

        Defendant.

Civil Action No: 06-CV-01807-RCL

## [PROPOSED] SECOND AMENDED COMPLAINT

    Plaintiff, Jennifer Thong (the "Plaintiff), by counsel, hereby files this Complaint for

violation of the Fair Labor Standards Act of 1963 ("FLSA"); violation of the D.C.  Wage and

Hour Act ("WHA"); violation of the D.C. Wage Payment and Collection Act ("WPCA"),

violation of the D.C.  Human Rights Act ("DCHRA"); for unlawful assault, battery and

conversion; negligence; and for intentional infliction of emotional distress against Defendants

Andre Chreky ("Mr. Chreky"), Andre Chreky Salon/Andre Chreky Inc. (the "Salon") and SPAC,

LLC.  ("SPAC") (collectively "Defendants").  The Defendants did not compensate Plaintiff for

all hours worked and did not pay her at one and one half times her normal hourly rate of pay for

all hours worked in excess of forty hours per week. As a result, Mr. Chreky and the Salon knowingly, willfully and intentionally violated and continue to violate the FLSA, the WHA and the WPCA. Plaintiff therefore brings this to recover unpaid wages, overtime pay, liquidated damages, attorney's fees and costs.

Further, Mr. Chreky and the Salon subjected Plaintiff to unwanted sexual comments, touches and physical attacks violating the DCHRA and intentionally committed assault, battery and intentional infliction of emotional distress against Plaintiff. The Salon and SPAC were negligent in failing to warn and protect Plaintiff from this physical and emotional harm. In addition, Mr. Chreky and the Salon confiscated and retained money that Plaintiff had earned in tips committing conversion and economically harming against Plaintiff. Plaintiff therefore brings this action for economic, compensatory and punitive damages, attorney's fees and costs, and all other forms of relief the Court deems just. Upon information and belief, Plaintiff alleges as follows:

## PARTIES AND JURISDICTION

1.     Plaintiff Jennifer Thong ("Plaintiff" or "Ms. Thong"), is a resident of Virginia. The actions complained of herein, however, took place primarily in the District of Columbia.

2.     Defendant Andre Chreky Salon/Andre Chreky Inc. (the "Salon"), is a District of Columbia corporation engaged in business at 1604 K Street, N.W. Washington, D.C.

3.     Defendant Andre Chreky ("Mr. Chreky"), is the owner and manager of Andre Chreky Salon. Mr. Chreky is a resident of Virginia and resides at 549 River Bend Road, Falls Church, Virginia 22066. Mr. Chreky is part owner of the Salon and SPAC.

4.     Defendant SPAC, LLC ("SPAC") is a District of Columbia corporation with its principal place of business at 1604 K Street, N.W., Washington, D.C. 20006. SPAC owns and

rents the property that houses the Salon.  SPAC is owned and operated by principals Mr. Chreky and his wife, Serena Chreky.

5.      As Defendants regularly transact business in the District of Columbia, they are subject to personal jurisdiction in the District of Columbia.

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1343(a)(3), as this case involves federal questions of law.  This Court has supplemental jurisdiction over Plaintiff's state and common law claims under 28 U.S.C. § 1367(a).

## RELEVANT FACTS

### Background

7.      The Salon is a full service salon providing hair cuts, hair styling, hair coloring, manicures, pedicures, facials and massages.

8.      Mr. Chreky is the owner and operator of the Salon.  Mr. Chreky has control over the day-to-day operations of the Salon and acted in the interest of the Salon in relation to Plaintiff.

9.      Mr. Chreky and the Salon are engaged in interstate commerce in the District of Columbia as they run and operate a hair salon that does business with clients in the District of Columbia and routinely provide stylists who travel all over the United States with clients.

10.      Plaintiff worked as a stylist at the Salon from 1998 until on or about April 1, 2006.

### Wage and Overtime Violations

11.      Upon information and belief, in 2003, the Salon was investigated by the Department of Labor ("DOL") for overtime violations.  The DOL found that the Salon required

stylists and other employees to work well over forty (40) hours per week every week, often as many as sixty (60) to seventy (70) hours per week, and failed to pay them any requisite overtime.

12. Upon information and belief, as a result of the DOL investigation, the Salon was required to pay the overdue overtime to many employees.

13. Upon information and belief, despite this DOL investigation and its results, in 2004, the Salon classified all stylists as "salaried" employees and stopped paying overtime for work in excess of forty (40) hours. Failure to pay stylists for hours worked and for overtime after the DOL investigation constitutes a knowing and willful failure by the Salon and Mr. Chreky to comply with the requirements of the FLSA, the WHA and the WPCA.

14. Upon information and belief, despite calling the stylists "salaried" employees, the Salon treated them at all times as hourly employees. The Salon would dock pay for stylists who did not work at least fifty-five (55) hours and would not pay stylists for any work in excess of fifty-five (55) hours. Additionally, the stylists and other employees were not paid overtime for hours worked over forty (40) hours.

15. Upon information and belief, from 2004 when the stylists were reclassified as "salaried" employees until February of 2006, the Plaintiff worked an estimated sixteen (16) overtime hours per week for which she was not compensated.

16. On a daily basis, Mr. Chreky and the Salon would take money or checks earned by the Plaintiff and other stylists. Every Saturday, Mr. Chreky and the Salon would then hand out envelopes containing the "tips." Such envelopes contained less than the amount of tips that had been earned by the Plaintiff and at times, if Mr. Chreky was unhappy or angry with the Plaintiff or other stylists, the envelopes would contain no money at all.

**<u>Violations of I.R.S. Regulations Regarding the Reporting of Tips</u>**

17.     Mr. Chreky and other ACI officers, including Serena Chreky, specifically instructed Salon employees to under-report the tips they received from clients in an effort to lower the amount of FICA/social security taxes the Salon would be required to pay to the Internal Revenue Service.  Mr. and Mrs. Chreky directed Salon employees to come up with a tip figure that was large enough not to raise suspicion by the IRS.

18.     Mr. Chreky specifically advised Ms. Thong that she should not report all of the tips she received, including cash tips provided to her directly from a client.  With regard to the tips that clients left for her in envelopes at the front desk, Mr. and Mrs. Chreky told Ms. Thong and other Salon employees to simply report a nominal amount.

19.     Mr. Chreky's purpose in encouraging his employees to under-report their tips was to minimize the employer's share of federal income taxes withheld and paid out on all such tips.

20.     Under 26 U.S.C. §§ 3121(a)(12)(B), 3401(a)(16)(B), cash tips of twenty dollars or more that are received in any calendar month while working for any one employer are subject to Social Security and income tax withholding.  These tips must be reported to the employer by the tenth day of the month following the month in which they were received.

21.     At all times relevant to this case, defendants were aware of this legal requirement.

22.     Tips received by an employee in the course of his or her employment are considered employer-provided remuneration for FICA purposes.  26 U.S.C. § 3121(q), therefore requires employers to apply and collect both the employer's and the employee's portion of FICA taxes on an employee's reported tip income up to the taxable wage base for the given year. Withholding for income tax and Medicare tax purposes is not capped.

23.     At all times relevant to this case, defendants were aware of this legal requirement.

24.     Under 26 U.S.C. § 3121(q), employers must pay FICA taxes on the total amount of cash tips received by an employee up to an including the contribution and the benefit wage base determined under 26 U.S.C.§ 3121(a)(1).

25.     However, by law, an employer is only responsible for the payment of FICA for those tips which are actually reported by the employee.  If an employer is able to convince its employees to under report their tips, the employer's obligations to pay FICA taxes are reduced to whatever extent the employee under reports.

26.     26 U.S.C. 7207 provides: "Any person who willfully delivers or discloses to the Secretary any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter, shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both.  Any person required pursuant to section 6047(b), section 6104(d), or subsection (i) or (j) of section 527 to furnish any information to the Secretary or any other person who willfully furnishes to the Secretary or such other person any information known by him to be fraudulent or to be false as to any material matter shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both."

27.     Defendants were aware that the tips reported by its employees were false, because Mr. and Mrs. Chreky had specifically instructed their employees to under-report the tips they had received.  In addition, defendants received the monthly tip reports from the employees which alerted them to the fact that given the number of services provided by each employee and the tips generally provided for clients for such services (e.g. typically 15%) the amounts reported were a small fraction of the amounts actually received.  Most salon employees reported the exact same

amount of tips month after month (e.g. $300 to $400 per month) despite the fact that there were obvious variations in the tips actually received by virtue of customer flow and number of hours worked by employees during differing time periods, and despite the fact that given the number of services provided each week, the actual tip amount would likely be in the range of $4,000 to $6,000 per month

28.    Defendants knew or reasonably should have known that the tip reports were false and fraudulent but nevertheless submitted them to the IRS in violation of Section 7207.  They did so in an effort to minimize the amount the Salon paid in taxes and in order to maximize the Salon's profits.

**Violations of D.C. Licensing Ordinances**

29.    Chapter 37 D.C. Reg. § 3702 requires individuals employed in the District of Columbia in the barber and cosmetology industry to maintain current licenses with the District of Columbia before performing services on customers.  The regulations specifically list barbers, cosmetologists, esthticians, manicurists, shampoo assistants, salon managers, salon owners, and individuals who provide facials, massages, and scalp treatments as individuals who can not operate without first obtaining a D.C. license and apply to all Salon employees who perform such services for Salon customers.

30.    A sizable number of salon employees did not have valid District of Columbia licenses at the time they rendered services at the Andre Chreky Salon and Spa or on behalf of Salon customers, including First Lady Laura Bush, and the President's daughters Barbara and Jenna Bush.  Such individuals include but are not limited to Elena Vantovskaya, Linda Mahboub, Edil Karkas, Xiomara Maradiaga, Maria Guzman and Sami Tellawi.

31.     Defendants were aware that all of their salon professionals were required to have valid D.C. licenses in order to perform services at the salon.

32.     Section 3727 provides that the City's Director of Consumer and Regulatory Affairs may conduct inspections to determine if a salon or spa maintains appropriate licenses for its professionals.  Section 3727.2 specifically requires that salon owners take "appropriate action to ensure access to all parts of the premises for the purpose of facilitating inspection."

33.     Instead of complying with these requirements, Mr. Chreky developed an emergency drill whereby all unlicensed workers would flee out the back door of the Salon whenever District of Columbia licensing officials appeared to conduct licensing inspections.

34.     On such occasions, the front desk staff was trained to stall the inspectors at the front desk to provide the unlicensed staff, which was often as much as one third of the total staff, sufficient time to sneak out the back door where they would wait in the alley until the inspection had been completed.

35.     Upon information and belief, Defendants terminated several employees who did not have current District of Columbia licenses as a result of discovery sought by Ms. Thong and Ms. Barrett relating to Defendants' compliance with District of Columbia licensing regulations

36.     Section 3727.3 provides that the failure to facilitate inspections constitutes cause for withholding the issuance of a new license or revoking or suspending an existing license. Section 3727.5 further provides that any person who fails to comply with any provision of Chapter 37, shall, upon conviction, be punished by a fine not to exceed $5,000 or by imprisonment not to exceed 90 days for each failure to comply.

**Inappropriate Sexual Comments**

37.     On a daily basis, Mr. Chreky will comment to one or more female employees that she looks "sexy" or "especially sexy today." He also repeatedly references the sex lives of female employees, questions whether their husbands can please them in bed and offers to "help out."

38.     Starting in the fall of 2000, Mr. Chreky made daily comments to Plaintiff about the way she looked and her attire.  Such statements included that she looked "sexy," had "sexy legs," and that he liked the way she looked in that shirt or with that lipstick.

39.     Starting in the fall of 2003, Mr. Chreky repeatedly required Plaintiff to come to his office at the end of the day.  During such visits, Mr. Chreky would discuss sexual topics and repeatedly proposition Plaintiff to have sex with him.  He also told her that other stylists were having an affair with him.

40.     During such visits to his office, Mr. Chreky would promise better work, such as assigning the President's family to her or offering to let her travel with the President's family, in an attempt to induce Plaintiff to have sex with him.

41.     At a fundraiser in December of 2004, Mr. Chreky asked Plaintiff if she wanted to have a threesome and that he "would get any kind of girl [she] wanted, blond or brunette." Later he asked another employee if Plaintiff was the "hottest" stylist and if the three of them wanted to get a room with him for a threesome.

**Touching and Physical Attacks**

42.     Throughout her employment, Mr. Chreky would often direct Plaintiff to help him with a client's hair.  Mr. Chreky would then stand close to Plaintiff, rub hips against her or lean very close to her face as she worked.

43.     On or about November of 2003, Plaintiff was eating lunch in the kitchen area.  In front of other employees, Mr. Chreky stated that Plaintiff had sexy legs.  When the other employees had left, Mr. Chreky returned, leaned over Plaintiff and rubbed her leg and upper thigh.  Plaintiff told Mr. Chreky to stop and he responded, "you have such smooth legs.  Just let me touch them."  Plaintiff slapped his hand and fled the room.

44.     On or about early summer of 2004, Plaintiff was waiting outside of the Salon for a ride that was over an hour late.  Mr. Chreky offered her a ride, which she declined.  After Mr. Chreky repeatedly insisted on driving her home, she reluctantly agreed.  On the drive home, Mr. Chreky pulled the car over and attacked her.  He pulled her toward him, tried to kiss her, pinned her to the back of the seat, and rolled on top of her.  Mr. Chreky lifted her skirt, grabbed her underwear and pulled it to the side, exposing her vagina, and then grabbed her genitals.  Plaintiff pleaded and tried to get him to stop.  Mr. Chreky unzipped his pants and tried to penetrate her with his penis.  When Plaintiff threatened to call the cops, Mr. Chreky stopped and drove her home while threatening her to not tell anyone about the ride home.

45.     Later in 2004, Plaintiff was again assaulted while alone in the lunchroom.  Mr. Chreky shoved her against the sink, pushed his groin against hers and attempted to get his hand under her bra.  When Plaintiff grabbed his arm and told him to stop, he pleaded for her to "let me touch it one time, just one time."  Plaintiff threatened to scream if he did not stop.  In response, Mr. Chreky backed off and she fled the room.

46.     In 2004 through 2006, Mr. Chreky would continually attempt to trap Plaintiff alone while at work.  If he ever found her alone, he would grab her around the shoulders or waist and press his groin against her body.  He would often try to grab her buttocks or genital area, and would grab and lift her skirt.  These attacks occurred, at times, as much as twice per day.

47.     In December of 2004, Mr. Chreky lured Plaintiff to his office by promising to switch her schedule as she had repeatedly requested (in an attempt to be scheduled to work when Mr. Chreky was not).  Suddenly, Mr. Chreky rolled his chair toward hers, grabbed her legs and moved his hand up toward her groin.  She tried to resist.  He told her to relax.  He then grabbed the tie in the front of her shirt, tried to open it and get his hands under her bra.  Plaintiff stood up crying and left the office.

48.     In March of 2005, Mr. Chreky attacked Plaintiff in the kitchen by slamming her into the sink.  He pressed his body against hers, pried her legs apart with his leg and placed his hand underneath her skirt.  Although Plaintiff repeatedly tried to escape, Mr. Chreky physically restrained her.  He repeatedly asked her to just let him touch her.  Mr. Chreky was able to grab the side of her underwear and told her, while holding a lighter up to her face, that if she kept fighting that he was going to burn her underwear off.  Mr. Chreky then violently ripped her underwear off (bruising her genital area) and holding it up to his face, while saying, "see, now I got it and now I am going to keep it as a souvenir." That day, he repeatedly taunted her at her work station following this attack.

49.     Repeatedly during 2005 and up to her termination, Mr. Chreky would grab her when he found her alone and push her head toward his genitals demanding that she "give him a blow job." Plaintiff would often end these attacks by fleeing, pushing him back or telling him that another employee was coming.

50.     In late summer of 2005, Mr. Chreky ordered Plaintiff to do inventory on the fifth floor.  Plaintiff thought she was safe on the fifth floor because Mr. Chreky was with a client, but Mr. Chreky followed and attacked her by forcing her against a wall at the top of the stairwell. Plaintiff tried to escape down the stairs, but to no avail.  When Plaintiff screamed, he covered her

mouth with his hand.  Mr. Chreky unzipped his pants, pulled the Plaintiffs skirt up above her waist, pulled her underwear to one side and attempted to penetrate her.  At this point, Plaintiff was sobbing loudly and having trouble breathing.  When he released her mouth, she began screaming and again, he covered her mouth.  Plaintiff was finally able to get away when another employee walked to the bottom of the stairwell.

51.    In the fall of 2005, Mr. Chreky again required Plaintiff to come to his office.  She went, but stood just inside the open door.  Mr. Chreky got up and slammed the door, pushed her over and got on top of her.  Plaintiff began to cry and yelled for him to let her go.  He grabbed her skirt, tore it and tried to get his hand to her genital area.  Mr. Chreky unzipped his pants, tried to get her skirt above her waist and attempted to penetrate her.  At this time, another employee knocked on the door.  In response, Mr. Chreky jumped up and zipped his pants.  Plaintiff opened the door and ran past her shocked colleague.

### Reprisals and Damages

52.    Mr. Chreky repeatedly retaliated against Plaintiff for her rejections of his sexual advances.  Mr. Chreky would alter her schedule, disrupt her work with regular clients, reassign her regular clients to other stylists and refuse to assign her new clients.  Mr. Chreky would even assign clients who specifically asked for Plaintiff to other stylists.  Such actions dramatically altered Plaintiffs earning potential and caused her great economic harm.

53.    As a result of Mr. Chreky's attacks, Plaintiff has experienced severe depression, anxiety, trouble sleeping, severe headaches, nightmares, and trouble being intimate with her husband.  Plaintiff is currently under the care of a psychiatrist for treatment of injuries caused by Mr. Chreky's attacks.

54.     Plaintiff was the primary wage earner for her family while working at the Salon and earned close to $100,000 annually.  She was concerned about being able to provide for her family and she knew it would take years for her to build up her clientele if she left the Salon, which would cause her to earn far less income.  Despite these needs, she could not take working at the Salon anymore and in February of 2006 she decided to leave.

55.     As a result of being forced to leave the Salon because of Mr. Chreky's attacks, Plaintiff was forced to take a new job, which only pays her about half of what she made at the Salon.

**Obstruction of Justice**

56.     Ms. Thong filed her original complaint on or about September 22, 2006.  Since that time, Defendants and their agents have engaged in a series of prolonged and persistent efforts to obtain favorable testimony from third-party witnesses, and to prevent third-party witnesses from testifying in a manner unfavorable to defendants, through the use of threat, intimidation, and misrepresentation.  By and through their actions, defendants and their agents have suborned perjury and otherwise obstructed justice violating Ms. Thong's rights and the rights of countless other persons who are not parties to this lawsuit

57.     At the beginning of discovery in this case, counsel for Ms. Thong provided counsel for defendants copies of several declarations from third-party witnesses all of whom witnessed and confirmed some or all of the allegations in Ms. Thong's Complaint.  Counsel for Ms. Thong also provided the names of additional persons who they had interviewed and who they anticipated would also provide declarations in the near future.  One such individual, Damon Taylor, was in the midst of reviewing and editing a declaration that he would eventually execute on February 2, 2007.  Counsel for Ms. Thong explained to counsel for Defendants that Mr. Taylor had witnessed and had confirmed many of the allegations of sexual harassment, retaliation, and FLSA violations that Ms. Thong had alleged.

58.    Approximately four hours after counsel for defendants had been apprised of Mr. Taylor's cooperation with counsel for Ms. Thong, Mr. Taylor received a threatening phone call from Sami Tellawi, a then current Salon employee. Mr. Tellawi told Mr. Taylor that Mr. Chreky demanded that he report to the Salon, where he was no longer an employee, so that he could be interviewed. When Mr. Taylor responded that he was under no obligation to report to the Salon or to cooperate with either party, Mr. Tellawi, at Mr. Chreky's direction, threatened that Mr. Chreky would have Mr. Taylor arrested if he did not cooperate.

59.    Mr. Taylor immediately reported this incident to counsel for Ms. Thong and explained that he was concerned that he had placed himself in legal peril by cooperating with Ms. Thong's counsel and by refusing to report to the Salon as Mr. Chreky had demanded and by agreeing to be interviewed by Ms. Thong's counsel.

60.    Counsel for Ms. Thong immediately contacted counsel for defendants to advise them of Mr. Chreky's threatening conduct and to demand that defendants cease all efforts to intimidate potential material witnesses. Nevertheless, Mr. Chreky, and those acting on his behalf, have continued to threaten, intimidate, and manipulate third party witnesses in this case.

61.    In February of 2007, shortly after Ms. Thong filed her Complaint, Mr. Chreky and/or his agents ordered all current Salon employees to meet with David Sullivan, one of the attorneys for defendants. All employees were scheduled for time slots, lasting ten to fifteen minutes each, in which they were required to meet with Mr. Sullivan at a Starbucks situated next door to the Salon where they worked. Upon information and belief, most, if not all such employees felt pressured and compelled to meet with Mr. Sullivan. Upon information and belief, most, if not all such employees believed that meeting with Mr. Sullivan was a job requirement and that they could be terminated for failing to comply.

62.     On February 16, 2007, several employees were required to meet with Mr. Sullivan again, this time in the Salon.  These employees were presented with declarations drafted by Mr. Sullivan and were instructed to execute them.  Upon information and belief, most if not all of the employees felt pressured and compelled to sign the declarations.  Upon information and belief, most, if not all of the employees believed that signing the declarations presented to them was a job requirement and that they could be terminated for failing to comply.

63.     Mr. Chreky, his agents, and his attorneys knew that in executing these declarations, the declarants provided unreliable, deceptive, and perjurous testimony under oath. The declarations, most of which are carbon copies of each other, all provided that the declarant was aware of and did not believe the "allegations" contained in Ms. Thong's Complaint. However, as Mr. Chreky and Mr. Sullivan knew, none of the declarants had seen, read, or had otherwise been informed of most of the allegations contained in Ms. Thong's Complaint and could not competently provide any testimony on the allegations at the time they were required to sign the declarations under pain and penalty of perjury.  In addition, most of the declarants are immigrants for whom English is a second language.  Mr. Chreky and Mr. Sullivan knew that the declarants did not possess sufficient language skills to understand many of the words contained in the declarations they were required to sign.  Mr. Chreky and Mr. Sullivan were aware that due to their lack of sophistication with regard to legal matters, most, if not all of the declarants did not understand or appreciate the legal consequences of executing a sworn declaration that was less than fully accurate or truthful.

64.     On October 1, 2 and 3, 2007, counsel for Ms. Thong and Ms. Barrett deposed nine of the individuals who provided virtually identical declarations in support of Mr. Chreky.  In the days leading up to their depositions, Mr. Chreky and/or his agents contacted each of the deponents and ordered them to meet with counsel for Defendants at a hotel.  Mr. Chreky or his agents told the deponents that counsel for Ms. Barrett and Ms. Thong would attempt to "trick" or

"confuse" them during their depositions and that they needed to meet with counsel for defendants so that they would know how to answer properly.  All nine deponents met with counsel for defendants in advance of their depositions.  All nine deponents believed that attending said meetings was a job requirement.  Most of the deponents believed that they could be terminated if they failed to report for their assigned meetings with counsel for defendants in advance of their depositions.

65.     Upon information and belief, Mr. Chreky and/or his agents promised the deponents that they would receive financial rewards if they provided favorable testimony during their depositions.  Upon information and belief, at least one deponent Khadija Darif received a phone call from Mr. Chreky immediately following her deposition.  Mr. Chreky had attended her deposition just as he had for all of the other current employees deposed that week.  Mr. Chreky admonished Ms. Darif for providing testimony that was favorable to Ms. Thong and Ms. Barrett.  Mr. Chreky later called the Darif residence again, this time asking to speak to her husband.  Mr. Chreky told Mr. Darif that it was unfortunate that his wife had provided testimony that was favorable to Ms. Thong and Ms. Barrett, but that she could expect to receive a bonus and/or a raise if she would provide testimony favorable to him in the future.

66.     With respect to witnesses who were no longer employed by the Salon, counsel for defendants hired two separate investigation firms, Fortress Global Investigations and Security, and Vital Investigations, to investigate several individuals including but not limited to those individuals who provided declarations for Ms. Thong.  The investigators approached most of the witnesses at work posing as customers.  The investigators did not identify themselves as agents for Mr. Chreky.  In fact, the investigators attempted to appear to be unassociated parties who were simply interested in hearing of more about the lawsuit.  In many cases, where witnesses declined to comment on the lawsuit, the investigators would identify themselves and explain that the lawsuit was likely to settle.  The investigators knew that there was no possibility that the

lawsuit would settle when speaking with the witnesses but were rather attempting to extract information from reluctant witnesses by lying about the posture of the lawsuit.

67.    Several individuals who are potential witnesses for Ms. Thong at trial have advised counsel for Ms. Thong that they found the tactics employed by the private investigators to be threatening, that they were second guessing their decision to cooperate with counsel for Thong, and that they were worried about their continued involvement in this lawsuit.

68.    Like the laws prohibiting discrimination, sexual harassment, retaliation, misappropriation of tips, and overtime compensation, federal laws regarding the reporting of tips to the IRS, and local laws pertaining to the licensing of barber and cosmetology professionals and obstruction of justice are clear constraints on the manner in which an employer may treat his employees and conduct business in general.  Defendants' actions demonstrate a reckless disregard for these laws and a proclivity to treat their employees in any manner that best suits the Andre Chreky Salon and its principals, including defendants Chreky and Mrs. Chreky.

## COUNT I —Defendants Mr. Chreky and the Salon

### (Violation of the FLSA)

69.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through sixty-eight.

70.    At all times relevant, Defendants were "employers" within the meaning of the FLSA.  29 U.S.C. § 203(d).

71.    At all times relevant, Plaintiff was an "employee" and was engaged in "commerce" within the meaning of the FLSA.  29 U.S.C. §§ 203(b), 203(e).  Plaintiff was not an exempt employee under the FLSA, but rather, was a covered employee during her employment and was entitled to the protections of the FLSA.

72.    During the course of Plaintiff's employment, Plaintiff was required to work in excess of fifty-five (55) hours per week without pay and in excess of forty (40) hours without being paid one and one half time her normal hourly rate of pay.  Defendants' practice of failing to pay overtime compensation for all work in excess of forty (40) hours to Plaintiff and for retaining Plaintiff's tips was and is in violation of the FLSA.  29 U.S.C. § 207.

73.    Plaintiff is entitled to an award of her unpaid overtime compensation (at the rate of one and one-half times her regular pay) and unpaid tips for the time period commencing two (2) years prior to the filing of this Complaint to the date of any final award of such unpaid overtime compensation.

74.    Additionally, Plaintiff is entitled to an award of liquidated damages under the FLSA as well as pre- and post judgment interest, attorneys' fees and costs, all to be determined at the trial.

WHEREFORE, Plaintiff prays that she be awarded judgment against Defendants, jointly and severally, for unpaid overtimes wages and tips in an amount to be determined at trial, or other such amount as proved at trial, plus an equal amount in liquidated damages, interest (both pre- and post-judgment), attorney's fees, the costs of this action and any other and further relief this Court or a jury deems appropriate.

## COUNT II—Defendants Mr. Chreky and the Salon

### (Willful violation of FLSA)

75.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through seventy-four.

76.    Defendants' practice of failing to pay overtime compensation for all work in excess of forty (40) hours to Plaintiff was and is in violation of the FLSA.

77.    Defendants' violations of the FLSA were and are being done willfully.  Because the DOL investigated and cited the Defendants in 2003 for failing to follow the FLSA, Defendants either knew or showed reckless disregard as to whether its conduct was prohibited by the FLSA.

78.    Plaintiff is entitled to an award of her unpaid overtime compensation (at the rate of one and one-half times her regular pay) and unpaid tips for the time period commencing three (3) years prior to the filing of this Complaint to the date of any final award of such unpaid overtime compensation.

79.    Additionally, Plaintiff is entitled to an award of liquidated damages under the FLSA as well as pre- and post judgment interest, attorneys' fees and costs, all to be determined at the trial.

WHEREFORE, Plaintiff prays that she be awarded judgment against Defendants, jointly and severally, for unpaid overtimes wages and tips in the amount an amount to be determined at trial, or other such amount as proved at trial, plus an equal amount in liquidated damages, interest (both pre- and post-judgment), attorney's fees, the costs of this action and any other and further relief this Court or a jury deems appropriate.

## COUNT Ill—Defendants Mr. Chreky and the Salon

### (Violation of the D.C.  Wage and Hour Act)

80.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through seventy-nine.

81.    At all times relevant, Defendants were "employers" within the meaning of the WHA.  D.C.  CODE § 32-1002(3).

82.    At all times relevant, Plaintiff and was an "employee" within the meaning of the WHA.  D.C.  CODE § 32-1002(3).

83.    During the course of Plaintiff's employment, Plaintiff was required to work in excess of fifty-five (55) hours per week without pay and in excess of forty (40) hours without being paid one and one half times her normal hourly rate of pay.  Defendants' practice of failing to pay overtime compensation for all work in excess of forty (40) hours to Plaintiff and of retaining tips earned by Plaintiff was and is in violation of the WHA.  D.C.  CODE § 32-1003.

84.    Plaintiff is entitled to an award of her unpaid overtime compensation (at the rate of one and one-half times her regular pay) and unpaid tips for the time period commencing three years prior to the filing of this Complaint to the date of any final award of such unpaid overtime compensation.  D.C.  CODE § 32-10 12.

85.    Additionally, Plaintiff is entitled to an award of liquidated damages under the WHA as well as pre- and post judgment interest, attorneys' fees and costs, all to be determined at the trial.  D.C.  CODE § 32-1012.

WHEREFORE, Plaintiff prays that she be awarded judgment against Defendants, jointly and severally, for unpaid overtimes wages and tips in the amount an amount to be determined at trial, or other such amount as proved at trial, plus an equal amount in liquidated damages, interest (both pre- and post-judgment), attorney's fees, the costs of this action and any other and further relief this Court or a jury deems appropriate.

## COUNT IV—Defendants Mr. Chreky and the Salon

### (Violation of the D.C.  Wage Payment and Collection Act)

86.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through eighty-five.

87.    At all times relevant, Defendants were "employers" within the meaning of the WPCA.  D.C.  CODE § 32-1301(1).

88.    At all times relevant, Plaintiff was an "employee" within the meaning of the WPCA.  D.C.  CODE § 32-1301(2).

89.    During the course of Plaintiff's employment, Plaintiff was required to work in excess of fifty-five (55) hours per week without pay and in excess of forty (40) hours without being paid one and one half time her normal hourly rate of pay.  Additionally, Defendants failed to pay Plaintiff the money that she had earned as tips as part of her compensation.  Under the WPCA, Defendants were and are obligated to pay Plaintiff all wages due for work that Plaintiff performed.  D.C.  CODE § 32-1302.

90.    Plaintiff is entitled to an award of her unpaid compensation.  Additionally, Plaintiff is entitled to an award of liquidated damages under the WPCA as well as pre- and post-judgment interest, attorneys' fees and costs, all to be determined at the trial.  D.C.  CODE § 32-1308.

WHEREFORE, Plaintiff prays that she be awarded judgment against the Defendants, jointly and severally, for unpaid overtimes wages and tips in the amount an amount to be determined at trial, or other such amount as proved at trial, plus an equal amount in liquidated damages, interest (both pre- and post-judgment), attorney's fees, the costs of this action and any other and further relief this Court or a jury deems appropriate.

## COUNT V—Defendants Mr. Chreky and the Salon

### (Violation of the District of Columbia Human Rights Act)

91.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through ninety.

92.    At all times relevant, Defendants were "employers" within the meaning of the District of Columbia Human Rights Act ("DCHRA").  D.C. CODE § 2-1401.2(10).

93.    At all times relevant, Plaintiff was an "employee" within the meaning of the DCHRA.  D.C. CODE § 2-1401.2(9).

94.    Plaintiff is female and therefore, is a member of a protected classification within the meaning of the DCHRA.  D.C.  CODE § 2-1402.11.

95.    Since her hiring in 1998, Plaintiff was subjected to a constant, continuous, ongoing and pervasively hostile working environment by Defendants.  This hostile work environment was so severe and pervasive that it altered the terms and conditions of Plaintiff's employment.

96.    Since her hiring in 1998, Mr. Chreky has repeatedly solicited sexual favors and/or contact with Plaintiff in exchange for employment benefits such as assigning her to high profile clients like the President's family.

97.    Plaintiff repeatedly advised Mr. Chreky that his statements and advances were offensive and unwelcome.

98.    Because Plaintiff repeatedly resisted Mr. Chreky's attacks, Mr. Chreky took tangible employment actions against her including reassigning key clients, refusing to assign new clients, adjusting her schedule, all of which caused her to lose much of her income. Additionally, Mr. Chreky's continual attacks and harassment were so unbearable that Plaintiff was forced to find another job, effectively constructively terminating her.

99.    The harassment complained of affected the term, condition and privilege of Plaintiff's employment as prohibited by the DCHRA.

100.    The Salon is vicariously liable for Mr. Chreky's actions because he was, at all times relevant to this Complaint, the owner and operator of the Salon.

101.    As a direct and proximate result of the discriminatory conduct of Defendants, Plaintiff has lost considerable pay, has suffered humiliation, mental anguish, and emotional pain, as well as other incidental and consequential damages.

102.    Defendants unlawful and discriminatory motives in their treatment of the Plaintiff's employment were willful, wanton and malicious.  As a result, Plaintiff is entitled to full relief under the law, including, but not limited to, economic, compensatory and punitive damages.

WHEREFORE, Plaintiff prays that she be awarded:  (1) a finding that Defendants violated the DCHRA; (2) backpay, including all increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' discriminatory conduct; (3) future pay, in lieu of reinstatement, including increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' discriminatory conduct; (4) compensatory damages in an amount to be determined at trial but no less than $1,000,000 or a greater amount as deemed appropriate by a jury; (5) punitive damages in an amount to be determined at trial but no less than $3,000,000 or a greater amount deemed appropriate by a jury; and (6) attorney's fees and costs relating to this action and any other relief deemed appropriate.

## COUNT VI—Defendants Mr. Chreky and the Salon

### (Violation of the District of Columbia Human Rights Act-Retaliation)

103.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through one hundred and two.

104.    At all times relevant, Defendants were "employers" within the meaning of the DCHRA.  D.C.  CODE § 2-1401.2(10).

105.    At all times relevant, Plaintiff was an "employee" within the meaning of the DCHRA.  D.C.  CODE § 2-1401.2(9).

106.    Plaintiff is female and therefore is a member of a protected classification within the meaning of the DCHRA.  D.C.  CODE § 2-1402.11.

107.    Since her hiring in 1998, Plaintiff has been subjected to a constant, continuous, ongoing sexual harassment by Mr. Chreky.

108.    Plaintiff engaged in protected activity when she complained to Mr. Chreky that his comments were offensive and not welcome, and when she refused to consent to have sex with Mr. Chreky on multiple occasions.

109.    In response to Plaintiff's protected activity, Mr. Chreky has taken tangible employment actions against her including, reassigning key clients, refusing to assign new clients, adjusting her schedule, all of which caused her to lose much of her income.  Such actions constitute retaliation in violation of the DCHRA.  D.C.  CODE § 2-1402.61.

110.    The Salon is vicariously liable for Mr. Chreky's actions because he was, at all times relevant to this Complaint, the owner and operator of the Salon.

111.    As a direct and proximate result of the retaliation of Defendants, Plaintiff has lost considerable pay, has suffered humiliation, mental anguish, and emotional pain, as well as other incidental and consequential damages.

112.    Defendants' retaliations against the Plaintiff were willful, wanton and malicious. As a result, Plaintiff is entitled to full relief under the law, including, but not limited to, economic, compensatory and punitive damages.

WHEREFORE, Plaintiff prays that she be awarded: (1) a finding that the Defendants violated the DCHRA; (2) backpay, including all increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' discriminatory conduct; (3) future pay, in lieu of reinstatement, including increases in pay and other benefits of employment that the Plaintiff would have received but for Defendants' discriminatory conduct; (4) compensatory damages in an amount to be determined at trial but no less than $1,000,000 or a greater amount as deemed appropriate by a jury; (5) punitive damages in an amount to be determined at trial but no less than $3,000,000 or a greater amount deemed appropriate by a jury; and (6) attorney's fees and costs relating to this action and any other relief deemed appropriate.

## COUNT VII—Defendants Mr. Chreky and the Salon

### (Assault)

113.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through one hundred and twelve.

114.    On multiple occasions, Mr. Chreky intentionally threatened or attacked Plaintiff causing her to suffer an apprehension of an unwanted physical contact from Mr. Chreky.

115.    Mr. Chreky knew or should have known that such actions would cause Plaintiff to suffer a reasonable apprehension of immediate harm and offensive contact to her person.

116.    Plaintiff reasonably believed that Mr. Chreky would harm her and such fear was directly caused by Mr. Chreky's actions.

117.    The threat of attack and the apprehension of unwanted physical contact has directly caused Plaintiff to suffer severe depression, anxiety, trouble sleeping, severe headaches, nightmares, and trouble being intimate with her husband. Plaintiff is currently under the care of a psychiatrist for treatment for injuries caused by Mr. Chreky's attacks.

118.    The Salon is vicariously liable for Mr. Chreky's actions because he was, at all times relevant to this Complaint, the owner and operator of the Salon.

WHEREFORE, Plaintiff prays that she be awarded:  (1) backpay, including all increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' tortious conduct; (2) future pay, in lieu of reinstatement, including increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' tortious conduct; (3) compensatory damages in an amount to be determined at trial but no less than $1,000,000 or a greater amount as deemed appropriate by a jury; (4) punitive damages in an amount to be determined at trial but no less than $3,000,000 or a greater amount deemed appropriate by a jury; and (5) attorney's fees and costs relating to this action and any other relief deemed appropriate.

## COUNT VIII—Defendants Mr. Chreky and the Salon

### (Battery)

119.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through one hundred and eighteen.

120.    On multiple occasions, Mr. Chreky intentionally physically touched and attacked the Plaintiff.

121.    Mr. Chreky knew or should have known that such contact would bring about harmful and offensive contact to the Plaintiff's person.  Mr. Chreky acted with intent and malice in attacking the Plaintiff.

122.    The physical attacks and unwanted physical contact from the Mr. Chreky has directly caused the Plaintiff to suffer bruises, aches, pains, severe depression, anxiety, trouble sleeping, severe headaches, nightmares, and trouble being intimate with her husband.  Plaintiff is

currently under the care of a psychiatrist for treatment for injuries caused by Mr. Chreky's attacks.

123.    The Salon is vicariously liable for Mr. Chreky's actions because he was, at all times relevant to this Complaint, the owner and operator of the Salon.

WHEREFORE, Plaintiff prays that she be awarded:  (1) backpay, including all increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' tortious conduct; (2) future pay, in lieu of reinstatement, including increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' tortious conduct; (3) compensatory damages in an amount to be determined at trial but no less than $1,000,000 or a greater amount as deemed appropriate by a jury; (4) punitive damages in an amount to be determined at trial but no less than $3,000,000 or a greater amount deemed appropriate by a jury; and (5) attorney's fees and costs relating to this action and any other relief deemed appropriate.

## COUNT IX—Defendants Mr. Chreky and the Salon

### (Conversion)

124.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through one hundred and twenty-three.

125.    As part of her employment compensation, Plaintiff earned tips from clients.  The clients paid such tips to Plaintiff and the tips belonged to Plaintiff.

126.    Mr. Chreky required Plaintiff, and other stylists, to give him the full amount of their tips on a daily basis.  On a weekly basis, Mr. Chreky would return some but not all of the tips that Plaintiff had earned and at times, Mr. Chreky would not return any of the tips at all.

127.    The Salon is vicariously liable for Mr. Chreky's actions because he was, at all times relevant to this Complaint, the owner and operator of the Salon.

128.    The taking and retention of Plaintiffs money constitutes the unlawful taking and exercise of ownership and control by Defendants over the personal property of Plaintiff. Because Defendants never returned most of the tips, such a taking constituted a complete deprivation of Plaintiff's rights to such property.

129.    As a direct result of Defendants' actions, Plaintiff has suffered a loss of a large amount of her income.

WHEREFORE, Plaintiff prays that she be awarded:  (1) backpay, including all increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' tortious conduct; (2) future pay, in lieu of reinstatement, including increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' tortious conduct; (3) compensatory damages in an amount to be determined at trial but no less than $1,000,000 or a greater amount as deemed appropriate by a jury; (4) punitive damages in an amount to be determined at trial but no less than $3,000,000 or a greater amount deemed appropriate by a jury; and (5) attorney's fees and costs relating to this action and any other relief deemed appropriate.

## COUNT X—Both Defendants

### (Intentional Infliction of Emotional Distress)

130.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through one hundred and twenty-nine.

131.    Mr. Chreky repeatedly sexually harassed and attacked Plaintiff.  Such pattern of harassment and attacks constitute extreme and outrageous conduct by Mr. Chreky.  Mr. Chreky acted intentionally and in reckless disregard that such actions would cause severe emotional distress to Plaintiff.

132.    The physical attacks and unwanted physical contact from Mr. Chreky has directly caused Plaintiff to suffer severe emotional distress including, severe depression, anxiety, trouble sleeping, severe headaches, nightmares, and trouble being intimate with her husband.  Plaintiff is currently under the care of a psychiatrist for treatment for injuries caused by Mr. Chreky's attacks.

133.    The Salon is vicariously liable for Mr. Chreky's actions because he was, at all times relevant to this Complaint, the owner and operator of the Salon.

WHEREFORE, Plaintiff prays that she be awarded:  (1) backpay, including all increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' tortious conduct; (2) future pay, in lieu of reinstatement, including increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' tortious conduct; (3) compensatory damages in an amount to be determined at trial but no less than $1,000,000 or a greater amount as deemed appropriate by a jury; (4) punitive damages in an amount to be determined at trial but no less than $3,000,000 or a greater amount deemed appropriate by a jury; and (5) attorney's fees and costs relating to this action and any other relief deemed appropriate.

## COUNT XI—The Salon

### (Negligent Supervision)

134.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through one hundred and thirty-three.

135.    As an employer, the Salon has a duty to use reasonable care in its supervision and retention of employees.  The Salon owed a duty to Plaintiff to protect her from the unreasonable risk of foreseeable harm.

136.    The Salon also had a duty to train, supervise, and restrain its principal manager, Mr. Chreky, from harming Plaintiff and its other female employees.

137.    Mr. Chreky's persistent sexual harassment and assaultive conduct towards Plaintiff and other female Salon employees was well known to the Salon.

138.    The Salon, owned and controlled by Mr. Chreky and his wife, Serena Chreky, had actual and constructive knowledge that Mr. Chreky harassed, assaulted, and battered Plaintiff and other female Salon employees.  The Salon acquired this knowledge through Mr. Chreky, its President and Treasurer.

139.    The Salon breached its duties to protect its employees from unreasonable risk of harm, and to train and restrain its manager Mr. Chreky from sexually harassing and assaulting its employees.

140.    The Salon's breach of its duties was the proximate cause of Plaintiffs injuries and damages.

WHEREFORE, the Plaintiff prays that she be awarded:  (1) backpay, including all increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' unlawful conduct; (2) future pay, in lieu of reinstatement, including increases in pay and other benefits of employment that the Plaintiff would have received but for Defendants' unlawful conduct; (3) compensatory damages in an amount to be determined at trial but no less than $1,000,000 or a greater amount as deemed appropriate by a jury; (4) punitive damages in an amount to be determined at trial but no less than $3,000,000 or a greater amount deemed appropriate by a jury; and (5) attorney's fees and costs relating to this action and any other relief deemed appropriate.

## COUNT XII—SPAC, LLC.

### (Negligence)

141.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through one hundred and forty.

142.    Landlords in the District of Columbia have a duty to protect invitees from the foreseeable risk of harm caused by third parties on its property.

143.    SPAC, LLC., a corporation owned and operated by Mr. Chreky and his wife, Serena Chreky, leased the premises at 1604 K Street, NW, Washington, D.C. to the Salon where Plaintiff worked.

144.    Plaintiff's employment at the Salon made here an invitee of SPAC, LLC.

145.    SPAC, LLC. had actual and constructive knowledge that Mr. Chreky harassed and assaulted Plaintiff and, other female Salon employees on its premises. This knowledge was gained from its principal, Mr. Chreky.

146.    SPAC, LLC had a duty to warn and protect Plaintiff from known harassing and assaultive conduct.

147.    SPAC, LLC.'s breached its duty to warn and protect Plaintiff, and was the proximate cause of Plaintiff's injuries and damages.

WHEREFORE, the Plaintiff prays that she be awarded: (1) backpay, including all increases in pay and other benefits of employment that Plaintiff would have received but for Defendants' unlawful conduct; (2) future pay, in lieu of reinstatement, including increases in pay and other benefits of employment that the Plaintiff would have received but for Defendants' unlawful conduct; (3) compensatory damages in an amount to be determined at trial but no less than $1,000,000 or a greater amount as deemed appropriate by a jury; (4) punitive damages in an

amount to be determined at trial but no less than $3,000,000 or a greater amount deemed

appropriate by a jury; and (5) attorney's fees and costs relating to this action and any other relief

deemed appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:  (1) enter judgment against

Defendants on all claims, (2) grant Plaintiff the specific relief requested following each claim,

including attorney's fees and costs, and (3) grant such other relief as this Court deems just and

proper.

Respectfully submitted,


_____

Jonathan G. Rose (DC Bar No. 446208)
Sheppard Mullin Richter & Hampton, LLP
1300 I Street, NW, Ste. 1100 East
Washington, D.C. 20005
Telephone: (202) 218-0000
Facsimile: (202) 218-0020
jrose@sheppardmullin.com

*Attorney for Plaintiff Jennifer Thong*

Dated: _____, 2008

# **EXHIBIT 2**

## DECLARATION OF DAMON TAYLOR

I, DAMON TAYLOR, hereby state that I am over eighteen (18) years of age, am competent to testify and have personal knowledge of the facts stated herein:

1.    I joined the staff at the Andre Chreky Salon ("the Salon") as a Receptionist in May 2005 and left the Salon in June 2006.  I was a full time student at American University during the time that I worked at the Salon.

2.    I worked with both Ronnie Barrett and Jennifer Thong at the Salon.

3.    When I first began working at the Salon I noticed that Andre Chreky, the owner of the Salon, routinely made comments to Ms. Barrett, Ms. Thong, and other female employees about their bodies and appearance.  I saw Mr. Chreky behave in a sexually inappropriate fashion toward Ms. Barrett and Ms. Thong, often getting inappropriately close when speaking to them. I also was aware that Ms. Barrett and Ms. Thong tried to avoid Mr. Chreky in the Salon, and that Mr. Chreky often tried to isolate them in the Salon.

4.    Mr. Chreky also commented to me about female employees, asking me if I thought they were sexy or cute.  On one occasion he called me on the phone at the receptionist desk from his office upstairs and asked me what I thought about the appearance of a new front desk female employee, Laura.  Apparently, Mr. Chreky had been watching me interact with Laura on the video cameras before he called down to the receptionist desk.  He told me that Laura used to work at Victoria's Secret, and stated, "Don't you think she's sexy?"  I did not think it was appropriate for Mr. Chreky to be discussing Laura or other female employees in this way, and attempted to avoid these conversations with him.  However, Mr. Chreky persisted and tried repeatedly to involve me in sexually explicit conversations about female employees at the Salon. I also heard Mr. Chreky refer to female staff and clients using derogatory terms like "bitch."

5.    On one occasion, just a few months before I stopped working at the Salon, after an attractive female client left, Mr. Chreky approached me and asked if I wanted to "party" with her for my birthday.  Mr. Chreky then told me that the woman was a stripper and that I should go to the club on my birthday and let the woman "give you head."  He also stated that he thought I should "fuck her" for my birthday.  I could only react with a nervous laugh, because I was extremely uncomfortable with Mr. Chreky's comments and thought they were totally inappropriate.

6.    While I worked in the Salon I often observed that Mr. Chreky became angry with Ms. Barrett and Ms. Thong and treated them in a hostile and abusive manner.  They often looked scared of him, and worried about his temper.  When he became angry with either of them, he altered their schedules by instructing me or one of the other receptionists to remove their clients from their schedules.  He also directed us not to give them any new clients.  In the evening, after reviewing the schedule for the following day, Mr. Chreky often called down to the Receptionist's area and instructed me to remove Ms. Barrett and Ms. Thong's clients from their schedules, and

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 1

to assign them to another stylist. He also frequently instructed me not to assign new clients to either Ms. Barrett or Ms. Thong. When Mr. Chreky took away Ms. Thong or Ms. Barrett's clients, he often assigned them to Mindy Roberts, an employee who many at the Salon believed was involved in a romantic relationship with Mr. Chreky.

7.      I heard rumors from other employees in the Salon that Ms. Roberts and Mr. Chreky had a sexual relationship. I believed these rumors were true because Ms. Roberts and Mr. Chreky were often together in the Salon late into the evening, and they interacted in an overly familiar way with each other.

8.      Mr. Chreky directed me not to tell Ms. Barrett or Ms. Thong about the changes he made to their schedules. In fact, on several occasions he threatened that he would terminate my employment if I told them about the changes he directed me to make to their schedules.

9.      I was present in the Salon on Ms. Barrett's last day of employment in December of 2005. Ms. Barrett and I were downstairs in the Reception area when Amelle Darri came downstairs and told Ms. Barrett to go upstairs and stock the product shelves. Ms. Barrett told Ms. Darri that she had already clocked out for the day. Ms. Darri then went upstairs and returned with Mr. Chreky who began yelling and cursing at Ms. Barrett. He said "get the fuck out of here, this is my house and I don't want to see your face again." Ms. Barrett was crying hard. Mr. Chreky continued to yell at her and tell her to get out of the Salon. I understood that he had fired her. I helped Ms. Barrett gather her things and she left the Salon. I felt that Mr. Chreky was extremely abusive to her, and his behavior appeared to be physically threatening to Ms. Barrett. I was worried about her safety.

10.     While I worked in the Salon, I noticed that Ms. Thong was becoming increasingly unhappy. Mr. Chreky worked her especially hard, often assigning her to serve up to four clients per hour. I also noticed that Mr. Chreky was becoming increasingly hostile towards her. On one occasion, about a month before I left the Salon, I saw Mr. Chreky grab Ms. Thong's upper arm and forcefully pull her down to the couch in the waiting area. He was yelling and cursing at her. He said "What the fuck, you have got to listen to me, what are you doing." Ms. Thong appeared scared of him and quite upset by his treatment of her.

11.     After Jennifer Thong left the Salon, Mr. Chreky approached me and asked me if clients were calling in and asking for Ms. Thong. Mr. Chreky had instructed us to lie about the whereabouts of anyone who left the Salon. I told Mr. Chreky that clients had called the Salon, but that I did not tell them where she went. Mr. Chreky then accused me of giving Ms. Thong's client information, and began yelling and screaming at me. Mr. Chreky demanded that I sign a paper that said that Ms. Thong called me to get client information. This statement was not true, but Mr. Chreky insisted that I make it under threat of termination.

12.     I was hired at the rate of $8 per hour. I worked full time for the first month of my employment at the Salon and worked over forty hours. I was not paid overtime for the hours I worked over 40 hours that week. I called the Salon and asked Serena Chreky about my overtime hours. She informed me that from that point on I would receive a raise and time and one-half for overtime. I received a raise to $12 per hour. I worked part-time for most of the rest of my

employment with the Salon because I was in school full-time at American University. During the time that I worked at the Salon I was aware that most of the other employees did not receive pay for overtime hours regardless of how many hours they worked in a given week.

13.     During the time that I worked at the Salon, Mr. Chreky instructed that all tips be collected and held until they could be divided and distributed to employees on Saturday night after closing. I frequently heard stylists complain that their tips had been stolen.

14.     In June of 2006, Mr. Chreky terminated my employment after I called in sick to work.

15.     In December, 2006, I was contacted by phone by Sammy a former colleague from the Salon, who was working for Mr. Chreky. Sammy told me "Damon, you need to go over to Andre's office and meet with him immediately. Andre is a very powerful man and he can have you thrown in jail if you don't." It is my belief that Mr. Chreky instructed Sammy to call and make the threat. I was particularly scared from the threatening phone call, because I had seen that Mr. Chreky had a propensity for physical violence, having heard that Mr. Chreky had attacked a homeless man outside the Salon. I have been genuinely scared for my safety since this call.

        I SOLEMNLY SWEAR OR AFFIRM under the penalties of perjury that the matters set

forth in this Declaration are true and correct to best of my personal knowledge, information and

belief. Executed on this 2nd day of February 2007.


_____
DAMON TAYLOR

# EXHIBIT 3

 **COPY**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
RONNIE BARRETT,             :
                            :
        Plaintiff,          :
                            :
    vs.                     :    C.A. No.
                            :    07-CV-0250(RCL)
ANDRE CHREKY,               :
ANDRE CHREKY SALON/ANDRE    :
CHREKY INC., SPAC, LLC,     :
                            :
        Defendants.         :
                            :
- - - - - - - - - - - - - - - x
JENNIFER THONG,             :
                            :
        Plaintiff,          :
                            :    Civil No.
    vs.                     :    1:06-1807(RCL)
                            :
ANDRE CHREKY SALON, et al., :
                            :
        Defendants.         :
                            :
- - - - - - - - - - - - - - - x

                    Washington, D.C.
                    Tuesday, October 30, 2007

        The deposition of DAMON TAYLOR, called for

examination by counsel for Defendants in the

above-entitled matter, pursuant to Notice, in the

offices of Sheppard, Mullin, Richter & Hampton, LLP,

1300 I Street, N.W., 11th Floor East, Washington,

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 2

15

1    a sheet of paper which basically told the job

2    description and the salary, the $8 an hour starting

3    pay, and just some basic paperwork.

4        Q.    Are you familiar with or have you read the

5    Complaints filed against the salon by either Jennifer

6    Thong or Ronnie Barrett?

7        A.    I haven't specifically seen the

8    documentation.  I am aware of some of the charges

9    that they would be filing, but I don't know exactly

10   what it is or the actual documentation that was being

11   filed.

12       Q.    So, if you haven't read the documents, how

13   have you come to learn about the allegations in the

14   lawsuits?

15           MR. ROSE:  Objection.  Lacks foundation.

16   BY MR. SULLIVAN:

17       Q.    You can answer.

18       A.    Newspaper.  It was in the Post a few months

19   ago.

20       Q.    So, you read about it in the Post?

21       A.    Yes.

22       Q.    Have you talked to either Jennifer or Ronnie

94

1          MR. SULLIVAN:  Asked and answered.

2          THE WITNESS:  That is correct.

3    BY MR. ROSE:

4      Q.    Directing your attention to paragraph 15 of

5    your declaration, it says:  In December 2006 I was

6    contacted by phone by Sami, a former colleague from

7    the salon.

8          That is Sami Tellawi?

9      A.    Yes.

10     Q.    He was working for Mr. Chreky at that time;

11   is that correct?

12     A.    Yes.

13     Q.    It goes on to say:  Sami told me, quote,

14   "Damon, you need to go over to Andre's office and

15   meet with him immediately.  Andre is a very powerful

16   man and he can have you thrown in jail if you don't."

17         Do you see that?

18     A.    Yes.

19     Q.    That quote is accurate?

20     A.    It is.

21     Q.    That is what Sami told you?

22     A.    That is what he told me.

95

1    Q.    Did you have reason to fear that threat that

2    Sami was delivering to you from Mr. Chreky?

3    A.    I was afraid.  Yes.

4    Q.    And you understood Sami's call to be a

5    threat coming from Mr. Chreky, correct?

6          MR. SULLIVAN:  Foundation.

7          THE WITNESS:  I did.

8    BY MR. ROSE:

9    Q.    Do you recall how long it had been since you

10   had last spoken with Sami before that phone call

11   threatening that you might go to jail if you didn't

12   go and speak with Mr. Chreky?

13   A.    I'm sorry.  Could you repeat that?

14   Q.    The question is when was the time before

15   that phone call in December 2006 when Sami called you

16   threatening that Mr. Chreky could have you thrown in

17   jail if you didn't come over and speak with him, how

18   long before that had it been since you had spoken

19   with Sami?

20   A.    It must have been one of the last days of my

21   employment there.  I mean, I hadn't talked to Sami in

22   several months.

# EXHIBIT 4



### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x

RONNIE BARRETT,                :

        Plaintiff,      :

    vs.                       :    C.A. No.
                     :    07-CV-0250(RCL)
ANDRE CHREKY,                  :
ANDRE CHREKY SALON/ANDRE       :
CHREKY INC., SPAC, LLC,        :

        Defendants.     :
                     :

- - - - - - - - - - - - - - - x

JENNIFER THONG,               :

        Plaintiff,      :

                     :    Civil No.
    vs.                       :    1:06-1807(RCL)

ANDRE CHREKY SALON, et al.,    :

        Defendants.     :
                     :

- - - - - - - - - - - - - - - x

                  Washington, D.C.
                  Wednesday, November 14, 2007

        The deposition of NORAH DUNLAVEY CRITZOS,

called for examination by counsel for Defendants in

the above-entitled matter, pursuant to Notice, in the

offices of Sheppard, Mullin, Richter & Hampton, LLP,

RONNIE BARRETT,
v
ANDRE CHREKY, et al
C.A. No. 07-CV-0250 (RCL)

Exhibit 3

46

1      A.    It was I believe she was Ethiopian, a

2  manicurist.

3      Q.    Was her name Aki?

4      A.    Yes.

5      Q.    And you found out about this because Aki

6  told you?

7      A.    She told a lot of people.

8      Q.    That is what we understand.

9            Was it well-known that Mr. Chreky employed

10 people to perform services on people's hair who did

11 not have licenses in the District of Columbia?

12     A.    Yes.

13     Q.    Can you name any employees who worked for

14 Mr. Chreky who were unlicensed?

15     A.    I heard that Linda didn't have a license.

16     Q.    That would be Linda Mahoub, a colorist?

17     A.    I can't recall her last name.

18     Q.    Was she a colorist?

19     A.    Yes.  She was a colorist.

20     Q.    Do you know whether this Linda went to the

21 White House and performed services at the White

22 House?

49

```
1      Q.    In what respect?

2      A.    Because he was just -- he was off-the-wall.

3      Q.    We have heard that too.

4            Do you recall any instances while you were

5   employed at the Andre Chreky Salon when members of

6   the D.C. Licensing Board came in for an inspection?

7      A.    Yes.

8      Q.    And in those instances isn't it true that

9   the unlicensed employees would scurry out the back of

10  the salon?

11     A.    Yes.

12     Q.    As the member of the D.C. Licensing Board

13  was kept waiting down in the reception area?

14     A.    Yes.

15     Q.    And Mr. Chreky was aware of this, correct?

16     A.    Yes.

17     Q.    How many times can you recall this

18  occurring?

19     A.    Maybe two, three.

20     Q.    How did you receive your tips at the Andre

21  Chreky Salon?

22     A.    In envelopes.
```

72

1   business.

2       Q.    With respect to tips, you have described

3   already that there were instances where it was

4   widespread that service providers believed that tips

5   had been stolen.

6       A.    Yes.

7       Q.    And you said that Mr. Chreky was made aware

8   of these concerns and issues.

9       A.    Yes.

10      Q.    Are you aware of any instances where

11  Mr. Chreky contacted the IRS to pursue an employee

12  over tip disclosure issues in a punitive manner?

13      A.    I understood one of the colorists who left,

14  it was rumored that he had done that to.

15      Q.    Do you recall the name of this colorist?

16      A.    It was Yolanda.

17      Q.    Yolanda?

18      A.    Yes.

19      Q.    That was a well-known rumor?

20      A.    Yes.

21      Q.    Had you heard that from a manager?

22      A.    This was years ago.  I couldn't tell you.

78

1    on their paychecks what their tips were, correct?

2        A.    Repeat please.

3        Q.    These tips are reported to the salon so the

4    salon is able to report on their paychecks what their

5    tips were for that two-week period?

6        A.    Correct.

7        Q.    And you understand that at the end of the

8    year when the W-2s come out they reflect what the

9    tips were based on those biweekly reports?

10       A.    Yes.

11       Q.    And you, like every other professional in

12   the salon, understood that the failure to accurately

13   report these tips was illegal, correct?

14       A.    Yes.

15       Q.    With that background in mind, what exactly

16   did you understand that Mr. Chreky did to Yolanda?

17       A.    You are asking me what I heard that he did?

18       Q.    Correct.

19       A.    I believe he called the IRS and said that

20   she under-reported her tips.

21       Q.    How long had Yolanda been working for

22   Mr. Chreky at the time he made this report?

79

```
 1        A.    He didn't do it until after she left.

 2        Q.    Do you know about how long she worked for

 3    him?

 4        A.    A couple of years.

 5        Q.    So, as far as you know, during that two-year

 6    period when she was working there, I am talking about

 7    Yolanda, he never reported Yolanda while she was

 8    working there?

 9        A.    No.

10        Q.    It was after she left that he made this

11    report to the IRS?

12        A.    Yes.

13        Q.    Do you have any reason to believe that

14    Mr. Chreky became aware of her fraudulent tip reports

15    only after she was let go?

16              MR. SULLIVAN:   Foundation.

17    BY MR. WILKENFELD:

18        Q.    Let me rephrase.

19              Mr. Chreky was aware during her employment

20    of what her tip reports were?

21              MR. SULLIVAN:   Foundation.

22              THE WITNESS:   Yes.
```

1    BY MR. WILKENFELD:

2        Q.    And his belief that she was under-reporting

3    her tips was a belief that he formed, as far as you

4    know, during her employment?

5            MR. SULLIVAN:  Foundation.

6            THE WITNESS:  Yes.

7    BY MR. WILKENFELD:

8        Q.    But he didn't report them until after she

9    left?

10       A.    No.

11       Q.    You would agree with me that most of the

12   salon employees would average their tips on the tip

13   reports, correct?

14           MR. SULLIVAN:  Foundation.

15           THE WITNESS:  Yes.

16   BY MR. WILKENFELD:

17       Q.    And this was a common practice, correct?

18       A.    Yes.

19       Q.    And in all likelihood when employees

20   reported their tips they were probably

21   under-reporting, correct?

22           MR. SULLIVAN:  Foundation.

81

```
 1            THE WITNESS:  Yes.
 2            BY MR. WILKENFELD:
 3      Q.    And this is something that was well-known to
 4   Mr. Chreky?
 5            MR. SULLIVAN:  Foundation.
 6            THE WITNESS:  Yes.
 7   BY MR. WILKENFELD:
 8      Q.    In fact, this was something that Mr. Chreky
 9   encouraged his professionals to do, correct?
10            MR. SULLIVAN:  Foundation.
11            THE WITNESS:  Yes.
12            BY MR. WILKENFELD:
13      Q.    Well, you heard him --
14      A.    I have heard him discuss things with us.
15      Q.    And you heard him tell employees, different
16   employees, you should report this amount, you should
17   report this amount, correct?
18      A.    Yes.
19            Not exactly in those words though.
20      Q.    Well, I am going to let your recollection
21   rule today.
22            What do you remember him saying?
```

82

```
 1      A.    I just remember him telling how to spend the

 2  cash.

 3      Q.    How to spend the cash?

 4      A.    Yes.  To pay cash for everything so there is

 5  no record.

 6      Q.    So, he was advising employees on how to

 7  dispose of tips which they had not reported?

 8      A.    Correct.

 9            MR. SULLIVAN:  Foundation.

10  BY MR. WILKENFELD:

11      Q.    You overheard him doing this?

12      A.    Yes.

13      Q.    You testified in response to something

14  Mr. Sullivan asked you that he talked about people's

15  boobs and butts.

16            Is that accurate?

17            MR. SULLIVAN:  Asked and answered.

18            THE WITNESS:  Yes.

19  BY MR. WILKENFELD:

20      Q.    You would agree with me that you heard

21  Mr. Chreky on several occasions comment on different

22  female employee's breasts?
```

84

1              MR. SULLIVAN:  Asked and answered.

2              THE WITNESS:  I didn't hear that.

3    BY MR. WILKENFELD:

4        Q.    Did a private investigator attempt to

5    contact you?

6        A.    Yes.

7        Q.    How did this private investigator try to

8    contact you?  Was it by phone or in person?

9        A.    By phone and then showed up kind of like she

10   was a new client.

11       Q.    Was this a man or a woman?

12       A.    A woman.

13       Q.    Do you know her name?

14       A.    I can get it for you.  It is in my wallet.

15       Q.    Could you retrieve that for me?

16       A.    (Witness complies.)

17       Q.    Was it Anna Mass?

18       A.    I have her card.

19             MR. WILKENFELD:  I am not going to take this

20   card, but the record will reflect that I am looking

21   at a business card that says:  Vital Investigation,

22   Anna Mass, M-A-S-S, President.  The address is 2022

1    Columbia Road, Northwest, Suite 511, Washington, D.C.

2    20009.  Phone number (202) 415-6277.  Fax (202)

3    330-5583.  E-mail is anna@vitalinvestigations.com.

4            MR. NICKERSON:  Do you want to see it?

5            MR. SULLIVAN:  I will take his word for it.

6            BY MR. WILKENFELD:

7        Q.    So, this person, Ms. Mass, showed up at your

8    place of work?

9        A.    Yes.

10       Q.    And when she showed up at your place of work

11   she was posing as a potential client, correct?

12       A.    Yes.

13             Then she identified herself after starting

14   to ask me questions.  And I said, who are you again?

15       Q.    So, she asked you a number of questions

16   before she identified herself?

17       A.    Yes.

18       Q.    And then eventually you asked her, who the

19   hell are you, correct?

20       A.    Well, I couldn't understand what she was

21   saying.

22       Q.    So, you asked her who she was?

86

1    A.    Yes.

2    Q.    And at that point did she tell you?

3    A.    Yes.

4    Q.    What did she tell you?

5    A.    She told me she was an investigator

6  sub-lawyer for -- I guess that would be for you.

7         MR. WILKENFELD:  Let the record reflect that

8  the witness is pointing directly at Mr. Sullivan.

9         THE WITNESS:  I'm sorry.

10        BY MR. WILKENFELD:

11   Q.    That is okay.

12        Once she identified herself, did she

13  continue to ask you questions?

14   A.    Yes.  Absolutely.

15   Q.    Did you answer her questions?

16   A.    No.

17   Q.    How long would you say it was that she

18  continued to ask you questions once you refused to

19  answer?

20   A.    About a minute-and-a-half.

21   Q.    How did you end your conversation?

22   A.    I said that if she wanted to know what I

87

1  said in this, you need to go to the lawyers.

2        She was just asking if I was getting paid,

3  all kinds of just weird questions. And I was, first

4  of all, I don't know who you are, so you don't need

5  to ask me anything.

6     Q.   So, this person who you never met before

7  asked you questions about whether or not you were

8  being compensated for your sworn testimony in this

9  case, correct?

10    A.   Yes.

11    Q.   And before that day you never met this

12 person, correct?

13    A.   No.   Never met her.

14    Q.   Did you find the fact that a private

15 investigator came to your place of work and began

16 questioning you and insinuating that you were paid

17 for your testimony, did you find that at all

18 intimidating?

19    A.   Absolutely.

20    Q.   In what respect?

21    A.   She was really up there in my face.  I mean,

22 just right there in my face.  And I was, you know, I

88

1    don't know who you are.  But it was accusatory

2    questions.

3        Q.    And after this experience of meeting this

4    private investigator, did you become nervous about

5    the fact that you had provided a statement in this

6    case?

7        A.    Yes.

8        Q.    Would you agree with me that the atmosphere

9    in the Andre Chreky Salon when you worked there could

10   be described as a highly sexualized working

11   environment?

12       A.    Yes.  That is the nature of the business.

13       Q.    When you say it is the nature of the

14   business, in your experience are all salons highly

15   sexualized in the way that Mr. Chreky's business was?

16       A.    No.

17       Q.    So, even within the realm of the salon

18   industry, this was highly sexualized and

19   inappropriate?

20       A.    I can't say as to inappropriate or not.  It

21   was my workplace.

22       Q.    Did you find the workplace inappropriate

92

1    inappropriate?

2        A.    No.

3        Q.    Changing subjects here.

4            Why did you become nervous, according to

5    your words, hopefully accurately, if I am not, please

6    correct me, why did you become nervous about the fact

7    that you provided a statement in this case?

8        A.    I felt nervous because I didn't know who

9    this lady was and she was extremely confrontational.

10   As I said, this is my personal space.  She was well

11   within that.  And she was a very large woman.

12       Q.    So, you were nervous because of her

13   closeness I guess and demeanor you are saying?

14       A.    And I have never done this before and I

15   didn't know what this was coming from.  And if she

16   was part of the investigation or whatever part of

17   this, she would have this information.  Maybe I am

18   incorrect.  I don't know.  I didn't feel comfortable.

19       Q.    You didn't feel comfortable talking to her?

20       A.    Talking to her.

21            And then it was just like, huh, I felt very

22   strange about it.

# EXHIBIT 5



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - - - x
                                  :
RONNIE BARRETT,                   :
                                  :
          Plaintiff,              :
                                  :
     vs.                          :     C.A. No.
                                  :     07-CV-0250(RCL)
ANDRE CHREKY,                     :
ANDRE CHREKY SALON/ANDRE          :
CHREKY INC., SPAC, LLC,           :
                                  :
          Defendants.             :
                                  :
- - - - - - - - - - - - - - - - - x
                                  :
JENNIFER THONG,                   :
                                  :
          Plaintiff,              :
                                  :     Civil No.
     vs.                          :     1:06-1807(RCL)
                                  :
ANDRE CHREKY SALON, et al.,       :
                                  :
          Defendants.             :
                                  :
- - - - - - - - - - - - - - - - - x
```

Washington, D.C.
Wednesday, November 14, 2007

     The deposition of CYNTHIA TORRICO, called

for examination by counsel for Defendants in the

above-entitled matter, pursuant to Notice, in the

offices of Sheppard, Mullin, Richter & Hampton, LLP,

1300 I Street, N.W., 11th Floor East, Washington,

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 4

44

1    said, I will be there tomorrow to meet with you.  I

2    said, okay, at 11:00.  She didn't even give me the

3    chance to get her information, her name.  And when

4    she came in the next day I received her and basically

5    told her I had no comment.

6        Q.   What did she ask you in particular, if you

7    remember?

8        A.   If I worked at Andre Chreky, which was

9    correct, but I still said no comment.  Why is it that

10   I don't want to talk to her?  I said, I have no

11   comment to say to you.

12           She just kept on being pushy about every

13   question.  I said, let me show you your way out.  I

14   just showed her out.

15       Q.   Did you find it at all intimidating that a

16   private investigator showed up at your workplace and

17   asked you questions repeatedly after you declined to

18   answer?

19       A.   Yes.

20       Q.   Did it make you nervous about your

21   involvement in this case?

22       A.   Yes.

1           What exactly about the private investigator

2    intimidated you?

3           MR. ROSE:  Form.

4           THE WITNESS:  I'm sorry.  Can you rephrase

5    that again?

6    BY MR. SULLIVAN:

7       Q.   Can you tell me what it was about the

8    private investigator that intimidated you?

9       A.   Just the way she was pushy asking questions

10   about the whole case.

11      Q.   When you say pushy, what was pushy about her

12   approach?

13      A.   Basically she started getting upset when I

14   wouldn't answer her questions.  Every question she

15   would ask me was a no comment answer and she kept on

16   pushing, kept on asking and asking and asking, and

17   basically she wasn't getting anywhere because my

18   answer was no comment constantly.  So, at that point

19   that is when I told her let me show you the way out.

20      Q.   And when you suggested that she should leave

21   did she leave?

22      A.   She followed me, yes, to leave out and as we

64

```
 1              EXAMINATION BY COUNSEL FOR PLAINTIFF
 2                      RONNIE BARRETT
 3           BY MR. WILKENFELD:
 4      Q.    Just to be clear, this private investigator
 5   showed up at your work, correct?
 6      A.    Correct.
 7      Q.    She attempted to interview you?
 8      A.    Correct.
 9      Q.    She asked you questions and you refused to
10   give answers?
11      A.    Correct.
12      Q.    And then you asked her to leave?
13      A.    Correct.
14      Q.    You attempted to show her to the door?
15      A.    Correct.
16      Q.    And after you had told her you are not going
17   to be interviewed and you are not going to give
18   answers, she continued to ask questions, correct?
19      A.    Correct.
20           MR. SULLIVAN:  Asked and answered.
21           MR. WILKENFELD:  Nothing further.
22           MR. SULLIVAN:  I guess we are done.
```

# **EXHIBIT 6**

 **COPY**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - x
                          :
RONNIE BARRETT,           :
                          :
          Plaintiff,      :
                          :
     vs.                  :    C.A. No.
                          :    07-CV-0250(RCL)
ANDRE CHREKY,             :
ANDRE CHREKY SALON/ANDRE  :
CHREKY INC., SPAC, LLC,   :
                          :
          Defendants.     :
                          :
- - - - - - - - - - - - - x
                          :
JENNIFER THONG,           :
                          :
          Plaintiff,      :
                          :    Civil No.
     vs.                  :    1:06-1807(RCL)
                          :
ANDRE CHREKY SALON, et al.,  :
                          :
          Defendants.     :
                          :
- - - - - - - - - - - - - x

                    Washington, D.C.
                    Monday, October 1, 2007


          The deposition of MILA PETROSYAN, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 5

14

1    to meet with Mr. Sullivan today, correct?

2        A.    What do you mean job?

3        Q.    As an employee of Mr. Chreky, it was your

4    job today, one of your duties as his employee today,

5    to go meet with Mr. Sullivan?

6        A.    Yes.

7        Q.    What did Mr. Sullivan tell you?

8        A.    He told me just tell the truth of what you

9    know and just the truth.  We never discussed about

10   other things.

11       Q.    How long did this meeting go on for?

12       A.    Maybe 10 or 15 minutes.  We came here after.

13       Q.    So, in those 10 to 15 minutes he told you

14   make sure you tell the truth?

15       A.    Yes.

16       Q.    What else did he tell you?

17       A.    Nothing.

18       Q.    Well, you were together for at least ten

19   minutes.

20       A.    He told me to just tell the truth.  If you

21   are asked something, tell the truth to what you know.

22       Q.    For ten minutes he just told you over and

32

```
 1            MR. BREDEHOFT:  We can stipulate it was not

 2    a confidential communication if it helps.

 3            MR. WILKENFELD:  That is fine.

 4            BY MR. WILKENFELD:

 5        Q.    And your meeting with Mr. Sullivan was very

 6    brief, right?

 7        A.    Yes.

 8        Q.    It was less than ten minutes?

 9        A.    Yes.  10 or 15 minutes.

10        Q.    10 or 15 minutes.

11            And during that time he asked you a number

12    of questions?

13        A.    Yes.

14        Q.    And they were mostly yes or no questions,

15    did this happen, did this happen, did this happen?

16        A.    Yes, no, and I told my opinion too.

17        Q.    Did you clock out to go meet with

18    Mr. Sullivan?

19        A.    No.

20        Q.    Because it was part of your job?

21        A.    Yes.

22        Q.    You met with Mr. Sullivan a few weeks later
```

39

1    Q.    And your understanding of what the

2    allegations were came from Mr. Sullivan?

3    A.    No.  I understand just something happens and

4    Jennifer and Ronnie complain about this sexual

5    harassment.

6    Q.    Well, let me ask you about that.

7    As you sit here today what is your

8    understanding of what sexual harassment is?

9    A.    I read it in this case.

10    Q.    Let me ask you this.

11    If someone, let's say someone like me, asks

12    you what is sexual harassment, what does it mean,

13    what do you understand sexual harassment to mean

14    under the law?

15    A.    I can't explain exactly, but when men are

16    not nice with a woman.

17    Q.    Are we talking about not being nice in a

18    physical way?

19    A.    Yes.  Physical way.

20    Q.    Anything else?

21    A.    I can't explain.  I'm sorry.  But I

22    understand what is sexual harassment.

# EXHIBIT 7

⌷ **COPY**

1

```
            UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
RONNIE BARRETT,                :

          Plaintiff,           :

     vs.                       :     C.A. No.
                               :     07-CV-0250(RCL)
ANDRE CHREKY,                  :
ANDRE CHREKY SALON/ANDRE       :
CHREKY INC., SPAC, LLC,        :

          Defendants.          :
- - - - - - - - - - - - - - - x
                               :
JENNIFER THONG,                :

          Plaintiff,           :
                               :     Civil No.
     vs.                       :     1:06-1807(RCL)
                               :
ANDRE CHREKY SALON, et al.,    :
                               :
          Defendants.          :
                               :
- - - - - - - - - - - - - - - x
```

                    Washington, D.C.
                    Tuesday, October 2, 2007

     The deposition of XIOMARA MARADIAGA, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

RONNIE BARRETT.
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 6

28

1    Q.    Is it like a test to see if you are good?

2    A.    No.  He said this is too short.

3          Well, now, he doesn't have hair, but before

4    he had a lot of hair.

5          MR. ROSE:  Let the record reflect he is here

6    and he is smiling at that.

7          THE WITNESS:  Sorry.

8          BY MR. ROSE:

9    Q.    It happens.  It happens.  It happens.

10         When you met with Mr. Sullivan yesterday,

11   how long did you meet with him?

12   A.    20 minutes.

13   Q.    And as best you can recall, what did he

14   advise you?

15   A.    Faviola.  Because I tell her, I'm sorry, but

16   I don't speak very good English and I don't

17   understand some words and I need help.

18   Q.    You are saying, if I understood you, you

19   just said the name Faviola.  I was asking about

20   Mr. Sullivan.

21         Faviola assisted you in understanding what

22   Mr. Sullivan was saying?

1    A.    Translated for me a little bit because she

2  focused and she had the question.  He said you say

3  the truth and take your time.  That is it.  Not too

4  much.

5    Q.    Did he ask you about sexual harassment?

6    A.    Faviola asked about that.  I don't

7  understand the harassment.

8         I say harassment and my brother don't

9  understand me.  I am very confused.  But I look in

10  the dictionary and I say, okay, I understand.  And I

11  asked my fiance what is harassment.

12    Q.    Just so that I understand, after your

13  meeting with Mr. Sullivan you went and looked up the

14  word harassment in the dictionary?

15    A.    No.  I look after.

16    Q.    After your meeting with Mr. Sullivan you

17  went and looked up the definition of harassment?

18    A.    Yes.

19    Q.    Why did you do that?

20    A.    I tell Faviola what is that.  I think she

21  don't understand too because she never tell me.

22         Because I don't pronounce very good.  I said

33

1    you keep papers?

2        A.    In my home.

3        Q.    You did look at home to see if you had

4    anything?

5        A.    Yes.  I looked in my home and my brother

6    read for me.  Yes.

7        Q.    Did you have any documents that are

8    responsive to the subpoena, any notes or anything

9    that refer or relate in any way to Ronnie Barrett or

10   Jennifer Thong's allegation against Mr. Chreky or

11   anything relating to your declaration?

12       A.    I don't understand.

13       Q.    Do you know what a declaration is?

14       A.    No.

15       Q.    Let me refer you to the end of this

16   document.  This is the declaration.

17           Do you recognize this document?

18           Have you ever seen this document before?

19       A.    Yes.  I recognize this.

20       Q.    This is a declaration.

21           Do you see on the second page you signed

22   this document?

37

1     A.    No.

2     Q.    And the reason you didn't punch out is

3  because you were told to go and meet with

4  Mr. Sullivan while you were at work, correct?

5          You need to actually say.

6     A.    No.  I don't understand that.

7     Q.    You keep your time at the salon, right, by

8  taking a card and punching it in when you come in?

9     A.    I don't punch.

10    Q.    But when you went to go talk with

11 Mr. Sullivan you didn't clock out?

12    A.    No.

13    Q.    You were still on the clock?

14    A.    Yes.

15    Q.    And the reason you did that was because it

16 was part of your job, you were asked to go and talk

17 with your boss' lawyers, correct?

18    A.    Yes.

19    Q.    So, when you met with Mr. Sullivan that day

20 in the Starbucks how long did you meet with him?

21    A.    Ten minutes.

22    Q.    What did Mr. Sullivan say to you?

79

1      A.    No.

2      Q.    In fact you weren't even aware of what the

3  word harassment meant until you looked at it in the

4  dictionary last night, correct?

5      A.    Yes.

6      Q.    And you looked up the word harassment after

7  you had met with Mr. Sullivan, Mr. Chreky's attorney,

8  correct?

9      A.    Yes.

10      Q.    Have you received in your seven years as a

11  full time employee at the Andre Chreky Salon, have

12  you ever received any sexual harassment training?

13      A.    No.

14      Q.    If in fact you felt that you or someone else

15  around you that you saw had been sexually harassed,

16  who would you report that to?

17            (Discussion between the Interpreter and the

18  witness.)

19            THE INTERPRETER:  She said to the owners.

20            Should I say what I am saying in English

21  afterwards?

22            MR. BREDEHOFT:  If I may, you said something

81

```
 1      A.    No.  His wife.

 2      Q.    You would go tell his wife?

 3      A.    Or the manager.

 4      Q.    That would probably be worse.

 5            So, you would go to a manager or not

 6  Mr. Chreky if you saw him acting in what you believed

 7  to be an inappropriate way, a sexually inappropriate

 8  way?

 9            Do you know what I mean by sexually

10  inappropriate?

11      A.    Inappropriate, no.

12      Q.    Okay.

13            If I understood your testimony before, there

14  were many weeks when you worked your four ten hour

15  days as Mr. Chreky's assistant when you might work

16  another day at the White House; is that correct?

17      A.    Yes.

18      Q.    Is it true that you weren't paid by the

19  salon for that time that you went to the White House?

20            MR. BREDEHOFT:  Asked and answered.

21            BY MR. ROSE:

22      Q.    He is just making an objection for the
```

100

1     A.    Yes.

2     Q.    The first sentence says:  I worked with both

3  Jennifer Thong and Ronnie Barrett at the Andre Chreky

4  Salon.  I never witnessed, heard, or heard of either

5  being sexually harassed by anyone at the Andre Chreky

6  Salon.

7         What did you mean by sexually harassed?

8  What does sexually harassed mean to you when you said

9  these words to Mr. Sullivan in or about early

10  February 2007?

11     A.    Because I never hear or saw it.

12     Q.    What is the it?  What do you understand

13  sexually harassed to mean?

14     A.    I understand like -- okay.  (Speaking

15  Spanish.)

16     Q.    I'm sorry.  I just want to say you need some

17  translation to understand what sexually harassed

18  means?

19     A.    Yes.

20     Q.    Okay.

21         (Discussion between the witness and

22  Interpreter.)

# EXHIBIT 8

 

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - x
                              :
RONNIE BARRETT,               :
                              :
        Plaintiff,            :
                              :
    vs.                       :      C.A. No.
                              :   07-CV-0250(RCL)
ANDRE CHREKY,                 :
ANDRE CHREKY SALON/ANDRE      :
CHREKY INC., SPAC, LLC,       :
                              :
        Defendants.           :
- - - - - - - - - - - - - - - x
                              :
JENNIFER THONG,               :
                              :
        Plaintiff,            :
                              :      Civil No.
    vs.                       :   1:06-1807(RCL)
                              :
ANDRE CHREKY SALON, et al.,   :
                              :
        Defendants.           :
- - - - - - - - - - - - - - - x
```

Washington, D.C.
Tuesday, October 2, 2007

The deposition of ANISA GHAFOORZAI, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 7

19

1        A.    Maybe 6:00 o'clock.

2             I was nervous and I wanted to ask David

3    about it because I had never been.  He said just tell

4    the truth and you don't have to be nervous, see you

5    tomorrow there, just tell the truth.  That is it.

6        Q.    Is it going okay so far?

7        A.    Yes.

8        Q.    Good.

9             Who else was at this meeting at the Hilton

10   yesterday?

11       A.    Yesterday it wasn't a meeting.  It was me,

12   Rodney, Faviola and Xiomara.  Just a few minutes I

13   saw David.  And when we were leaving I saw Andre and

14   we just shaked hands and we went home.

15       Q.    During that meeting you were told to think

16   about what sexual harassment means to you, right?

17       A.    Yes.

18       Q.    And Mr. Sullivan said that, right?

19       A.    No.

20             The case I know.  He said you know tomorrow

21   we are going to be there about this situation.

22       Q.    Right.

20

1          And he said this is a case that involves

2    sexual harassment, right?

3          A.    Yes.

4          Q.    Mr. Sullivan said that?

5          A.    Yes.

6          Q.    He said that you should think about what the

7    word sexual harassment means because of the language

8    barrier?

9          A.    Yes.

10         Q.    So, he told you to think about what the word

11   sexual harassment means to you and figure out a way

12   to explain?

13         A.    He said we have to read the documents he

14   gave us.

15         Q.    Just so I am clear, Mr. Sullivan told you

16   that you should think about how you would be able to

17   explain what sexual harassment is because you might

18   have a problem with the language barrier?

19         A.    I don't know.

20         Q.    Do you remember anyone telling you that you

21   should think about how to best explain sexual

22   harassment in English?

44

1    Mr. Sullivan after you?

2        A.    I think so.

3        Q.    How did you know what time you were supposed

4    to go to meet with Mr. Sullivan?

5        A.    I don't know.  Just they told me.

6        Q.    Who are they?  Who told you?

7        A.    I don't remember.  I don't remember.

8        Q.    But it was somebody at the salon?

9        A.    I think so.  I don't remember.

10       Q.    Well, did a customer tell you to go see

11   Mr. Sullivan?

12       A.    No.  Not a customer.

13       Q.    Did a person on the street tell you to see

14   Mr. Sullivan?

15       A.    No.  Somebody from the salon.

16       Q.    So, it was somebody from the salon?

17       A.    Yes.

18       Q.    Did you clock out when you went and saw

19   Mr. Sullivan?

20       A.    No.

21       Q.    And you didn't clock out because when you

22   went to see Mr. Sullivan you were doing your job,

52

1          Do you see that?

2     A.    Yes.

3     Q.    So, when you got this packet, Exhibit A, did

4  you read the Complaints?

5     A.    Yes.

6     Q.    Had you seen the Complaints before that?

7     A.    Complaints?

8     Q.    The documents contained in Exhibit 1.

9     A.    Yes.

10    Q.    The lawsuits.

11    A.    Yes.

12    Q.    Had you ever seen the lawsuits before?

13    A.    No.

14    Q.    And you understand that the lawsuits contain

15 the allegations in this case, right?

16    A.    What means allegation?

17    Q.    Why don't you tell me what you think the

18 word allegation means?  It is in your declaration.

19    A.    Those are different words.  You have to

20 explain it to me.

21          I am not American to know 100 percent the

22 words.

55

1    Q.    Did Mr. Sullivan say anything like if a

2    person lies under oath, they could be criminally

3    prosecuted?

4         Did he say that to you?

5    A.    I don't know.

6    Q.    Do you think you would remember that if he

7    had said that?

8    A.    I don't know.

9    Q.    In paragraph number seven of your

10   declaration, the second sentence, it says:  I have

11   been promised no benefit, nor threatened with any

12   reprisal in connection with this Declaration.

13        What are you trying to say in that

14   paragraph?

15   A.    You have to explain it to me a different way

16   to understand.

17   Q.    I can't explain it any differently because

18   these are your words.

19        Let's start with just individual words.

20        What does the word reprisal mean?  This word

21   right here.

22        Do you see the word reprisal?

56

1  A. Yes.

2   I don't do anything and somebody give me

3 something to pay for it or something to do this

4 thing.  That is what I think.

5  Q. Do you work hard during the day?

6  A. A job is a job.  Sometimes you are busy

7 back-to-back.  Sometimes you have time.

8  Q. Are you usually busy?

9  A. It just depends on the day, the week.

10  Q. How many clients do you usually see a day?

11  A. Sometimes we do more facial and less wax.

12 Sometimes more wax than facial.  It is hard to say.

13  Q. But how many people do you see during the

14 day?

15  A. I don't count.

16  Q. When was the last day you worked?

17  A. Saturday.

18  Q. How many people did you see that day?

19  A. I don't know.  Ten.

20  Q. Ten.

21   Is that a regular amount?

22  A. I told you it depends.  If I do just

104

```
 1              THE WITNESS:  Excuse me?
 2   BY MR. ROSE:
 3       Q.    What does the word reprisal mean?
 4       A.    Could you read it?
 5       Q.    I am just asking you.
 6       A.    What is it?
 7       Q.    The word reprisal.  It was a word you used.
 8             What does it mean?
 9       A.    Like somebody asked me if you do this, I
10   will give you a prize.
11       Q.    I am asking you if you know what the word
12   reprisal means?
13       A.    Maybe I know a different way.
14       Q.    What does the word discrimination mean?
15       A.    Discrimination is like don't treat you
16   right.
17       Q.    Is that it?
18       A.    Yes.
19       Q.    Don't treat you right?
20       A.    Don't treat you right.
21             Like pay for one is good and another one is
22   different.
```

# EXHIBIT 9



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                   :
RONNIE BARRETT,         :
                   :
       Plaintiff,   :
                   :
    vs.            :    C.A. No.
                   :   07-CV-0250(RCL)
ANDRE CHREKY,        :
ANDRE CHREKY SALON/ANDRE  :
CHREKY INC., SPAC, LLC,   :
                   :
       Defendants.   :
                   :
- - - - - - - - - - - - - - x
                   :
JENNIFER THONG,      :
                   :
       Plaintiff,   :
                   :   Civil No.
    vs.            :  1:06-1807(RCL)
                   :
ANDRE CHREKY SALON, et al., :
                   :
       Defendants.   :
                   :
- - - - - - - - - - - - - - x

Washington, D.C.
Monday, October 1, 2007

    The deposition of AOUATIF MAHBOUB, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396

9

1    A.    Normally like we can transfer our license to

2  a USA license.

3    Q.    Have you done that?

4    A.    Not yet.

5    Q.    Has Mr. Chreky ever told you to do that?

6    A.    Yes.

7    Q.    Is there a reason you haven't done that?

8    A.    Just busy with the kids.

9    Q.    A four-year old and a nine-month old.  That

10  is a reason.

11        I take it that at no time during the course

12  of your employment with the Chreky Salon that you

13  held a license; is that right?

14    A.    No.

15    Q.    You have never?

16    A.    Yes.

17    Q.    From this country?

18    A.    Yes.

19    Q.    Other employees at the salon are also

20  unlicensed; is that correct?

21    A.    I don't know about other employees.

22    Q.    But I take it Mr. Chreky has told you go

16

1      Q.    The Hilton on Connecticut Avenue?

2      THE WITNESS: Was it the Hilton?

3      MS. KATZ: He is not here to answer

4  questions.

5      MR. BREDEHOFT: We are not allowed to help.

6      BY MS. KATZ:

7      Q.    Just give us your best recollection.

8      There has been testimony by a prior witness

9  that you met at the Hilton.

10     A.    I think so.

11     Q.    Mr. Chreky asked you to come to that

12  meeting; is that right?

13     A.    Yes.

14     Q.    And he told you to come to the meeting

15  because he was concerned that you feel a comfort

16  level about this deposition; is that right?

17     A.    Correct.

18     Q.    And he told you, did he not, that he was

19  afraid that you would get tripped up or tricked by

20  the questions that could be asked of you today; is

21  that right?

22     A.    Correct.

17

1     Q.    And he told you that he thought it was very

2     important that you have the assistance of his lawyers

3     to make sure that you don't get tripped up; is that

4     right?

5     A.    Yes.

6     Q.    And it is fair to say that you want to do

7     your best to assist Mr. Chreky; is that right?

8     A.    Yes.

9     Q.    And you are very loyal to Mr. Chreky, right?

10    A.    I am very loyal to him.

11    Q.    And you feel very indebted to Mr. Chreky, do

12    you not?

13    A.    I can't understand the word.

14    Q.    You feel that you owe him a debt of

15    gratitude because of his employment of you; is that

16    right?

17    A.    Because he is a nice guy.

18    Q.    And it is fair to say that you also feel

19    very loyal to Serena Chreky?

20    A.    I do.

21    Q.    And it is fair to say that you would like

22    nothing that you say or do to negatively affect

23

1    with him in the Starbucks near the salon, correct?

2        A.    Correct.

3        Q.    And you were directed to go to that meeting

4    with Mr. Sullivan by Serena Chreky?

5              Who told you to go meet with Mr. Sullivan?

6        A.    Serena Chreky.

7        Q.    And she told you she wanted you to meet with

8    the lawyer for the salon to give a declaration,

9    correct?

10       A.    Yes.  Correct.

11       Q.    And you knew going into this meeting with

12   Mr. Sullivan that your purpose was to give a

13   declaration that would help the salon defend these

14   lawsuits, correct?

15       A.    Correct.

16       Q.    And when you met with Mr. Sullivan it was a

17   very short meeting, was it not?

18       A.    It was a very short meeting.

19       Q.    Five-minutes?

20       A.    More than that.

21       Q.    How many?

22       A.    Ten minutes.

27

```
 1        Q.    And these are the words that he put to what

 2   you told him; is that right?

 3        A.    Correct.

 4        Q.    These are not your words?

 5        A.    It is my words.

 6        Q.    He drafted this, right?

 7        A.    Yes.

 8        Q.    These are not your words.  Am I right about

 9   that?

10              These are not your words.  These are the

11   words that Mr. Sullivan gave to you, correct?

12        A.    Right.

13        Q.    What is sexual harassment?

14        A.    When someone pushes you to do things that

15   you don't want to do.

16        Q.    Things of a sexual nature?

17        A.    Yes.

18        Q.    Is there anything else that is sexual

19   harassment to your knowledge?

20        A.    No.

21        Q.    So, you understand sexual harassment to be

22   if someone pushes you to have sex with them and you
```

28

```
 1   don't want to?

 2        A.    Correct.

 3        Q.    But that is your total understanding of what

 4   sexual harassment is; is that right?

 5        A.    Yes.

 6        Q.    You have never been provided any kind of

 7   training of sexual harassment?

 8        A.    No.

 9        Q.    And the salon has never given you any

10   instruction on what sexual harassment could be; is

11   that right?

12        A.    No.

13        Q.    So, to your knowledge, making sexual

14   comments about someone would not be sexual harassment

15   because it wouldn't be forcing someone to have sex?

16             Is that your testimony?

17        A.    Yes.

18        Q.    And hugging or kissing someone is not sexual

19   harassment because it is not forcing them to have

20   sex; is that right?

21        A.    Right.

22        Q.    And by sex you mean sexual intercourse?
```

35

```
 1        Q.    And did you take any notes?

 2        A.    No.

 3        Q.    To help you refresh your memory?

 4        A.    No.

 5        Q.    Did you speak to any people to help you

 6   refresh your memory?

 7        A.    To my family.

 8        Q.    To your husband?

 9        A.    Yes.

10        Q.    I take it that you don't want to be here

11   today?

12        A.    No.  I do want to be here.

13        Q.    And I take it that one of the reasons you

14   want to be here is you want to try to do what you can

15   to help Mr. Chreky?

16        A.    Correct.

17        Q.    And I take it that your job is very

18   important to you?

19        A.    Very important to me.

20        Q.    And you would not want to lose that job; is

21   that right?

22        A.    No.
```

36

1      Q.    And I take it that you will do whatever you

2   think needs to be done to keep that job; is that

3   right?

4      A.    Yes.

5      Q.    Did Mr. Chreky call you over the weekend and

6   ask you to come in today early to meet with his

7   lawyers?

8      A.    Yes.  He called me.

9      Q.    And is that typical for Mr. Chreky to call

10   you at home?

11      A.    No.

12      Q.    So, it was unusual to receive a call from

13   Mr. Chreky asking for your help in this regard; is

14   that right?

15      A.    He calls me like if he needs me for like

16   clients if there is nobody working.  Yes.

17      Q.    But I take it that his call to you asking

18   for your help to come and speak with the lawyers

19   today was a different kind of request from

20   Mr. Chreky?

21      A.    A different kind of request.  Yes.

22      Q.    And I take it that he was concerned that you

39

1    Q.   Did Mr. Sullivan ever come to the salon to

2  interview you at the salon?

3    A.   At the salon?  No.

4    Q.   Just prior to you meeting with Mr. Sullivan

5  at the salon what Chreky employee met with him?

6      Do you know?

7    A.   At the salon?

8    Q.   No.  At Starbucks.

9    A.   At Starbucks most of the employees met with

10  him.

11    Q.   And it is fair to say that Serena said that

12  the employees had to go meet with Mr. Sullivan,

13  right?

14    A.   Right.

15    Q.   And everybody knew that they were required

16  to do that; is that right?

17    A.   Right.

18    Q.   And everyone knew that they were required to

19  give a declaration on behalf of Mr. Chreky, right?

20    A.   Right.

21    Q.   Did anybody tell you that they didn't want

22  to give a declaration?

40

```
 1        A.    No.

 2        Q.    Okay.  But it is fair to say that everyone

 3    knew that giving a declaration was a job requirement,

 4    right?

 5        A.    Right.

 6              MR. BREDEHOFT:  Foundation.  Form.

 7              MS. KATZ:  Paula, did you get her answer?

 8    She said right.

 9              COURT REPORTER:  Yes.

10              THE WITNESS:  I didn't understand the

11    question.

12              BY MS. KATZ:

13        Q.    Well, just because Mr. Bredehoft says

14    objection as to form he is preserving certain

15    objections for the record.  That doesn't mean you

16    cannot answer the question.  And I asked you a

17    question which was you understood --

18        A.    Like he is pushing people to do that?

19        Q.    No.  Just listen to my question.

20              Serena Chreky said all employees had to go

21    meet with Mr. Sullivan, the salon's lawyer, right?

22              MR. BREDEHOFT:  Foundation.
```

85

1    A.    Never.

2    Q.    Is it fair to say that from about April 2001

3  to about January 2005 you went to the White House

4  about once a month to do Mrs. Bush's color?

5    A.    Yes.  Once a month.  Sometimes once every

6  three weeks.

7    Q.    The records we have reflect that you were at

8  the White House a total of 53 times during that

9  period.

10          Does that sound about right?

11    A.    I don't remember.

12    Q.    But about every three weeks?

13    A.    Yes.

14    Q.    And it is true, is it not, that when you

15  went to the White House you were not licensed?

16    A.    Correct.

17    Q.    And Mr. Chreky knew that?

18    A.    Correct.

19          But it is a private place.  It is not

20  working over at the salon.

21    Q.    I understand that.

22          I am asking you a question about whether

JARDIM REPORTING ASSOCIATES
(703) 867-0396

# EXHIBIT 10

 **COPY**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                             :
RONNIE BARRETT,              :
                             :
        Plaintiff,           :
                             :
    vs.                      :      C.A. No.
                             :      07-CV-0250(RCL)
ANDRE CHREKY,                :
ANDRE CHREKY SALON/ANDRE     :
CHREKY INC., SPAC, LLC,      :
                             :
        Defendants.          :
- - - - - - - - - - - - - - x
                             :
JENNIFER THONG,              :
                             :
        Plaintiff,           :
                             :      Civil No.
    vs.                      :      1:06-1807(RCL)
                             :
ANDRE CHREKY SALON, et al.,  :
                             :
        Defendants.          :
- - - - - - - - - - - - - - x

                    Washington, D.C.
                    Tuesday, October 2, 2007

        The deposition of FAVIOLA VEIZAGA, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

**JARDIM REPORTING ASSOCIATES**
**(703) 867-0396**

RONNIE BARRETT,
v.
ANDRE CHREKY, et al
C.A. No. 07-CV-0250 (RCL)

Exhibit 9

13

1    Q.    So, you were a shampoo assistant?

2    A.    Yes.

3    Q.    So, during this period of time before your

4    license came over and you were working at the salon

5    you would assist other people give shampoos?

6    A.    Shampoos.  Yes.

7    Q.    So, there would be two people giving a

8    shampoo at the same time?

9    A.    What do you mean?

10    Q.    Let me try and back it up.

11          You said you were shampoo assistant.  Does

12    that mean that you were assisting someone else to

13    give shampoos?

14    A.    No.  We just call it a shampoo assistant.

15    We are assisting the colorists or the stylists.

16    Q.    What kind of assistance were you giving?

17    A.    For color sometimes mixing color if I could

18    or the stylist shampooing their clients, doing

19    treatments.

20    Q.    Just so that I am clear, during the period

21    of time before you had your license transferred over

22    you were mixing colors for clients at the salon; is

14

1   that correct?

2       A.    Yes.

3       Q.    And during the period of time before you got

4   your license at the salon you were providing

5   treatments?

6       A.    Yes.

7       Q.    The clients who you mixed colors for, were

8   they told that you didn't have a license in D.C. yet?

9       A.    No.

10      Q.    Were the clients you mixed colors for

11  charged the same price as every other client?

12      A.    I don't remember.  I didn't do the pricing.

13      Q.    Same question for treatments.

14            What does it mean to give a treatment?

15      A.    Just a deep conditioner.

16      Q.    On the hair?

17      A.    On the hair.  Yes.

18      Q.    The clients you did treatments for, were

19  they told that you didn't have a license?

20      A.    No.

21      Q.    I have already introduced everybody on this

22  side of the table.

18

```
1       Q.    Who was at that meeting?

2       A.    Who was at that meeting?

3             My co-workers.  Rodney, who was here earlier

4   this morning, Xiomara, Anisa and myself.

5       Q.    And during that meeting you discussed in

6   general terms, not you personally, but the group

7   discussed in general terms, what the deposition might

8   be like, correct?

9       A.    Yes.

10      Q.    And you were told that you should tell the

11  truth?

12      A.    Yes.

13      Q.    And you were told listen carefully so you

14  are not confused by the questions?

15      A.    Yes.

16      Q.    And in addition to that, there was a

17  discussion about what sexual harassment means; is

18  that right?

19      A.    Yes.

20      Q.    Who explained what sexual harassment means?

21      A.    Nobody.

22      Q.    You said there was a discussion about sexual
```

19

1    harassment.  What was the discussion?

2        A.    They just said, you know, because a lot of

3    us English is our second language, they said just

4    think about what that means to you.  That is the only

5    thing.

6        Q.    Who said that you should think about what

7    sexual harassment means to you?

8        A.    I said it to my co-worker in Spanish,

9    Xiomara.

10       Q.    Did someone say it to you first?

11       A.    Did someone say it to me first?

12       Q.    Yes.

13       A.    No.

14             Well, she asked me.

15       Q.    Xiomara did?

16       A.    Yes.  And I just explained to her.  I kind

17   of translated.

18       Q.    Were there any other words that you

19   suggested that she should think about what they mean?

20       A.    No.

21             I just told her to take her time answering

22   questions, kind of translating, and just tell the

22

```
1   Hilton --

2       A.   Well, just we were going to meet.  We didn't

3   know where yet.

4       Q.   So, she said you should go to the Hilton.

5       A.   That was Monday.  Yes.  Yesterday.

6       Q.   And you understood though that -- I'm sorry.

7   I have already forgotten the name.  Who called you?

8       A.   Elena.

9       Q.   Elena.

10           You understood Elena didn't set up this

11  meeting?

12      A.   No.

13      Q.   She was simply advising you of when the

14  meeting was, right?

15      A.   Yes.

16      Q.   When she told you that you should go to this

17  meeting, you understood that she was speaking for

18  Mr. Chreky?

19      A.   Yes.

20      Q.   And so it was really Mr. Chreky telling you

21  to go to this meeting?

22      A.   Yes.
```

23

1    Q.   And that is fine because you work for

2  Mr. Chreky?

3    A.   Yes.  That is fine.

4    Q.   And it was part of your job to go to this

5  meeting yesterday?

6    A.   Yes.

7    Q.   And it is part of your job to be here today;

8  is that correct?

9    A.   Yes.

10    Q.   You were served with a subpoena to appear

11  here today, correct?

12    A.   Yes.

13       MR. WILKENFELD:  Could I get this marked as

14  Exhibit 1?

15               (Veizaga Exhibit No. 1 was marked

16                  for identification.)

17       BY MR. WILKENFELD:

18    Q.   I am showing you now what has been marked as

19  Exhibit 1.  This is a copy.

20       Is this the document that you received?

21    A.   Yes.

22    Q.   If you turn to the third physical page, this

40

```
1        Q.   And do you remember when that was?

2        A.   I don't remember.  I think it was a cold

3   day.  Early spring maybe.

4        Q.   And you weren't the only one that met with

5   him that day, correct?

6        A.   No.  I don't think so.

7        Q.   There were other employees that met with him

8   before you?

9        A.   Yes.

10       Q.   And there were employees that met with him

11  after you?

12       A.   Yes.

13       Q.   How did you know that you were going to meet

14  with David Sullivan that day?

15       A.   One of the receptionists just came upstairs

16  and let me know that I was going to meet with Andre's

17  lawyer.

18       Q.   Do you remember which one?

19       A.   No.

20       Q.   When the receptionist told you that you were

21  going to go and meet with Mr. Chreky's lawyer, you

22  understood that that instruction was coming from the
```

41

1    company, not from the receptionist, correct?

2        A.    Yes.

3        Q.    And you understood that it was part of your

4    job to go speak with Mr. Sullivan?

5        A.    Yes.

6        Q.    And that if you didn't go speak with

7    Mr. Sullivan, you wouldn't be doing your job?

8        A.    No.

9              What do you mean I wouldn't be doing my job?

10       Q.    Well, it was as an employee you had to go

11   speak to Mr. Sullivan?

12       A.    Yes.

13       Q.    And when you went to speak with Mr. Sullivan

14   you went so with the intention of being of assistance

15   to Mr. Chreky in defending this lawsuit?

16       A.    I didn't know why I was going.  When I got

17   there, yes.

18       Q.    Did you know that there were lawsuits before

19   you sat down?

20       A.    Yes.

21       Q.    When did you first hear that there were

22   lawsuits?

72

```
 1        Q.    How do you know that she met with
 2    Mr. Sullivan?
 3        A.    We all met.  Everyone in the salon did.
 4        Q.    Every single employee in the salon met with
 5    Mr. Sullivan?
 6        A.    That is what I understood.  Yes.
 7        Q.    And that makes sense because it was their
 8    job to meet with Mr. Sullivan, correct?
 9        A.    I guess.  Yes.
10        Q.    There is nothing wrong with it.  I mean,
11    everybody was doing their job, right?
12        A.    Yes.
13        Q.    And when you signed the declaration you were
14    doing your job?
15            MR. BREDEHOFT:  Asked and answered.
16            MR. WILKENFELD:  I will strike the question.
17            BY MR. WILKENFELD:
18        Q.    When you spoke to Mr. Chreky about the
19    incident with Joshua --
20        A.    I didn't mention names.  I didn't say
21    Joshua.
22        Q.    I'm sorry.
```

# **<u>EXHIBIT 11</u>**

📄 COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                            :
RONNIE BARRETT,             :
                            :
          Plaintiff,        :
                            :
     vs.                    :        C.A. No.
                            :     07-CV-0250(RCL)
ANDRE CHREKY,               :
ANDRE CHREKY SALON/ANDRE    :
CHREKY INC., SPAC, LLC,     :
                            :
          Defendants.       :
                            :
- - - - - - - - - - - - - - x
                            :
JENNIFER THONG,             :
                            :
          Plaintiff,        :
                            :        Civil No.
     vs.                    :     1:06-1807(RCL)
                            :
ANDRE CHREKY SALON, et al., :
                            :
          Defendants.       :
                            :
- - - - - - - - - - - - - - x

                    Washington, D.C.
                    Monday, October 1, 2007

          The deposition of KHADIJA DARIF, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 10

96

```
1              (The reporter read the following requested

2     portion of the record.)

3              "QUESTION:  When you were being asked to

4     sign the declaration did you fear in any way that if

5     you didn't sign it that your employment at the salon

6     might be in jeopardy?"

7              THE WITNESS:  What does in jeopardy mean?

8              BY MR. ROSE:

9       Q.    I'm sorry.  That you might be terminated.

10      A.    Yes.

11      Q.    You did understand that?

12      A.    Yes.

13      Q.    If you didn't sign that, you might be

14    terminated?

15      A.    Yes.

16      Q.    Directing your attention back to the

17    declaration.  This is the last two pages of

18    Exhibit 1.  Let's go through some of the text of this

19    declaration.

20              You said I have never heard Andre Chreky

21    make comments of a sexual nature.

22              Did you ever hear Mr. Chreky make statements
```

# EXHIBIT 12

 **COPY**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                           :
RONNIE BARRETT,            :
                           :
          Plaintiff,       :
                           :
     vs.                   :     C.A. No.
                           :     07-CV-0250(RCL)
ANDRE CHREKY,              :
ANDRE CHREKY SALON/ANDRE   :
CHREKY INC., SPAC, LLC,    :
                           :
          Defendants.      :
- - - - - - - - - - - - - - x
                           :
JENNIFER THONG,            :
                           :
          Plaintiff,       :
                           :     Civil No.
     vs.                   :     1:06-1807(RCL)
                           :
ANDRE CHREKY SALON, et al.,:
                           :
          Defendants.      :
- - - - - - - - - - - - - - x

                    Washington, D.C.
                    Monday, October 1, 2007

     The deposition of ELENA VANTSOVSKAYA, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v
ANDRE CHREKY, et al
C.A. No. 07-CV-0250 (RCL)

Exhibit 11

15

```
 1      Q.   I understand that, but listen to the

 2   question that I ask you and this will go much

 3   quicker.

 4           Did someone request that you meet with the

 5   lawyers?  Yes or no?

 6      A.   Yes.

 7      Q.   Who made that request?

 8      A.   Andre.

 9      Q.   Did he make that request to you directly?

10      A.   Yes.

11      Q.   In what form did he make that request to

12   you?  Was that in person or in some other way?

13      A.   It was in person.

14      Q.   What did he say to you?

15      A.   He said that tomorrow we will have to meet

16   with the lawyers.  And it was when I already got the

17   subpoena.  So, I realized that I would probably have

18   to do that.

19      Q.   And when he told you that you will have to

20   meet with the lawyers, did he tell you where you

21   would meet with the lawyers?

22      A.   Yes.
```

18

1      A.    It was just for my confidence in telling the

2  truth and being able not to be stressed in the

3  position since it was the first time when I had to do

4  that.   It was more comforting than anything else.

5      Q.    Mr. Chreky told you, did he not, that the

6  lawyers for Ms. Barrett and Ms. Thong would try to

7  trip you up in their questions, did he not?

8      A.    No.

9      Q.    Did he tell you that this could be very

10  confusing?

11      A.    He did mention that.

12      Q.    And he told you that the lawyers would

13  deliberately create some confusion for you, right?

14      A.    Yes.

15      Q.    And he told you that we would be here trying

16  to trick you, so it would be important to talk to his

17  lawyers first to find out how not to be tricked; is

18  that right?

19      A.    No.

20      Q.    Words to that effect?

21      A.    I'm sorry?

22      Q.    He said words to that effect?

48

1          When your employer asks you to give a

2   declaration, I take it that you feel that you have an

3   obligation to comply with that employer's request?

4      A.   Yes.

5      Q.   And Mr. Chreky, as we established, is

6   sitting here at this deposition today; is that right?

7      A.   That is correct.

8      Q.   And you earlier mentioned that your

9   conversation with him was to give some degree of

10  comfort for you; is that correct?

11     A.   That is correct.

12     Q.   So, I take it that you look to Mr. Chreky to

13  be a source of comfort for you.

14          Is that a fair statement?

15     A.   Yes.

16     Q.   And I take it that you have a high degree of

17  loyalty to Mr. Chreky?

18     A.   That is correct.

19     Q.   And I take it that you feel that he has been

20  very good to you; is that right?

21     A.   That is correct.

22     Q.   And I take it that your job has been very

# EXHIBIT 13



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                                    :
RONNIE BARRETT,                     :
                                    :
              Plaintiff,            :
                                    :
        vs.                         :    C.A. No.
                                    :    07-CV-0250(RCL)
ANDRE CHREKY,                       :
ANDRE CHREKY SALON/ANDRE            :
CHREKY INC., SPAC, LLC,             :
                                    :
              Defendants.           :
                                    :
- - - - - - - - - - - - - - x
                                    :
JENNIFER THONG,                     :
                                    :
              Plaintiff,            :
                                    :    Civil No.
        vs.                         :    1:06-1807(RCL)
                                    :
ANDRE CHREKY SALON, et al.,         :
                                    :
              Defendants.           :
                                    :
- - - - - - - - - - - - - - x

                    Washington, D.C.
                    Monday, October 1, 2007

        The deposition of EDIL KARKAS, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v.
ANDRE CHREKY, et al
C.A. No. 07-CV-0250 (RCL)
Exhibit 12

16

1    the District of Columbia?

2        A.    In Washington.  Yes.

3        Q.    When in 2004?

4        A.    The month of I believe April.

5        Q.    So, you worked at the salon for about a year

6    before you were licensed in the District of Columbia?

7              Is that your testimony?

8        A.    Yes.

9        Q.    Did Mr. Chreky at the time you were hired

10   ask you if you were licensed in the District of

11   Columbia?

12       A.    Yes.  He did.

13       Q.    What did you say?

14       A.    I was working on it.

15       Q.    You said you were working on it?

16       A.    Yes.

17       Q.    And what did he say?

18       A.    Just do it as fast as possible, we need the

19   license to be working in the District of Columbia, in

20   D.C. you have to have a license.

21       Q.    But he employed you for a year when you

22   didn't have a license; is that correct?

1     A.   But I was just waiting for the moment, for

2  the time.

3     Q.   I'm sorry.  Did you not understand my

4  question?

5         MR. ROSE:  Please read back my question.

6         Listen to it please very carefully.

7         (The reporter read the requested portion of

8  the record.)

9         THE WITNESS:  Yes.

10        BY MR. ROSE:

11    Q.   What did you do during that year?  Did you

12  inform the clients who came in that you didn't have a

13  license to cut hair?

14    A.   Like I said, I was working on it.  I was

15  working on getting the license.

16    Q.   Again, you need to listen to the question

17  that has been asked.  It will make things go much

18  more quickly.

19        MR. ROSE:  Please re-read it.

20        (The reporter read the requested portion of

21  the record.)

22        MR. BREDEHOFT:  Objection to form.

1    Q.   And that has always been the case, he has

2   never represented you; is that correct?

3    A.   Yes, sir.

4    Q.   When I say Mr. Bredehoft, I am also

5   including his associate Mr. Sullivan.

6         Do you understand that?

7    A.   Yes.

8    Q.   And that is true?

9         They have never represented you, correct?

10    A.   Correct, sir.

11    Q.   So, when Mr. Chreky asked you to show up at

12   the Capitol Hilton this morning to meet with his

13   attorneys before coming over for this deposition, did

14   you feel you could say no?

15    A.   As far as what no?  Why would I say no?

16         MR. ROSE:  Please re-read my question.

17         BY MR. ROSE:

18    Q.   If there is something about my question that

19   you don't understand, just let me know.  Otherwise

20   please just respond.

21         (The reporter read the requested portion of

22   the record.)

38

1              THE WITNESS:  No.

2              BY MR. ROSE:

3      Q.    And the reason is because he is your boss,

4   correct?

5      A.    My boss.  I am just saying what I have seen.

6   I mean you can call him my boss.

7      Q.    Are you being paid to be here today?

8      A.    No, sir.

9      Q.    You are here because you are being compelled

10  by a subpoena to appear, correct?

11     A.    I didn't understand the last word.

12     Q.    Have you been subpoenaed?  Did you receive a

13  subpoena?

14     A.    What does a subpoena mean?

15     Q.    Hang on one second.  We will clear it up.

16             MR. ROSE:  Can we mark this one please?

17                      (Karkas Exhibit No. 1 was marked

18                       for identification.)

19             BY MR. ROSE:

20     Q.    I am showing you a document that has been

21  marked Exhibit 1, Mr. Karkas.

22             Did you receive this?

70

1      Q.    Instead of a script.

2          MR. BREDEHOFT:  Argumentative.  The question

3  has been answered.

4          And, counsel, if you are accusing me of

5  scripting the witness, please do it and get your

6  testimony on the record.  Otherwise don't use the

7  word.

8          MR. ROSE:  I wasn't suggesting you.  I was

9  suggesting a script.  I don't think there has been

10 anything elicited that would suggest that you gave

11 him a script.

12         MR. BREDEHOFT:  Or that anyone has given him

13 a script.  So, please don't use the word.

14         MS. ROSE:  It could be self-imposed.

15         (The reporter read the following requested

16 portion of the record.)

17         "QUESTION:  Did Mr. Chreky ever go up to his

18 office with an employee at any point during the

19 workday that you are aware of?"

20         THE WITNESS:  No.

21         BY MR. ROSE:

22     Q.    In your entire four years you have never

71

1   seen Mr. Chreky leave his chair and go to his office

2   with another employee?

3       A.    End of the work.  End of the day.

4       Q.    Who would he go upstairs to his office with?

5       A.    It could be me, Mindy, Josephine, one of the

6   manicurists.

7       Q.    Could be or was?

8       A.    No.  I saw her.  I saw the manicurist and

9   pedicurist.

10      Q.    Anybody else?

11      A.    Mindy.  Me.  Sometimes the shampoo girls.

12      Q.    What does sexual harassment mean to you?

13      A.    Sexual harassment means when you sexually

14  harass a woman, when you beat a woman or when you

15  force the woman to do something she doesn't want to

16  do.

17            That is what sexual harassment means to me.

18      Q.    To beat a woman or force a woman to do

19  something that they don't want to do?

20      A.    Yes.

21      Q.    Like what?  You mean what in particular?

22      A.    Sex.

74

```
 1        Q.    That is a true statement?

 2        A.    Yes.

 3        Q.    So, you have never seen him force himself

 4    sexually on someone to have sexual intercourse.

 5              Is that your understanding?

 6        A.    Yes.

 7        Q.    It says:  I have never heard Andre Chreky

 8    make comments of a sexual nature.

 9              Do you see that?

10        A.    The second page?

11        Q.    I'm sorry.  I am in the second sentence of

12    paragraph two.

13              Do you see that?

14        A.    Yes.

15        Q.    What did you mean by that?

16        A.    I just mean by that I have never seen him

17    doing it, doing that.

18        Q.    When you say doing it, what do you mean?

19        A.    Like what I was reading here, what I was

20    reading.

21        Q.    I am asking you about a sentence of your

22    declaration which you signed under oath.  It says:  I
```

# EXHIBIT 14

## DECLARATION OF LINDA MAHBOUB

My name is Linda Mahboub. I hereby declare as follows:

1.     I am employed by the Andre Chreky Salon as a colorist, and have held this position for approximately eight (8) years.

2.     In my eight (8) years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.     I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.     The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment. Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere. The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional. Clients of the salon can see almost everything that takes place inside the salon.

5.     If I witnessed sexual harassment in the workplace, I would not stand for it. If I witnessed sexual harassment at the Andre Chreky Salon, I would work elsewhere. I have not witnessed any such harassment and I have not heard any other employees complain of any such harassment.

RONNIE BARRETT,
v.
ANDRE CHREKY, et al
C.A. No. 07-CV-0250 (RCL)

Exhibit 16

6.    I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

7.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED

02/16/07
Date

LINDA MAHROUB


::ODMA\PCDOCS\DOCSNFK\1186841\1

2

Chreky 000002

## DECLARATION OF EDIL KARKAS

My name is Edil Karkas. I hereby declare as follows:

1.      I am employed by the Andre Chreky Salon as a stylist, and have held this position for four years.

2.      In my years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.      I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. In fact, my work station was right next to Jennifer Thong's. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.      I often gave Jennifer Thong rides home from work. During these rides, she would talk almost exclusively about things at work and Andre Chreky, but she never once mentioned any sexual harassment or anything even close to sexual harassment. The only complaints she ever mentioned about Andre Chreky were related to her concern that he didn't pay enough attention to her.

5.      Based on what I saw at work and heard from Jennifer Thong directly, I think Jennifer was pursuing Andre Chreky and became disappointed when her pursuit was unsuccessful. Jennifer followed Andre Chreky around the Salon quite a bit, often following him when he tried to take short breaks, and Andre Chreky would frequently ignore Jennifer and focus

on his work or focus on assisting others. This would frustrate Jennifer, and I think she was upset over it.

6.      When Jennifer Thong told me she was quitting the Andre Chreky Salon, she told me her reason for doing so was so that she could open up her own salon; she never mentioned any harassment from Andre Chreky. She even asked me if she could give me her new business cards so that I could hand them out to her clients when they came to the Andre Chreky Salon.

7.      Ronnie Barrett complained frequently about her personal and professional life, almost constantly, and never once mentioned sexual harassment.

8.      The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment. Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere. Clients of the salon can see almost everything that takes place inside the salon.

9.      The employees of the Chreky Salon have access to all areas of the salon. It is almost impossible to be alone anywhere in the salon for any period of time.

10.     I have never noticed any problem with my tips. I am confident the Andre Chreky Salon does not take any tips left for stylists, as the tip counting is done by the stylists.

11.     I have never seen Andre Chreky move a request client off a stylist's schedule. Similarly, I have never seen Andre Chreky direct the assignment of non-request clients other than for the purpose of generating business for a new stylist, keeping the best performing stylists busy, or balancing the schedules of the available stylists. These policies are reasonable and legitimate, and I have never had reason to question them or suspect that the assignment of clients was based on any improper factors.

2

Chreky 000004

12.    I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

13.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED


3 | 9 | 07
_____
Date

EDIL KARKAS


::ODMA\PCDOCS\DOCSNFK\1193552\1

3

Chreky 000005

## DECLARATION OF KHADIJA DARIF

My name is Khadija Darif.  I hereby declare as follows:

1.      I am employed by the Andre Chreky Salon as a colorist, and have held this position for approximately seven (7) years.

2.      In my seven (7) years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone.  I have never heard Andre Chreky make comments of a sexual nature.   Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.      I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon.   Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.      The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment.   Clients who pay relatively high fees at the Andre Chreky Salon demand a high quality, professional atmosphere.  The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional.

5.      If I witnessed sexual harassment, I would leave and find work elsewhere.  I have not witnessed any such harassment and I have not heard any other employees complain of any such harassment.

6.     I have worked at other salons, and I have chosen to stay with the Andre Chreky Salon for over seven years.  I am happy and satisfied working at the Chreky Salon enough to commute 1.5 hours each way to work every day.

7.     I have heard about the allegations made by Jennifer Thong and Ronnie Barrett against Andre Chreky.  Not only are these allegations false, but if anything, Jennifer Thong was guilty of following Andre Chreky around.  She was always following him around the salon and was eager to be around him.  She certainly didn't appear to be suffering from any type of harassment or discrimination.

8.     I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

9.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED

_02/ 16 /07_
Date

_KHADIJA DARIF_

::ODMA\PCDOCS\DOCSNFK\1186791\1

2

## DECLARATION OF MILA PETRSOSYAN

My name is Mila Petrsosyan. I hereby declare as follows:

1.      I am employed by the Andre Chreky Salon as an esthetician, and have held this position for five years.

2.      In my years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.      I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.      Andre Chreky is extremely busy with clients all day long at the salon. From the time he starts his day until the salon closes, Andre Chreky is working with clients. Andre Chreky takes very few breaks at all, and any breaks he takes are very short. Not only do I not believe the allegations that have been made against Andre Chreky by Jennifer Thong and Ronnie Barrett, I don't think Andre Chreky has any time in his day for such actions.

5.      I have made this Declaration voluntarily. I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

6.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED

2-16 07
_____
Date

_Mila Petrosyan_
MILA PETRSOSYAN

::ODMA\PCDOCS\DOCSNFK\1187110\1

2

Chreky 000016

## DECLARATION OF ANISA GHAFOORZAI

My name is Anisa Ghafoorzai. I hereby declare as follows:

1.    I am employed by the Andre Chreky Salon as an esthetician, and have held this position for approximately seven (7) years.

2.    In my seven (7) years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.    I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.    The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment. Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere. The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional. Clients of the salon can see almost everything that takes place inside the salon.

5.    If I witnessed sexual harassment in the workplace, I would look for work somewhere else. I have not witnessed any such harassment and I have not heard any other employees complain of any such harassment.

6.     I have heard about the allegations made by Jennifer Thong and Ronnie Barrett against Andre Chreky.  Not only are these allegations false, but if anything, Jennifer Thong was guilty of following Andre Chreky around.  She was always following him around the salon and was eager to be around him.  She certainly didn't appear to be suffering from any type of harassment or discrimination.

7.     I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

8.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED


_9 . 16 . 07_
Date

_Anisa Ghafoorza._
ANISA GHAFOORZAI


::ODMA\PCDOCS\DOCSNFK\1186807\1

2

## DECLARATION OF RODNEY PINION

My name is Rodney Pinion. I hereby declare as follows:

1.    I am employed by the Andre Chreky Salon as a stylist, and have held this position since the Chreky Salon opened.

2.    In my years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.    I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.    The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment. Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere. The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional. Clients of the salon can see almost everything that takes place inside the salon.

5.    The employees of the Chreky Salon have access to all areas of the salon. It is almost impossible to be alone anywhere in the salon for any period of time.

6.    I have never noticed any problem with my tips. I am confident the Andre Chreky Salon does not take any tips left for stylists, as the tip counting is done by the stylists.

7.      I have never seen Andre Chreky move a request client off a stylist's schedule. Similarly, I have never seen Andre Chreky direct the assignment of non-request clients other than for the purpose of generating business for a new stylist, keeping the best performing stylists busy, or balancing the schedules of the available stylists.   These policies are reasonable and legitimate, and I have never had reason to question them or suspect that the assignment of clients was based on any improper factors.

8.      I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

9.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED


2/16/07
—————————
Date

RODNEY PINION


::ODMA\PCDOCS\DOCSNFK\1186897\1


2

Chreky 000020

## DECLARATION OF XIOMARA MARADIAGA

My name is Xiomara Maradiaga. I hereby declare as follows:

1.      I am employed by the Andre Chreky Salon as an assistant to Andre Chreky, and have held this position for approximately seven (7) years.   As an assistant to Andre Chreky, I work side by side with Andre Chreky all day long.

2.      In my seven (7) years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone.  I have never heard Andre Chreky make comments of a sexual nature.  Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.      I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon.  Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.      The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment.  Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere.  The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional.

5.      I have heard about the allegations made by Jennifer Thong and Ronnie Barrett against Andre Chreky.  Not only are these allegations false, but if anything, Jennifer Thong was guilty of following Andre Chreky around.  She was always following him around the salon and was eager to be around him.  She certainly didn't appear to be suffering from any type of

harassment or discrimination.   Ronnie Barrett acted similarly, and often followed Andre Chreky around the salon.

6.      I understand that the allegations of Jennifer Thong and Ronnie Barrett include allegations that Andre Chreky conditioned being assigned to White House duties on submitting to sexual advances.  This is absolutely false.  I often worked at the White House and with the President's family on behalf of the Andre Chreky Salon, and I have never been the victim of sexual harassment, sexual advances, or sexual requests of any kind in connection with such work.  I was offered such work – like everyone else – strictly based on merit.

7.      I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

8.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED

02/16/07
_____
Date

XIOMARA MARADIAGA


::ODMA\PCDOCS\DOCSNFK\1186819\1

2

Chreky 000022

## DECLARATION OF ELENA VANTSOVSKAYA

My name is Elena Vantsovskaya. I hereby declare as follows:

1.      I have worked at the Andre Chreky Salon for three years. My current position is receptionist manager. As the receptionist manager, I am responsible for managing the client scheduling function and closing the salon in the evening.

2.      In my years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.      I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Chreky Salon.

4.      I do not believe that the Andre Chreky Salon would have such a large base of loyal clients if the clients witnessed sexual harassment, because clients expect a high quality, professional atmosphere. The clients of the salon can see almost everything that occurs inside the salon. Furthermore, the vast majority of the clients of the Andre Chreky Salon are women.

5.      Not only do I not believe the allegations made by Jennifer Thong and Ronnie Barrett, I know that Andre Chreky does not have time during his busy schedule to commit the acts alleged. The only time Andre Chreky leaves the main floors of the salon, other than for very short breaks, is after the salon closes for business. As the last employee in the salon when I

Chreky 000025

close, I see what takes place after the salon closes for business, and I have never seen anything inappropriate or sexual in nature.

6.     Andre Chreky does not move request clients from the requested stylist.  As for non-request clients, the salon has a booking policy that I maintain.  The booking policy is a guide for assigning non-request clients.  While the specifics of the policy must change periodically, the policy is generally designed to assign non-request clients to newer stylists with less busy schedules or the best performing stylists with availability.

7.     I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

8.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED


_3/08/07_
Date

_____
ELENA VAYTSOVSKAYA


::ODMA\PCDOCS\DOCSNFK\1187113\1

2

Chreky 000026

## DECLARATION OF FAVIOLA VEIZAGA

My name is Faviola Veizaga. I hereby declare as follows:

1.      I am employed by the Andre Chreky Salon as a colorist and colorist manager, and have held these positions for a total of three (3) years.

2.      In my three (3) years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.      I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.      The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment. Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere. The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional. Clients of the salon can see almost everything that takes place inside the salon.

5.      I have heard about the allegations made by Jennifer Thong and Ronnie Barrett against Andre Chreky. Not only are these allegations false, but if anything, Jennifer Thong was guilty of following Andre Chreky around. She was always following him around the salon and

was eager to be around him.  She certainly didn't appear to be suffering from any type of harassment or discrimination.

6.    I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

7.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED


_____2/16/07_____
Date

FAVIOLA VEIZAGA


::ODMA\PCDOCS\DOCSNFK\1186892\1

2

Chreky 000028

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------x

JENNIFER THONG,                     :

             Plaintiff,    :

      v.                    :      Civil No.

ANDRE CHREKY SALON, et al.,    :      1:06-1807

         Defendants.    :

-------------------------------x


Deposition of MARIA C. GUZMAN

Washington, D.C.

Tuesday, December 18, 2007

3:06 p.m.


Job No. 1-118838

Pages 1 - 343

Reported by:  Jacquelyn C. Jarboe

1    Q    Why are you no longer employed at the salon?

2    A    Well, honest with you, because Andre, he

3 says he wants to give me lay off because I don't have

4 my -- how do you say --

5        MR. WILKENFELD:  License?

6        THE WITNESS:  Yes.

7 BY MR. ROSE:

8    Q    So Andre said he wanted to lay you off

9 because you didn't have your license?

10    A    Yes, sir, because -- I don't know, I said,

11 "Okay, fine."  And I was crying, I was, like, "Okay,

12 fine."  But I told him, I don't do colors, I'm just

13 like a helper, and I do shampoos most of the time.

14    Q    When you did a color, how much -- what was

15 the price to get your hair colored at the Andre Chreky

16 Salon?

17    A    Well, I not get the -- they know the price,

18 I no make the ticket.  But some clients for color I

19 know it's 80.

20    Q    It's $80?

21    A    Yes.

22    Q    Is that for partial or full?

(

1     Q     You're looking at me puzzled.

2     A     Ask me, I cannot -- ask slow.

3     Q     Do you understand that the salon used to

4  have a contract with the White House?

5     A     Yes.

6     Q     You remember that?

7     A     Yes.

8     Q     Did you ever go perform services --

9     A     Yes.

10    Q     -- for anyone at the White House?

11    A     I went once, two, three times.

12    Q     Two, three times you went to the White

13  House?

14    A     (Nods head.)

15    Q     What did you do at the White House?

16    A     Well, I applied the color for Mrs. Bush.

17    Q     So you did the color for Mrs. Bush?

18    A     I just mixed -- yes, I did, I applied.

19    Q     You just applied it?

20    A     Yes.

21    Q     Who mixed the color?

22    A     Andre.

Page 80

1     A     Yes.

2     Q     And what would happen when the licensing

3 board person would come to the salon?

4     A     Well, for me it was normal, because nothing

5 would happen.

6     Q     So you wouldn't be one of the people running

7 out of the back of the salon?

8     A     Thank God, no.

9     Q     But you remember -- we've had a lot of

10 testimony in this case that people would run out the

11 back of the salon.

12          MR. SULLIVAN:   Form.

13     A     Because I never knew that, I never the -- I

14 never knew they went, because they dressed normally,

15 like you or him or me.  So I never knew that they were

16 there.  So I don't know they run or not.  I never seen

17 nobody run.

18 BY MR. ROSE:

19     Q     You never once saw employees leave their

20 station after the licensing board person came?

21     A     No, because most of the time I'm in the

22 shampoo area, so --

Page 81

1    Q    So you would never leave?

2    A    No.

3    Q    So Mr. Chreky, when he fired you, said it

4 was because the state licensing board people were

5 checking into things?

6    A    Yes.

7    Q    Is that what he said?

8    A    (Nods head.)

9    Q    Do you know of anyone else who was fired as

10 a result of Mr. Chreky's concern for licensing or

11 documentation issues?

12    A    Yes.

13    Q    Who else was fired?

14    A    Well, talking true, Adil.

15    Q    Adil?

16    A    Yes.

17    Q    Was fired?

18    A    Yes, and Linda.

19    Q    And Linda.  They were fired?

20    A    Yes.

21    Q    When was the last time that they worked at

22 the salon?

Page 303

1      Q    Okay, but you will agree with me --

2      A    You know what I mean?

3      Q    You will agree with me that these numbers

4 are off, correct?

5      A    Yes.

6      Q    Okay.  And you will agree with me that

7 submitting numbers that are off on your tip reports is

8 normal practice in the Andre Chreky Salon?

9      A    What I mean number?

10          MR. SULLIVAN:  Asked and answered.

11 BY MR. WILKENFELD:

12     Q    You weren't the only one doing that, giving

13 numbers that were off, correct?

14     A    It's not only me?

15     Q    It wasn't only you, right?  Other employees

16 put down information that wasn't fully correct?

17     A    I don't know.  I don't never -- I don't

18 know, I no say nothing.  I don't know.  I can tell

19 about me, but not somebody else.

20     Q    And the reason you put down numbers on these

21 forms that were less than accurate is because Andre

22 Chreky advised you that you should come up with a

Page 304

1 number that made sense, correct?

2     A    No.  Believe me or not -- okay, let me say

3 this.  I don't care, like I say, you know, the thing

4 is when they do -- when they do meetings and

5 everything, they told us you have to report tips,

6 right?  They have to know how much you make a month,

7 and then they say IRS do taxes something, like, after

8 the -- or we have to decide.  I mean, to know how much

9 we have to report a tip.  Do you understand what I'm

10 saying, you get me?

11     Q    Right.  So they told you it was your

12 decision to decide how much to report?

13     A    Honest with me, honest, they no say it's my

14 decision, because they don't count my tip.

15     Q    Right.

16     A    So it was our decision.

17     Q    Right.

18     A    In this case, what they say, whatever we

19 make, we have to -- taxes, do you understand what I'm

20 saying?

21     Q    Yes.

22     A    And then we report whatever we think we do a

Page 305

1 month, like after taxes.

2    Q    Right, so you were supposed to report your

3 best estimate, right?

4    A    What you mean?

5    Q    You were told --

6    A    I told you, I told you, I make 400 a week,

7 right?  I say -- agree with you, I say yes, I no about

8 to say no, no.  I told you, yes.

9    Q    Right.

10    A    You know?  And we do this a month, and then

11 end of the month you make a balance, how much you

12 make, and then you take the taxes away.  Do you

13 understand that, are you with me?

14    Q    So they told you that you should reduce the

15 amount that you put on here --

16    A    Yeah.

17    Q    -- to compensate for taxes?

18    A    Yes, because what I think what they do, this

19 tax, taxes, IRS take from my check --

20    Q    Right.

21    A    -- every month.  But that's what I see my

22 paycheck.

1    Q    Right.

2    A    How much you report, and the IRS take from

3 your check.

4    Q    Right.  So what they told you -- and this is

5 making sense now.  What they told you is that put --

6 you know, the amount that you put down, you should

7 figure out how much you made each month in tips --

8    A    Yeah.

9    Q    -- but take into account the fact that taxes

10 are going to be removed from this amount.

11    A    Yeah.

12    Q    And then, once you've calculated the tax

13 hit, you're going to take, then come up with the

14 number?

15    A    Yeah.

16    Q    Okay.

17    A    You understand?

18    Q    So the number you're putting down here in

19 these forms is to try to account for the taxes that

20 are going to have to be withheld.

21    A    Yes.

22    Q    It's not actually the amount of money that

Page 307

1 you earned --

2      A     Yes.

3      Q     -- it's the amount of money you earned minus

4 the taxes that were going to have to be taken out.

5      A     (Nods head.)

6      Q     And you did that, because that's what

7 management told you to do?

8      A     Yes.

9      Q     Okay.   And management includes Andre and

10 Serena Chreky, correct?

11      A     Yes.

12      Q     All right.

13      A     Yeah, because by example, I'll say I make

14 400 a week, $300 a week.   So under the months, we need

15 to calculate.

16      Q     Calculate.

17      A     And see, and then this money I write in

18 there, 150, IRS take in my check.

19      Q     Right.

20      A     They don't give it to me, this is gone

21 already.

22      Q     Right.

Page 308

1    A    So what they say, they say do the best you

2 can and don't get in trouble, because this is not go

3 with Andre, this is come to me, because I'm the one

4 that declares, it's not Andre, because he never count

5 my tip, he never show -- take my tip.

6    Q    Okay.

7         Now, Mr. Chreky, Mrs. Chreky, and

8 management, they knew that this number, these numbers

9 that you put down for tips, they knew that in making

10 those numbers you were doing this calculation where

11 you took the actual tips and reduced it by the amount

12 of taxes and came up with a new number, they knew that

13 you were doing that, right?

14         MR. SULLIVAN:  Form.

15    A    Yeah.

16 BY MR. WILKENFELD:

17    Q    Okay, so they knew that these numbers on

18 your tip reports weren't the -- didn't match up with

19 the amount that you actually earned in tips.

20    A    That's what I say.

21    Q    Okay.

22    A    I told you already.  I don't know you

# **EXHIBIT 16**



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x

RONNIE BARRETT,                  :

        Plaintiff,               :

    vs.                          :      C.A. No.
                                 :      07-CV-0250(RCL)
ANDRE CHREKY,                    :
ANDRE CHREKY SALON/ANDRE         :
CHREKY INC., SPAC, LLC,          :

        Defendants.              :
                                 :
- - - - - - - - - - - - - - x

JENNIFER THONG,                  :

        Plaintiff,               :
                                 :      Civil No.
    vs.                          :      1:06-1807(RCL)
                                 :
ANDRE CHREKY SALON, et al.,      :

        Defendants.              :
                                 :
- - - - - - - - - - - - - - x

                Washington, D.C.
                Tuesday, October 16, 2007

        The deposition of MAURICE CLARKE, called for

examination by counsel for Defendants in the

above-entitled matter, pursuant to Notice, in the

offices of Sheppard, Mullin, Richter & Hampton, LLP,

1300 I Street, N.W., 11th Floor East, Washington,

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 14

138

```
 1        A.    Yes.  I do.

 2        Q.    Do you know whether she had a license?

 3        A.    No.  She didn't.

 4        Q.    And you were aware of that, correct?

 5        A.    Yes.

 6        Q.    And Mr. Chreky was aware of that, correct?

 7        A.    Yes.

 8        Q.    And what about Edil?

 9              Do you know who Edil is?

10        A.    Yes.

11        Q.    And did he have a license?

12        A.    He might have had a Virginia license at one

13   time.

14        Q.    Okay.

15              But he didn't have a D.C. license, correct?

16        A.    No.

17        Q.    And he was working at the salon in D.C.,

18   correct?

19        A.    Yes.

20        Q.    And Mr. Chreky was aware of this, correct?

21        A.    Yes.

22        Q.    Anyone else that you can remember
```

139

1   specifically that provided hair care, was a hair care

2   professional, and was unlicensed?

3       A.   Actually she worked at the White House.

4   Tanya.

5       Q.   Tanya.

6            Linda Habob or Habib, she also worked at the

7   White House, didn't she?

8       A.   Yes.

9       Q.   She was over there pretty frequently, wasn't

10  she?

11      A.   Yes.

12      Q.   She did the coloring for the First Lady,

13  didn't she?

14      A.   Yes.

15      Q.   Almost every 20 days.  Is that about right?

16      A.   In the beginning.

17      Q.   So, Mr. Chreky knowingly sent someone over

18  to do the First Lady's hair coloring when he knew she

19  didn't have a license; is that correct?

20      A.   True.

21      Q.   Anyone else that you knew for a fact did not

22  have a license?

140

1  A. Xiomara.

2  Q. What did Xiomara do?

3    MR. BREDEHOFT:  I was going to object on

4 form because we don't know which one.

5 BY MR. ROSE:

6  Q. Which Xiomara?

7  A. The assistant.

8  Q. Not the receptionist.  The receptionist

9 Xiomara that you talked to us about earlier, she

10 didn't touch people's hair, correct?

11  A. No.  Not at all.

12    MR. ROSE:  This is your client.

13    BY MR. ROSE:

14  Q. So, she didn't have a license?

15  A. No.

16  Q. Did she get sent to the White House?

17  A. Yes.

18  Q. And Mr. Chreky knew she didn't have a

19 license, correct?

20  A. Yes.

21  Q. That was yes?

22  A. Yes.

141

```
 1        Q.    Okay.

 2              Is there anyone else that you knew did not

 3   have a license while you worked at the Andre Chreky

 4   Salon that nevertheless provided hair care for

 5   customers?

 6        A.    At the moment I can't think of anyone else,

 7   but I do know we had several employees and a scenario

 8   arise to where the State Board came in and actually

 9   we had the employees to go outside, out the back

10   door.

11        Q.    I see.

12              So, you had the unlicensed employees scurry

13   out of the back door?

14        A.    Yes.

15        Q.    Is that the one through the lunchroom?

16        A.    Yes.

17        Q.    Out to the alley?

18        A.    Yes.

19        Q.    Was there only one occasion that you can

20   recall where that occurred or was there more than one

21   occasion?

22        A.    That occasion only occurred once while I was
```

142

1    there.  But subsequently I have heard that it

2    happened a couple of more times.

3        Q.    You heard that in those instances after you

4    were no longer working there that similarly the

5    unlicensed employees scurried out of the back?

6        A.    Yes.

7        Q.    Which agency of the District Government was

8    in charge of licensing?

9        A.    Professional License.

10       Q.    Did you ever discuss with Mr. Chreky any

11   concerns that you had that he had on his staff

12   unlicensed professionals that were providing hair

13   care to Andre Chreky Salon clients?

14       A.    Yes.

15       Q.    And what did Mr. Chreky say?

16       A.    He didn't say anything.

17       Q.    Did the salon disclose to customers that

18   they were having services provided by unlicensed

19   professionals?

20       A.    Absolutely not.

21       Q.    Did the salon discount the fees paid by

22   clients who were --

186

1   unlicensed workers were scurried out the back door.

2       A.   Yes.

3       Q.   And I think you already answered this

4   question, but I will ask you to try again.

5            Do you remember what year that was?

6       A.   No.  I don't.

7       Q.   And again, to the best of your knowledge,

8   what was the purpose of this visit from these D.C.

9   Government workers?

10           MR. BREDEHOFT:  Foundation.

11           I'm sorry, sir.  Please don't pay any

12   attention to me.

13           THE WITNESS:  It should have been a regular

14   situation to where it is the Licensing Board

15   responsibility to go around and check all salons on

16   whether or not they had professional people working

17   there, whether or not it was sanitary, whether or not

18   the environment was then operating in a way that it

19   is supposed to perform.

20   BY MR. WILKENFELD:

21      Q.   And is this what they would call a spot

22   inspection, an unannounced inspection?

187

1      A.    Yes.

2      Q.    And how did you become aware that the

3   government was in the building?

4      A.    Well, usually they had a clipboard and they

5   would announce themselves at the front door.

6      Q.    So, just directing your attention to this

7   one particular occasion where all the unlicensed

8   workers had to be rushed out the back door.

9      A.    Sure.

10      Q.    Do you recall how you learned on that day

11   that the employees from the District of Columbia were

12   in the building?

13      A.    This particular time it was actually a male.

14   And because of the way the structure of the salon is

15   set up he announced who he was.  And then he was

16   asked to step over to the side of the salon while the

17   appropriate person was found for him to be able to

18   communicate with.

19      Q.    And who was the appropriate person for him

20   to communicate with?

21      A.    Well, it could have been any one of the

22   management.  It could have been Serena.  It could

188

1    have been Andre.

2        Q.    And as soon as he was moved over to the side

3    how was the flight of the unlicensed workers

4    orchestrated?

5        A.    Because it was visually -- the way that the

6    salon is set up it is clear to be able to see because

7    it is an open area.  The front is open to both the

8    second and first floor.  So, it is open that you can

9    actually see.  And, of course, by nature of how the

10   mirrors and everything is set up in the salon you can

11   truly see throughout the salon.

12           So, again, it wasn't like a far stretch to

13   be able to understand that this is the possibility of

14   somebody coming in here to inspect the salon.

15       Q.    And how did the unlicensed workers know that

16   what they should do in that situation was get out of

17   the salon?

18       A.    I would deem it almost the same way as

19   somebody crossing the border.  They know.

20       Q.    And did you and Mr. Chreky assist these

21   people in getting out of the building unseen?

22       A.    I didn't assist.

189

1     Q.    Who did assist them, if anybody?

2     A.    Like I said, pretty much they knew exactly

3  what they needed to do and they moved out of the

4  salon.

5     Q.    And for those of you who were licensed and

6  remained working after the unlicensed workers were

7  out of the salon, is it fair to say that it was

8  obvious to all of you that there were some people

9  missing?

10     A.    Absolutely.

11     Q.    Because there was a full house of clients

12  and all of a sudden there were fewer people to work

13  on them, correct?

14     A.    Yes.

15     Q.    And Mr. Chreky was aware that when the

16  Licensing Board showed up a sizeable portion of his

17  staff went out the back door?

18     A.    Yes.

19     Q.    Was this like a routine fire drill when the

20  Licensing Board would show up?

21     A.    It wasn't routine because they didn't come

22  around often enough.

190

1     Q.    When they did come around the unlicensed

2 people knew and the drill is get downstairs, get to

3 the lunchroom, get out the door and wait in the

4 alley?

5           MR. BREDEHOFT:  Foundation.  Asked and

6 answered.

7           THE WITNESS:  Yes.

8 BY MR. WILKENFELD:

9     Q.    Okay.

10          Now, when you were describing in your

11 declaration, and during your testimony when Mr. Rose

12 was questioning you, that you heard Andre say on a

13 number of occasions to employees he was yelling at

14 you're never going to work in this town again, did

15 you feel that Mr. Chreky had the ability to affect

16 your ability to be employed outside of the salon?

17    A.    No.

18    Q.    Did other employees, to your knowledge, have

19 a concern that Mr. Chreky could affect their

20 employment opportunities outside of the salon?

21    A.    Yes.

22    Q.    And so when Mr. Chreky said you're never

# EXHIBIT 17

 COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x

RONNIE BARRETT,                    :

            Plaintiff,             :

      vs.                          :     C.A. No.
                                   :     07-CV-0250(RCL)
ANDRE CHREKY,                      :
ANDRE CHREKY SALON/ANDRE           :
CHREKY INC., SPAC, LLC,            :

            Defendants.            :

- - - - - - - - - - - - - - - x

JENNIFER THONG,                    :

            Plaintiff,             :

      vs.                          :     Civil No.
                                   :     1:06-1807(RCL)
ANDRE CHREKY SALON, et al.,        :

            Defendants.            :

- - - - - - - - - - - - - - - x

                         Washington, D.C.
                         Tuesday, October 2, 2007

      The deposition of RODNEY PINION, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396

99

```
1    you reviewed it?

2        A.    No.

3        Q.    You didn't raise any questions with

4    Mr. Chreky or any other manager or any other employee

5    of the salon with respect to the contents of the

6    manual?

7        A.    No.

8        Q.    Are you an American citizen?

9        A.    Yes.

10       Q.    Have you always been an American citizen?

11       A.    Yes.

12       Q.    Where were you born?

13       A.    Mississippi.

14       Q.    Were you ever given written performance

15   appraisals?

16             Do you understand what I mean by a written

17   performance appraisal?

18       A.    No.

19       Q.    I think a lot of people would agree a good

20   practice would be for companies to evaluate their

21   employees on a regular basis, at least annual basis,

22   in writing, based on some sort of objective standards
```

1   to be able to evaluate their performance as being

2   good or not so good and areas where they might be

3   able to improve.

4           My question is is there such a procedure at

5   the Andre Chreky Salon?

6       A.    There has been.

7       Q.    There has been?

8       A.    Yes.

9       Q.    And how many times have you been evaluated

10  in your ten years?

11      A.    I don't know.

12      Q.    Once?

13      A.    More than once.

14      Q.    Twice?

15      A.    More than twice.  After that I don't know.

16      Q.    When was the last time that you received a

17  written performance evaluation?

18      A.    I don't know.

19      Q.    Were you given a copy of your evaluation?

20      A.    I believe so.

21      Q.    How much do you make a year?

22            What did you make in 2006?

1          I understand it is possible your taxes might

2     not yet be due if you filed an extension.

3          A.     $84,000.

4          Q.     $84,000.   That was including the tips?

5          A.     No.

6          Q.     That was not including the tips?

7          A.     No.

8          Q.     So, how much do you think you made in excess

9     of $84,000 based on your tips?

10          A.     I would say $2,000 or $3,000 maybe.

11          Q.     Only $2,000 or $3,000?

12          A.     Yes.

13          Q.     Your estimate is that you made $300 to $800

14     per month and even at the low end of that scale, if

15     it were every month, which wouldn't be consistent

16     with your testimony, that would come out to -- my

17     math is bad, but roughly $3,600.

18          A.     Okay.

19          Q.     Does that sound about what you made or was

20     it more?

21          A.     Maybe $3,000 or $4,000.

22          Q.     So, you didn't make $300 to $800 per month,

1   you made $300 per month?

2      A.   I don't know.  I don't keep a log.

3      Q.   But that is something that is a fairly

4   important component of your compensation is your

5   tips, correct?

6           Your tips are not an important part of your

7   compensation?

8      A.   Not that important.

9      Q.   Really?

10     A.   No.

11     Q.   It just doesn't matter?

12     A.   It matters, but it is not that big a

13   concern.

14     Q.   Just so that I am clear, as we sit here

15   today, in 2006 you made roughly between $3,000 and

16   $4,000 in tips?

17          Is that your testimony?

18     A.   No.  I don't know.

19     Q.   You have no idea?

20     A.   No.

21     Q.   When did you file your taxes?

22     A.   They were filed for me in January.

# **<u>EXHIBIT 18</u>**

# ◢◣KATZ, MARSHALL & BANKS, LLP

**Debra S. Katz, Partner**
**Direct Dial: 202-299-1143**
**katz@kmblegal.com**

                                              **By Electronic and First Class Mail**
                                              December 12, 2006

John M. Bredehoft, Esquire
Kaufman & Canoles, P.C.
150 West Main Street
Suite 2100
Norfolk, VA 23510

          RE: <u>Ronnie Barrett v. Andre Chreky & Andre Chreky Hair Salon and Spa</u>

Dear John:

        I am writing to follow up on our meeting of December 7, 2006, and to call your
attention to what appears to be an attempt by an agent of the Andre Chreky Salon to
intimidate a material witness in the above-captioned matter following our meeting.

        In the interest of promoting a settlement dialogue, we agreed to allow you to
review signed statements we had obtained from witnesses with the understanding that no
effort would be made to contact the witnesses unless we were notified first. Obviously
we were under no obligation to share these statements with you, but did so assuming that
you and your client were acting in good faith and were trying to resolve this matter.

        In addition to showing you the declarations that various witnesses had already
signed, Ari and I shared our notes from interviews of other witnesses who had not yet
signed declarations, but who had indicated a willingness to do so. We shared in some
detail the statement Damon Taylor had given us which included information about affairs
Mr. Chreky had evidently had with three employees named Mindy, Amelle and
Christina. We also advised you that Mr. Taylor reported that Mr. Chreky was prone to
violent outburst and that it was the Salon's practice not to pay overtime.

        Mr. Taylor has since reported to us that at approximately 2:00 pm on Thursday,
he received a threatening phone call from a Salon employee who stated that Mr. Chreky
was irate that Mr. Taylor was not willing to provide a statement to his lawyers, and that if
he did not report to the salon immediately, Mr. Chreky would have him arrested. Mr.
Taylor was intimidated by this call and now fears that he will be retaliated against him
because he was known to have cooperated with Ms. Barrett's attorneys.

        Both Ari and I have voice mail messages alerting you to this serious matter and
requesting that you contact us at once to discuss this witness intimidation issue. As I am
sure you are aware, attempting to intimidate a potential witness to a charge of
discrimination pending before the District of Columbia Office of Human Rights is a
criminal act punishable by a fine and up to 10 day in prison. <u>See</u> D.C. Code § 2-1402.65
(Falsifying documents and testimony).

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 17

# KATZ, MARSHALL & BANKS, LLP

John M. Bredehoft, Esq.
December 12, 2006
Page 2

Please contact me or Ari immediately to explain what actions you intend to take to ensure that your client does not continue to intimidate witnesses likely to testify in this matter.

Sincerely,

Debra S. Katz

cc: Ms. Ronnie Barrett

# <u>EXHIBIT 19</u>

# ◢KATZ, MARSHALL & BANKS, LLP

Debra S. Katz, Partner
Direct Dial: 202-299-1143
katz@kmblegal.com

**By Electronic Mail and First Class Mail**
September 18, 2007

John M. Bredehoft, Esq.
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510

RE:     <u>Ronnie Barrett v. Andre Chreky & Andre Chreky Hair Salon and Spa</u>

Dear John:

This letter is written in response to your letter dated September 14, 2007, in which you accuse us of violating Rule 4.4(a) - presumably of the District of Columbia's Rules of Professional Conduct. Your accusations are factually inaccurate and ironic in the extreme given the methods defendants and their agents have used to gather information in this case.

After reading your description of the alleged telephone exchange with Ms. Wareham, we can only conclude that you have been grossly misinformed. Idris Patterson, one of our legal assistants, is the only person who has been attempting to contact witnesses in this case for the past several weeks. Your letter indicates that the person who called Ms. Wareham was female. Mr. Patterson has a very deep voice and it is inconceivable that he could have been mistaken for a female caller. More importantly, as your letter acknowledges, Mr. Patterson was careful to identify himself, his employer and the party on whose behalf he was seeking information.

We did not instruct Mr. Patterson to interview Mr. Wareham, or any spouse of any witness for that matter. Mr. Patterson had no intention whatsoever of interviewing Mr. Wareham and made not attempt to do so. His recollection is clear that he called the Wareham residence and asked for Ms. or Mr. Wareham – not knowing, based on the records he had available to him, which of the two worked at the salon. Ms. Wareham did call Mr. Patterson and did speak to him voluntarily. At no time during this call did Mr. Patterson ask to speak to Mr. Wareham – nor did he ask any questions about Mr. Wareham. In any event, we can attempt to interview anyone we wish as long as we properly identified ourselves to the witness - a necessary practice that your investigators apparently do not adhere to.

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 18

# ◢◢Katz, Marshall & Banks, LLP

John M. Bredehoft, Esq.
September 18, 2007
Page 2

Rule 4.4(a) of the District of Columbia Rules of Professional Conduct provides:

In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or knowingly use methods of obtaining evidence that violate the legal rights of such a person.

Neither Ms. Barrett's attorneys, nor any other individual acting on their behalf or at their direction have done anything that would remotely implicate the prohibitions contained in Rule 4.4(a).

We are perplexed that you have raised the specter of a violation of the Rules of Professional Conduct by our firm given our strict adherence to the rules - and particularly when confronted with the tactics used by private investigators working on defendants' behalf. Several former employees of the Salon have reported to us that a private investigator working for Defendants has been attempting to interview them even after they have adamantly declined to speak with her. One witness has reported that this private investigator, posing as a regular client, made five separate appointments for haircuts with him, attempted to obtain information about the case on all five occasions, and never revealed that she was working on behalf of the defense. Such "under-cover" tactics are clearly prohibited by Rule 4.1 - Truthfulness in Statements to Others.

We will be seeking discovery of the tactics used by the various private investigators retained by the defense and will raising this troubling matter with the Court.

This is by no means the first time that Mr. Chreky, or persons acting on his behalf, have attempted to intimidate or mislead material witnesses in this case. We have previously brought to your attention Mr. Chreky's efforts to obtain a declaration from a former employee by threatening to have him arrested if he did not cooperate. We are aware that current Salon employee's have been threatened with termination if they did not cooperate with the defense and sign declarations. Now we have learned that the defense has hired private investigators who use subterfuge and bullying tactics to obtain information from persons likely to testify at trial. In the past you have responded to these issues by indicating that you cannot control your client's conduct. Given the conduct of the private investigators, presumably hired by your firm, it is now clear that you have a duty, under the rules of Professional Conduct, to ensure that witnesses are not harassed, threatened, or deliberately misinformed as to the person seeking information from them.

# KATZ, MARSHALL & BANKS, LLP

John M. Bredehoft, Esq.
September 18, 2007
Page 3

     I ask that you respond to this letter immediately and explain the steps you plan to take to control your client and the person or persons working on behalf of the defense. Further, please advise us immediately as to whether or not your firm has sanctioned the tactics used by the private investigators working on behalf of the defense. If you have sanctioned such tactics we would appreciate an explanation as to how you believe such tactics conform to the rules of Professional Conduct.

     Sincerely,

     Debra S. Katz

cc:  Ms. Ronnie Barrett
    Jonathan Rose, Esq.

# EXHIBIT 20

## Emily Seymour

| | |
|---|---|
| **From:** | Sullivan, David J. [djsullivan@kaufcan.com] |
| **Sent:** | Tuesday, February 05, 2008 11:36 AM |
| **To:** | Emily Seymour |
| **Cc:** | Jonathan Rose |
| **Subject:** | RE: Amended Complaint |

We've read the proposed amended complaint and have a question - can you explain the purpose behind the amendment?  Since you're not alleging any new causes of action and the amendments (other than being factually unsupported) don't add any facts related to the original causes of action, the only purpose I see is to add facts to the record that would be embarrassing to the defendants.

---

**From:** Emily Seymour [mailto:ESeymour@sheppardmullin.com]
**Sent:** Monday, February 04, 2008 7:32 PM
**To:** Sullivan, David J.
**Cc:** Jonathan Rose; Bredehoft, John M.
**Subject:** RE: Amended Complaint

David,

I am writing to follow up on my correspondence below regarding Plaintiffs' Second Amended Complaint.  We did not hear back from you today regarding Defendants' position on Plaintiff's proposed Second Amended Complaint, nor did you propose a time to conduct a Local Rule 7 conference regarding Plaintiff's motion for leave to amend.  Please confirm whether Defendants consent to filing Plaintiff's proposed Second Amended Complaint.

Thank you,
Emily

---

**From:** Emily Seymour
**Sent:** Wednesday, January 30, 2008 10:37 AM
**To:** 'Sullivan, David J.'
**Cc:** Jonathan Rose; 'Bredehoft, John M.'
**Subject:** Amended Complaint

David,

As I mentioned in my email last week, Plaintiff intends to file a second amended complaint in this matter.  I am writing to request your consent to the filing as allowed by FRCP 15(a).  I have attached a proposed second amended complaint for your review, with the new language underlined.   Please let me know if you will consent by Monday, February 4th.  Alternatively, please let me know a convenient time when we can hold a conference of counsel pursuant to Local Rule 7(m), preferably between today and Monday.

Best regards,
Emily

---

 1300 I Street, N.W.
11th Floor East
Washington, DC 20005-3314
202.218.0000 *office*

202.218.0020 *fax*
***www.sheppardmullin.com***

**Emily Seymour**
202.772.5359 *direct* | 202.312.9447 *direct fax*
*ESeymour@sheppardmullin.com*

Circular 230 Notice: In accordance with Treasury Regulations we notify you that any tax advice given herein (or in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or in any attachments).

Attention: This message is sent by a law firm and may contain information that is privileged or confidential.  If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

**Sheppard, Mullin, Richter & Hampton LLP**

Please visit our website at www.sheppardmullin.com

The information contained in this electronic message is legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If you are not the intended recipient of this message, you are hereby notified that any use, distribution, copying or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Kaufman & Canoles at (757) 624-3000 or by return e-mail to helpdesk@kaufcan.com, and purge the communication immediately without making any copy or distribution.

Disclosure Required by Internal Revenue Service Circular 230:  This communication is not a tax opinion.  To the extent it contains tax advice, it is not intended or written by the practitioner to be used, and it cannot be used by the taxpayer, for the purpose of avoiding tax penalties that may be imposed on the taxpayer by the Internal Revenue Service.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JENNIFER THONG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 1:06-1807 (RCL) |
| | ) |
| ANDRE CHREKY, | ) |
| ANDRE CHREKY SALON/ANDRE CHREKY INC., | ) |
| SPAC, LLC | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

      This Court, having considered Plaintiff Jennifer Thong's Motion for Leave to File a Second Amended Complaint finds that good cause exists for granting the relief requested therein. Therefore, Plaintiff's Motion for Leave to File a Second Amended Complaint is hereby GRANTED.

DATE:

_____

                                    _____
                                      United States District Court Judge